RESTRUCTURING SUPPORT AGREEMENT

BY AND AMONG

SUMMIT BUSINESS MEDIA HOLDING COMPANY,

SUMMIT BUSINESS MEDIA INTERMEDIATE HOLDING COMPANY, LLC,

THE NATIONAL UNDERWRITER COMPANY,

RESEARCH HOLDINGS, LTD.,

FUTURES MAGAZINE, INC.,

NUCO BUSINESS INFORMATION, LLC,

AGENT MEDIA CORPORATION,

JUDY DIAMOND ASSOCIATES, INC.,

MINING INDABA, LLC,

THE SUPPORTING CREDITORS,

- AND -

THE ADDITIONAL SUPPORTING CREDITORS

January 24, 2011

US_ACTIVE-104625788.17

## Table of Contents

**Page**

1. Certain Definitions...............................................................................................4

2. Agreement to File Plan........................................................................................5

3. Additional Supporting Creditors.........................................................................5

4. Transfer Restrictions............................................................................................6

5. Restructuring Support..........................................................................................7

6. Effectiveness........................................................................................................8

7. Termination..........................................................................................................8

8. Representations and Warranties.........................................................................12

9. Consent to Debtor-in-Possession Financing.....................................................13

10. Governing Law; Jurisdiction.............................................................................14

11. Specific Performance.........................................................................................14

12. Reservation of Rights.........................................................................................14

13. Validity of Liens.................................................................................................15

14. Successors and Assigns......................................................................................15

15. Notice.................................................................................................................15

16. Counterparts.......................................................................................................16

17. No Third-Party Beneficiaries............................................................................16

18. No Solicitation...................................................................................................16

19. Representation by Counsel.................................................................................16

20. Contract Interpretation.......................................................................................17

21. Amendments.......................................................................................................17

22. Indemnification..................................................................................................17

23. Fees and Expenses.............................................................................................18

| 24. | Consideration. | 18 |
|---|---|---|
| 25. | Further Assurances. | 18 |
| 26. | Headings. | 18 |
| 27. | Several Obligations. | 18 |
| 28. | Remedies Cumulative. | 18 |
| 29. | Entire Agreement. | 18 |
| 30. | Severability. | 18 |
| 31. | Public Announcements. | 19 |
| 32. | Restrictions on Equity Trading. | 19 |

## <u>*RESTRUCTURING SUPPORT AGREEMENT*</u>

This RESTRUCTURING SUPPORT AGREEMENT (this "***Agreement***") is made and entered into as of January 24, 2011 by and among Summit Business Media Holding Company, a Delaware corporation ("***Summit***"), Summit Business Media Intermediate Holding Company, LLC, a Delaware limited liability company ("***Summit Intermediate***"), The National Underwriter Company, an Ohio corporation ("***National Underwriter***"), Research Holdings, LTD., a California corporation ("***Research Holdings***"), Futures Magazine, Inc., an Illinois corporation ("***Futures Magazine***"), NUCO Business Information, LLC, a Delaware limited liability company ("***NUCO***"), Agent Media Corporation, a Florida corporation ("***Agent Media***"), Judy Diamond Associates, Inc., a District of Columbia corporation ("***Judy Diamond***"), Mining INDABA, LLC, a Delaware limited liability company ("***INDABA***" and, together with Summit, Summit Intermediate, National Underwriter, Research Holdings, Futures Magazine, NUCO, Agent Media, and Judy Diamond, collectively, the "***Summit Group***"), each of the entities set forth on <u>Schedule 1</u> hereto (collectively, the "***Supporting First Lien Term Lenders***"), which entities hold outstanding term loan obligations of the Summit Group under the First Lien Credit Agreement (as defined below) and Parent Guaranty and Subsidiary Guaranty (both as defined in the First Lien Credit Agreement) as specified on <u>Schedule 1</u> hereto, each of the entities set forth on <u>Schedule 2</u> hereto (collectively, the "***Supporting First Lien Revolving Lenders***" and, together with the Supporting First Lien Term Lenders, the "***Supporting First Lien Lenders***"), which entities hold outstanding revolving loan obligations of the Summit Group under the First Lien Credit Agreement (as defined below) and Parent Guaranty and Subsidiary Guaranty (both as defined in the First Lien Credit Agreement) as specified on <u>Schedule 2</u> hereto, each of the entities set forth on <u>Schedule 3</u> hereto (collectively, the "***Supporting First Lien Secured Parties***" and, together with the Supporting First Lien Lenders, the "***Supporting First Lien Creditors***"), which entities hold outstanding swap obligations of the Summit Group under the Rate Protection Agreements (as defined in the First Lien Credit Agreement) as specified on <u>Schedule 3</u> hereto, each of the entities set forth on <u>Schedule 4</u> hereto (collectively, the "***Supporting Second Lien Creditors***" and, together with the Supporting First Lien Creditors, collectively, the "***Supporting Creditors***" and, individually, each a "***Supporting Creditor***"), which entities hold outstanding term loan obligations of the Summit Group under the Second Lien Credit Agreement (as defined below) and Parent Guaranty and Subsidiary Guaranty (both as defined in the Second Lien Credit Agreement) as specified on <u>Schedule 4</u> hereto.

WHEREAS, the Summit Group, Supporting Creditors, and their respective advisors have engaged in negotiations with the objective of reaching an agreement with regard to a financial restructuring of the Summit Group, including its outstanding obligations under (i) the Amended and Restated First Lien Credit Agreement, dated as of July 6, 2007 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***First Lien Credit Agreement***"), by and among Summit Intermediate, the financial institutions party thereto from time to time as lenders (the "***First Lien Lenders***"), and Bank of Montreal, Chicago Branch ("***BMO***"), as administrative agent for the First Lien Lenders (in such capacity, the "***First Lien Agent***"), (ii) the Parent Guaranty and Subsidiary Guaranty (both as defined in the First Lien Credit Agreement), (iii) the Rate Protection Agreements (as defined in the First Lien Credit Agreement), (iv) the Amended and Restated Second Lien Credit Agreement, dated as of July 6,

2007 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Second Lien Credit Agreement***" and, together with the First Lien Credit Agreement, the "***Credit Agreements***"), by and among Summit Intermediate, the financial institutions party thereto from time to time as lenders (the "***Second Lien Lenders***"), and Ares Capital Corporation ("***Ares***"), as administrative agent for the Second Lien Lenders (in such capacity, the "***Second Lien Agent***" and, together with the First Lien Agent, the "***Agents***"), and (v) the Parent Guaranty and Subsidiary Guaranty (both as defined in the Second Lien Credit Agreement).

WHEREAS, the Summit Group and Supporting Creditors now desire to implement a comprehensive financial restructuring of the Summit Group pursuant to a plan of reorganization for the members of the Summit Group, under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "***Bankruptcy Code***"), to be filed with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") in substantially the form set forth in <u>Exhibit A</u> attached hereto, (as the same may be amended or otherwise modified from time to time in accordance with this Agreement, the "***Plan***"), together with the exhibits thereto. The restructuring contemplated by the Plan and by the other Restructuring Documents (as defined hereinafter) is hereinafter referred to as the "***Restructuring***".

NOW THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Summit Group and Supporting Creditors hereby agrees as follows:

1.      <u>Certain Definitions</u>.

(a)      Capitalized terms that are used but are not otherwise defined herein shall have the meanings given to them in the Plan.

(b)      Each member of the Summit Group, each Supporting Creditor, and each Person who subsequently becomes an Additional Supporting Creditor (as defined hereinafter) in accordance with the terms hereof shall be referred to herein individually as a "***Party***" and collectively as the "***Parties***".

(c)      Each Supporting Creditor and each Person who subsequently becomes an Additional Supporting Creditor (as defined hereinafter) in accordance with the terms hereof shall be referred to herein individually as a "***Supporting Party***" and collectively as the "***Supporting Parties***"

(d)      "***Voting Amount***" means, with respect to any Class of Claims under the Plan, an aggregate amount thereof representing at least two-thirds in amount and more than one-half in number of all Claims that are classified in such Class under the Plan.

(e)      "***Requisite Supporting Parties***" means, as of any date of determination and as the context requires, (i) any Supporting Party or group of Supporting Parties that, individually or in the aggregate, beneficially holds or acts as the investment advisor or manager with respect to at least a Voting Amount of the Pre-Petition First Lien Secured Claims held by Supporting Parties as of the date of determination, plus (ii) any Supporting Party

or group of Supporting Parties that, individually or in the aggregate, beneficially holds or acts as the investment advisor or manager with respect to at least a Voting Amount of the Pre-Petition Second Lien Claims held by Supporting Parties as of the date of determination.

(f)     "*Requisite Supporting First Lien Parties*" means, as of any date of determination and as the context requires, any Supporting Party or group of Supporting Parties that, individually or in the aggregate, beneficially holds or acts as the investment advisor or manager with respect to at least a Voting Amount of the Pre-Petition First Lien Secured Claims held by Supporting Parties as of the date of determination.

(g)     "*Requisite Supporting Second Lien Parties*" means, as of any date of determination, (i) with respect to any determination under Section 7(b) hereof, any Supporting Party or Supporting Parties that, individually or in the aggregate, beneficially hold or act as the investment advisor or manager with respect to more than one-half in amount of all of the Pre-Petition Second Lien Claims and, (ii) as the context otherwise requires, any Supporting Party or group of Supporting Parties that, individually or in the aggregate, beneficially holds or acts as the investment advisor or manager with respect to at least a Voting Amount of the Pre-Petition Second Lien Claims held by Supporting Parties as of the date of determination.

(h)     "*Restructuring Documents*" means collectively the Plan and all other agreements and other instruments which are attached as Exhibits hereto, including, without limitation, the Equity Documents and Exit Credit Agreement.

(i)     "*Equity Documents*" means collectively (i) the Limited Liability Company Operating Agreement for New Holdco LLC attached hereto as Exhibit B-1, (ii) that certain Management Rights Agreement among Eos Capital Partners III, L.P., Eos Capital Partners IV, L.P., Summit Intermediate, and New Holdco LLC attached hereto as Exhibit B-2, and (iii) the Management Incentive Plan attached hereto as Exhibit B-3.

(j)     "*Exit Credit Agreement*" means the Credit Agreement, dated as of the Effective Date, entered into by and among National Underwriter, as the borrower, New Holdco LLC, Summit, and Summit Intermediate, as guarantors, General Electric Capital Corporation, as administrative agent, and various financial institutions and other persons from time to time parties thereto, as lenders, attached hereto as Exhibit C.

2.     Agreement to File Plan.  Subject to the terms and conditions of this Agreement, each member of the Summit Group will use its commercially reasonable efforts to implement the Restructuring and file with the Bankruptcy Court (a) voluntary petitions for relief under chapter 11 of the Bankruptcy Code with respect to each member of the Summit Group (the bankruptcy cases commenced thereby, the "*Bankruptcy Cases*", and the date of such commencement, the "*Petition Date*") and (b) the Plan, the related disclosure statement (the "*Disclosure Statement*"), and the Plan Supplement.

3.     Additional Supporting Creditors.  Any Person who is a creditor of any member of the Summit Group and is (or would be if the Plan has not been filed at such time) a holder of a Claim specified, and as defined, in the Plan may become a Party at any time prior to the Petition Date (each, an "*Additional Supporting Creditor*") under this Agreement, provided

that the Summit Group and such Person execute prior to the Petition Date an accession agreement in substantially the form attached hereto as <u>Exhibit D</u>, which identifies such Claim (each, an "***Additional Supporting Creditor Claim***") and the amount thereof, and pursuant to which such Person agrees to be bound by the terms of this Agreement.

        4.    <u>Transfer Restrictions</u>.

        (a)    Each Supporting Party covenants and agrees that it shall not at any time during the period commencing on the date hereof and ending on the earlier of the effective date of the Plan (the "***Effective Date***") and the termination of this Agreement pursuant to the terms hereof, sell, pledge, hypothecate, loan or otherwise transfer (any of the foregoing, a "***Transfer***") any Pre-Petition First Lien Secured Claim, Pre-Petition Second Lien Claim, or Additional Supporting Creditor Claim, (or any option, right to acquire, or voting, participation or other interest therein or any Claim with respect thereto) without (x) to the extent it would cause an adverse economic impact on the Summit Group, as determined by the Summit Group in an exercise of their reasonable business judgment, the consent of the Summit Group, which consent shall not be unreasonably withheld, conditioned or delayed, and (y) to the extent the Transferee (as defined below) is not already a Supporting Party, the Transferee executing and delivering to the Summit Group an assumption agreement in substantially the form set forth hereto as <u>Exhibit E</u>, binding the Transferee to the terms of this Agreement from and after the date on which such assumption agreement is executed.

        (b)    With respect to any Transfer by a Supporting Party pursuant to the provisions of clause (a) above, the Supporting Party making such Transfer shall be referred to herein as the "***Selling Party***" and the Person to whom such Transfer is made shall be referred to herein as the "***Transferee***".

        (c)    No Selling Party shall have any liability under this Agreement arising from or related to the failure of its Transferee to comply with the terms of this Agreement or the applicable assumption agreement.

        (d)    This Agreement shall in no way be construed to preclude any Supporting Party from acquiring additional loan or other obligations under the Credit Agreements or other Claims or Equity Interests with respect to any member of the Summit Group. However, any such additional loans or other obligations, Claims or Equity Interests so acquired by a Supporting Party shall automatically be deemed to be subject to the terms of this Agreement.

        (e)    Upon the effectiveness of any Transfer by any Selling Party to any Transferee effected in accordance with the provisions hereof (including, without limitation, the relevant Transferee's execution and delivery of an assumption agreement in substantially the form set forth hereto as <u>Exhibit E</u>) and in accordance with the requirements of the Credit Agreements or other governing documents, as applicable, the obligations of the members of the Summit Group under this Agreement to such Selling Party shall be deemed to constitute obligations in favor of such Transferee, and, subject to their consent rights under section (a) hereof, promptly after the effective date of any Transfer, the members of the Summit Group shall acknowledge in writing such Transfer. Failure to obtain such acknowledgment with respect to

any Transfer shall not affect the obligations of the Parties to the respective Transferee under this Agreement, or such Transferee's obligations hereunder.

(f)     Any Transfer not in compliance with this <u>Section 4</u> shall be deemed void *ab initio*, regardless of any notice provided to the Summit Group, and shall not create any obligation or liability of the Summit Group to the purported Transferee.

5.     <u>Restructuring Support</u>.     Until such time as this Agreement has been terminated in accordance with its terms:

(a)     Each Party covenants and agrees to use its commercially reasonable efforts to (i) support and complete the Restructuring and, (ii) in the case of any Party which requires regulatory and/or third-party approval to effectuate the Restructuring, obtain any and all such required regulatory and/or third-party approvals.

(b)     Each Supporting Party covenants and agrees that it shall not, and shall not encourage any other Person to, directly or indirectly seek, solicit, propose, file, support, encourage, or vote for any chapter 11 plan of reorganization with respect to any one or more members of the Summit Group other than the Plan, unless proposed by the Summit Group and consented to by the Requisite Supporting First Lien Parties and, to the extent their consent is required by Section 5(f) and/or Section 21 hereof, the Requisite Supporting Second Lien Parties.

(c)     Each Supporting Party covenants and agrees that, following receipt of the Disclosure Statement and other related solicitation materials approved by the Bankruptcy Court, it shall vote all Claims that it holds in favor of the Plan, by delivering its duly executed and timely completed ballot or ballots accepting the Plan to the voting agent for the Plan, and it shall not withdraw or change such vote; <u>provided</u> that the Plan and Disclosure Statement shall not have been amended or otherwise modified except in accordance with this Agreement.

(d)     Each Party covenants and agrees that it will not:

(i)     object to or take any other action to interfere, directly or indirectly, in any material respect with acceptance or implementation of the Plan or encourage any Person to do any of the foregoing; or

(ii)     take any other action with respect to the Bankruptcy Cases, including but not limited to, initiating any legal proceeding, that is materially inconsistent with, or that would prevent or delay in any material respect consummation of, the Restructuring.

(e)     Each Supporting Party covenants and agrees that it will give instructions to the Agents, if and when reasonably appropriate, to desist from taking action that is inconsistent in any material respect with this Agreement or the Restructuring.

(f)     The terms and conditions of all Restructuring Documents shall be as attached hereto or otherwise:

(i)     in form and substance satisfactory to the members of the Summit Group and Requisite Supporting First Lien Parties, and

(ii)     solely insofar as the following are concerned, in form and substance satisfactory to the Requisite Supporting Second Lien Parties:

(1)     the terms of the economic treatment of the Claims of the creditors classified in Classes 1, 4 and 5 of the Plan and of the Equity Interests classified in Class 7 of the Plan,

(2)     the release of the Pre-Petition Second Lien Lenders pursuant to Article V of the Plan and any other terms of the Plan that disproportionately affect the Pre-Petition Second Lien Claims, the Pre-Petition Second Lien Agent or the Pre-Petition Second Lien Lenders, or

(3)     the terms of the NewCo Operating Agreement.

Without limiting the generality of the foregoing, the members of the Summit Group shall consult with the Agents with respect to the timing of the filing of all Restructuring Documents with the Bankruptcy Court. The Parties shall coordinate with one another in good faith in the preparation and negotiation of all agreements and other documents contemplated by the Restructuring Documents that are not attached hereto and all agreements and other documents prepared in connection with the Restructuring, including, without limitation, the Disclosure Statement and Plan Supplement, and agree that all such agreements and other documents shall be consistent with the terms and conditions of the Restructuring as reflected in the exhibits hereto.

(g)     Subject to the occurrence of the Effective Date under and in accordance with the Plan, each Supporting First Lien Creditor, to the extent a party thereto, commits, covenants and agrees (severally and not jointly) to and with each Party to, on the Effective Date, execute and deliver and perform under the Exit Credit Agreement in substantially the form set forth in Exhibit C hereof and the Exit Credit Documents in substantially the form as shall be set forth in Exhibit 9 to the Plan.

(h)     Subject to the occurrence of the Effective Date under and in accordance with the Plan, each Supporting Party, to the extent a party thereto, covenants and agrees (severally and not jointly) to and with each Party to, on the Effective Date, execute and deliver and perform under the Equity Documents, and each Party hereto acknowledges the terms thereof and agrees to support and complete the Restructuring upon the terms and provisions set forth therein.

6.     Effectiveness.  This Agreement shall become effective upon satisfaction of the following conditions: this Agreement has been executed and delivered prior to the Petition Date by (i) each member of the Summit Group and (ii) the Requisite Supporting Parties. Notwithstanding anything contained herein, any counterpart to this Agreement purported to be executed by any person or entity on or after the Petition Date shall be deemed null and void for all purposes.

7.     Termination.

(a)     Termination by Requisite Supporting First Lien Parties.    This Agreement and the obligations of all Parties hereunder may be terminated by the Requisite Supporting First Lien Parties upon the occurrence of any of the following events without the prior written consent of the Requisite Supporting First Lien Parties and delivery of a written notice of the occurrence of such event in accordance with Section 15 to the other Parties (each a **"First Lien Party Termination Event"**):

(i)     An order confirming the Plan shall not have been entered by the Bankruptcy Court on or before June 15, 2011 or such later date to which the Requisite Supporting First Lien Parties have consented in writing;

(ii)     Any member of the Summit Group shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered an order approving the use of cash collateral or a debtor-in-possession credit facility or granting adequate protection to any Person, in each case, other than on terms materially consistent with the DIP Credit Agreement (as defined below) or DIP Orders (as defined below) or that if incorporated as an amendment, modification or supplement to the DIP Credit Agreement or DIP Orders, would require the consent of the Requisite Supporting First Lien Parties and such consent is not obtained;

(iii)     Entry of an order by the Bankruptcy Court converting the Bankruptcy Case of any member of the Summit Group to a case under chapter 7 of the Bankruptcy Code;

(iv)     Entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any member of the Summit Group to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(v)     Any or all members of the Summit Group file, publicly announce or state in writing an intention to file a chapter 11 plan that contains terms and conditions that are inconsistent in any material respect with the Plan or any exhibit or supplement attached thereto or that if incorporated as an amendment, modification or supplement to the Plan or any exhibit or supplement thereto, would require the consent of the Requisite Supporting First Lien Parties and such consent is not obtained;

(vi)     The entry of an order by the Bankruptcy Court appointing an examiner with enlarged powers relating to the operation of the material part of the business of the Summit Group, taken as a whole (i.e., powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, or the entry of an order by the Bankruptcy Court appointing a trustee under section 1104 of the Bankruptcy Code in any or all of the Bankruptcy Cases;

(vii)     Any member of the Summit Group shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered an order approving a payment to any Person (whether in cash or other property or whether as adequate protection, settlement of a dispute, or otherwise) that would be materially inconsistent with the economic treatment of any such Person under the Plan or that, if incorporated as an amendment,

modification or supplement to the Plan, would require the consent of the Requisite Supporting First Lien Parties and such consent is not obtained;

(viii)   Any member of the Summit Group shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered an order approving a payment to any Person (whether in cash or other property or whether as adequate protection, settlement of a dispute, or otherwise) that would be materially inconsistent with the provisions of the DIP Credit Agreement or DIP Orders or that, if incorporated as an amendment, modification or supplement to the DIP Credit Agreement or DIP Orders, would require the consent of the Requisite Supporting First Lien Parties and such consent is not obtained;

(ix)   The entry of an order by the Bankruptcy Court dismissing one or more of the Bankruptcy Cases;

(x)   The entry of an order by the Bankruptcy Court invalidating, disallowing or limiting in any respect, as applicable, either (A) the enforceability or validity of the liens securing the Pre-Petition First Lien Secured Claims or (B) the allowability of the Pre-Petition First Lien Secured Claims in an aggregate amount not less than $188,618,143; or

(xi)   The occurrence of an Event of Default under, and as defined by, the DIP Facility or a violation of the DIP Order by any Member of the Summit Group.

(b)   <u>Termination by Requisite Supporting Second Lien Parties</u>.   The rights and obligations of the Supporting Second Lien Creditors hereunder may be terminated by the Requisite Supporting Second Lien Parties upon the occurrence of any of the following events (each a ***"Second Lien Party Termination Event"***) and delivery of a written notice of the occurrence of such event in accordance with <u>Section 15</u> to the other Parties:

(i)   The Effective Date of the Plan shall not have occurred on or before September 30, 2011 or such later date to which the Requisite Supporting Second Lien Parties have consented in writing;

(ii)   Entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any member of the Summit Group to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(iii)   Any or all members of the Summit Group file, publicly announce or state in writing an intention to file a chapter 11 plan that contains terms and conditions that are inconsistent in any material respect with the Plan or any exhibit or supplement attached thereto or that if incorporated as an amendment, modification or supplement to the Plan or any exhibit or supplement thereto, would require the consent of the Requisite Supporting Second Lien Parties and such consent is not obtained;

(iv)   Any member of the Summit Group shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered an order that, if incorporated as an amendment, modification or supplement to the Plan, would require the consent of the Requisite Supporting Second Lien Parties and such consent is not obtained; or

(v)     The entry of an order by the Bankruptcy Court invalidating, disallowing or limiting in any respect, as applicable, either (A) the enforceability or validity of the liens securing the Pre-Petition Second Lien Claims or (B) the allowability of the Pre-Petition Second Lien Claims in an aggregate amount not less than $55,224,420.

(c)     Termination by the Summit Group.   At any time prior to commencement of the Bankruptcy Cases, this Agreement and the obligations of all Parties hereunder may be terminated by the Summit Group if the board of directors of Summit reasonably determines that its failure to do so would result in a breach of its fiduciary duties under applicable law (a "**Summit Termination Event**"), by delivering written notice of the occurrence of such event in accordance with Section 15 to the other Parties.

(d)     Mutual Termination.   This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement among the Summit Group and Requisite Supporting Parties.

(e)     Other Terminations.   This Agreement may be terminated upon ten (10) days prior written notice to all other Parties, delivered in accordance with Section 15:

(i)     By the Requisite Supporting Parties upon the material breach by any member of the Summit Group of any of its representations, warranties or covenants under this agreement if such breach remains uncured for the ten (10) business day notice period referenced above; or

(ii)     By the Summit Group or the Requisite Supporting Parties upon the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring.

The First Lien Party Termination Events, Second Lien Party Termination Events, Summit Termination Event and termination events provided for in Sections 7(d) and (e) above are hereinafter referred to collectively as "**Termination Events**").   The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder in connection with the giving of any notice after the occurrence of any Termination Event as provided herein.

(f)     Expiration of Term.   If not previously terminated in accordance with the provisions hereof, this Agreement shall expire upon the Effective Date of, and as defined in, the Plan.

(g)     Effect of Termination.   If this Agreement is terminated or expires in accordance with its terms, no Party shall have any further obligation or liability hereunder, except that the obligations of the Summit Group under Section 22 and Section 23, to the extent there are any accrued and unpaid fees and expenses (including fees and expenses of attorneys and financial advisors) as of the effective date of termination or expiration, shall survive the termination or expiration hereof.   Notwithstanding anything contained herein, no Party shall be relieved of any liability for damages resulting from its breach of any representation, warranty, covenant or obligation hereunder that occurred prior to the termination or expiration of this

Agreement, and each of the Supporting Parties shall have all rights and remedies available to it, as the case may be, under the Credit Agreements and related documents or the documents governing any applicable Additional Supporting Creditor Claim, under applicable law or otherwise with respect to any default or event of default that may have occurred at any time prior to such termination or expiration or otherwise.

8.     Representations and Warranties.

(a)     Each member of the Summit Group hereby represents and warrants (jointly and severally) to each of the Supporting Parties, and each Supporting Party hereby represents and warrants (severally and not jointly) to each member of the Summit Group and each other Supporting Party, that the following statements, as applicable to it, are true, correct, and complete as of the date hereof:

(i)     It is a corporation, trust, partnership, or limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.  It has all requisite corporate, partnership, or limited liability company, as applicable, power and authority to execute and deliver this Agreement and has duly executed and delivered this Agreement;

(ii)     The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly and validly authorized by all necessary corporate, partnership or limited liability company action on its part, and no other proceedings are necessary to authorize this Agreement or to consummate the transactions contemplated hereby;

(iii)     This Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether enforcement is sought by proceedings in equity or at law);

(iv)     To its knowledge, the execution, delivery and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, foreign or other governmental authority or regulatory body;

(v)     No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would reasonably be expected to adversely affect, in any material respect, its ability to enter into this Agreement or perform its obligations hereunder; and

(vi)     The execution, delivery and performance by it of this Agreement do not and shall not (A) violate any provision of law, rule or regulation applicable to it or its certificate of incorporation or bylaws or other organizational documents or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

(b)    Each of the Supporting Parties represents and warrants, severally and not jointly, to each of the other Parties that the following statements, as applicable to it, are true, correct, and complete as of the date hereof:

(i)    It is: (A) the sole beneficial owner and/or the investment advisor or manager for the beneficial owners of the Pre-Petition First Lien Secured Claim, Pre-Petition Second Lien Claim, or Additional Supporting Creditor Claim as set forth on its signature page attached hereto, having the power to vote and dispose of such Claims on behalf of such beneficial owners; and (B) entitled (for its own account or for the account of other persons claiming through it) to all of the rights and economic benefits of such Claims.

(ii)    It has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in the Claims that are subject to this Agreement.

(iii)    It is: (A) a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in any securities that may be issued in connection with the Restructuring, making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement; and (B) either a "qualified institutional buyer" or an "accredited investor", each within the meaning of Rule 501 of the Securities Act of 1933, as amended.

9.    Consent to Debtor-in-Possession Financing.    Each of the Supporting Parties hereby:

(a)    consents to any debtor-in-possession credit facility provided to any member of the Summit Group in the Bankruptcy Cases, which credit facility shall be substantially on the terms and conditions described in the form of Senior Secured Superpriority Debtor-in-Possession Credit Agreement attached to the Plan as Exhibit 7 (such credit agreement as amended or otherwise modified in accordance with the provisions thereof and hereof, the "**DIP Credit Agreement**") and form of interim financing order attached hereto as Exhibit F (the interim financing order, together with any final financing order substantially the same as the interim financing order, in each case, as amended or otherwise modified in accordance with the provisions thereof and hereof, the "**DIP Orders**" and the debtor-in-possession credit facility contemplated by the DIP Credit Agreement and the DIP Orders, the "**DIP Facility**");

(b)    consents to the entry of the DIP Orders approving such DIP Facility, which orders (and any modifications thereto) shall be in form and substance satisfactory to the Summit Group and Requisite Supporting First Lien Parties;

(c)    agrees that the Bank of Montreal, Chicago Branch (and/or any affiliates thereof), or Bank of Montreal, Chicago Branch, and such other financial institutions as are acceptable to Bank of Montreal, Chicago Branch, shall be the providers of the DIP Facility;

(d)    without limiting the generality of the foregoing, consents to the subordination of the pre-petition and post-petition liens securing, and any administrative super-priority claims granted by the Bankruptcy Court with respect to, the Pre-Petition First Lien Secured Claims, Pre-Petition Second Lien Claims, and Additional Supporting Creditor Claims to the liens and administrative super-priority claims securing the DIP Facility;

(e)    consents to the use of cash collateral by the members of the Summit Group substantially on the terms and conditions described in the DIP Credit Agreement and the DIP Orders; and

(f)    consents to the provision of adequate protection as set forth in the DIP Orders to the First Lien Lenders, Supporting First Lien Secured Parties, and Second Lien Lenders.

10.    <u>Governing Law; Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction. Each Party agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement, whether in tort or contract or at law or in equity, either in the Bankruptcy Court  or otherwise exclusively in a federal or state court of competent jurisdiction located in the City of New York, New York and (i) irrevocably submits to the exclusive jurisdiction of such courts, (ii) waives any objection to laying of venue in any such action or proceeding in such courts, (iii) waives any objection that any such court is an inconvenient forum or does not have jurisdiction over any Party, and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if notice is given in accordance with this Agreement. Notwithstanding the foregoing, upon commencement of the Bankruptcy Cases, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.

11.    <u>Specific Performance</u>.  Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement (including, without limitation, all annexes, exhibits and schedules attached hereto) will cause other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach, such other Parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which such Parties may be entitled, at law or in equity.

12.    <u>Reservation of Rights</u>.  Except as otherwise expressly provided in this Agreement, the Parties fully reserve any and all of their rights.  Nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of any of the Supporting Parties to protect and preserve any of its rights, remedies and interests, including without limitation its claims against any member of the Summit Group, or its full participation in any Bankruptcy Case in a manner consistent with this Agreement.  For the avoidance of doubt, any action by a Supporting Party to defend against, respond to or otherwise refute any claim, action, proceeding or challenge with respect to such Supporting Party's liens or claims, whether under the

Bankruptcy Code, or applicable law, contract or equity, will not constitute a breach of this Agreement, including Section 5(d) hereof. No waiver of any Termination Event shall constitute a waiver of or otherwise affect any subsequent Termination Event or impair any right consequent thereon.

13.     Validity of Liens.  The Parties to this Agreement agree not to take any action or assert any claims (directly or indirectly) challenging or otherwise disputing the validity, nature, perfection, priority, enforceability and nonavoidability of the liens granted under the Loan Documents (as defined in the First Lien Credit Agreement) or Loan Documents (as defined in the Second Lien Credit Agreement).

14.     Successors and Assigns.  Subject to Section 4, this Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.   The agreements, representations, warranties, covenants and obligations of the Supporting Parties under this Agreement are, in all respects, several and not joint.

15.     Notice.  All notices, requests, demands, claims and other communications hereunder shall be in writing and shall be (a) transmitted by hand delivery, (b) mailed by registered or certified mail, postage prepaid, (c) transmitted by overnight courier, addressed as follows or (d) transmitted by telecopy to the number set forth below (or at such other address and/or number as shall be designated from time to time by any Party in the manner provided for in this Section 15):

> If to the Summit Group:
>
>> 5081 Olympic Boulevard
>> Erlanger, KY  41018
>> Attn:  Chief Financial Officer
>> Fax:  (859) 692-2000
>>
>> -with a copy to-
>>
>> Reed Smith LLP
>> 599 Lexington Avenue
>> 22nd Floor
>> New York, NY 10022
>> Attn: J. Andrew Rahl, Jr
>> Facsimile:  212-521-5450
>
> If to any Supporting Party, then to all of the Supporting Parties at the address and facsimile number specified for each of them in Schedule 1, Schedule 2, Schedule 3, Schedule 4, or Schedule 5 hereto, as applicable, or as otherwise provided:
>
>> -with a copy to-
>>
>> Mayer Brown LLP
>> 71 S. Wacker Dr.

Chicago, IL 60606
Attn:   J. Robert Stoll
        John J. Voorhees, Jr.
Fax: (312) 701-7711

-with a copy to-

Bingham McCutchen LLP
399 Park Avenue
New York, NY  10022-4689
Attn:   Katherine G. Weinstein
Fax: (212) 702-3691

A notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a business day; (iii) in the case of overnight courier, upon the first attempted delivery on a business day; or (iv) in the case of a telecopy transmission, on the date sent, as confirmed by written confirmation of receipt.   Notices by the Supporting Parties may be given by their respective counsel or by counsel to the administrative agents for the applicable Supporting Parties.

16.   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page by telecopier or by electronic mail shall be effective as delivery of a manually executed counterpart hereof.

17.   <u>No Third-Party Beneficiaries</u>.   Unless otherwise expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other Person shall be a third-party beneficiary hereof.

18.   <u>No Solicitation</u>.   This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan or any plan of reorganization pursuant to the chapter 11 of the Bankruptcy Code.  Each of the Supporting Parties' votes with respect to the Plan will not be solicited until such Supporting Party has received the Plan, the Disclosure Statement and other solicitation matters (including the ballots to vote to accept or reject the Plan) and the Bankruptcy Court has entered an order approving the Disclosure Statement and related solicitation materials.

19.   <u>Representation by Counsel</u>.   Each Party acknowledges that it has received adequate information to enter into this Agreement and the transactions contemplated hereby.  The Agents acknowledge that they have been represented by counsel in connection with this Agreement and the transactions contemplated hereby.   Accordingly, any rule of law or any legal decision that would provide any party with a defense to the enforcement of the terms of this Agreement against such party shall have no application and is expressly waived.

20.   Contract Interpretation.   The provisions of this Agreement shall be interpreted in a reasonable manner to effectuate the intent of the Parties.

21.   Amendments.

(a)   This Agreement may be modified, amended or supplemented in a written instrument duly executed and delivered by the Summit Group and Requisite Supporting Parties. In addition, the Plan and the other Restructuring Documents (other than this Agreement), including, without limitation, the Exit Credit Agreement, Equity Documents, DIP Credit Agreement, may be modified, amended or supplemented in a written instrument duly consented to and, to the extent a party thereto, executed and delivered by the members of the Summit Group and Requisite Supporting First Lien Parties; provided, however, that any modification, amendment or supplement to any term of any such Restructuring Document that is described in Section 5(f)(ii) of this Agreement shall also require the written consent of the Requisite Supporting Second Lien Parties.

(b)   Notwithstanding and without limiting clause (a) above, in the event that:

(i)   any Supporting First Lien Creditor does not consent to any modification, amendment, or supplement of this Agreement, the Plan, or other Restructuring Document;

(ii)   there is an event or circumstance that would be a Termination Event but for consent to such event or circumstance by the Requisite Supporting First Lien Parties, and any Supporting First Lien Creditor did not consent to such event or circumstance; or

(iii)   the following conditions are satisfied:

(x)   there shall have occurred a Termination Event described in Section 7(e) hereof,

(y) the Requisite Supporting Parties shall have waived their right to terminate this Agreement pursuant to Section 7(e) hereof as a result of such Termination Event (the "Waiving Supporting Parties" with respect to such Termination Event), and

(z) any Supporting First Lien Creditor (other than a Waiving Supporting Party with respect to such Termination Event) wishes to be released from its obligations under this Agreement,

then, such Supporting First Lien Creditor may, by giving notice to the Summit Group and the Agents, be automatically released from its obligations under this Agreement as of the date of such notice.

22.   Indemnification.  Each member of the Summit Group jointly and severally agrees to indemnify and hold harmless each Supporting Party, their respective successors and permitted assigns, and their respective officers, directors, members partners, employees, agents,

and advisors from and against any and all claims, suits, actions, liabilities, and judgments and reasonable costs related thereto (including any reasonable defense costs associated therewith on an as-incurred basis) arising under or in connection with this Agreement or the transactions contemplated hereby or by the Restructuring Documents or any act or failure to act taken in contemplation, furtherance or connection herewith, except to the extent such claim or liability is the result of such Supporting Party's intentional breach of this agreement, willful misconduct or gross negligence.

23. <u>Fees and Expenses</u>. In accordance with the terms and provisions of their reimbursement agreements, including, without limitation, the First Lien Credit Agreement, and, if applicable, the DIP Credit Agreement and DIP Orders, the members of the Summit Group shall pay in full the reasonable and documented fees, costs and expenses of the First Lien Agent, including the reasonable fees and expenses of its counsel and financial advisors, except as may be expressly prohibited by order of the Bankruptcy Court.

24. <u>Consideration</u>. The Parties hereby acknowledge that, other than the agreements, covenants, representations, and warranties set forth herein and in the Plan, no consideration shall be due or paid to any of the Supporting Parties for their agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement.

25. <u>Further Assurances</u>. Each of the Parties agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request, in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement. In the event that the Supporting Second Lien Creditors take any action under this section at the request of another Party, the Summit Group shall pay the reasonable and documented fees, costs and expenses of the Second Lien Agent in connection therewith in an amount not to exceed an aggregate amount of ten thousand dollars ($10,000.00).

26. <u>Headings</u>. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

27. <u>Several Obligations</u>. All covenants and other obligations of the Supporting Parties are several and not joint.

28. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

29. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior negotiations, agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof.

30. <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such

prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

31.     Public Announcements.   Unless otherwise required by applicable legal requirement, law, regulation or by obligations of the Parties or their respective affiliates pursuant to any listing agreement with or rules of any securities exchange, each Party shall consult with the Summit Group and the Supporting Parties before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby and shall not issue any such release or make any such statement without the prior written consent of the Summit Group and the Agents (such consent not to be unreasonably withheld or delayed); provided, that the foregoing shall not apply to any statements or other communications between any member of the Summit Group and any of its employees, customers, suppliers or any Person with whom it does business.

32.     Restrictions on Equity Trading.   Each of the undersigned Supporting Parties agrees that for the period from and including the date of this Agreement through and including the expiration or termination of this Agreement in accordance with the provisions hereof, it will not, directly or indirectly, sell, exchange, transfer, hypothecate, negotiate, gift, bequeath, convey in trust, pledge, mortgage, grant a security interest in, assign, encumber, or otherwise dispose of all or any portion of any equity securities of the Summit Group that such Supporting Party may own or hold at any time during such period.

*[signature pages follow]*

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

> SUMMIT BUSINESS MEDIA HOLDING COMPANY
>
> SUMMIT BUSINESS MEDIA INTERMEDIATE HOLDING COMPANY, LLC
>
> THE NATIONAL UNDERWRITER COMPANY
>
> RESEARCH HOLDINGS, LTD.
>
> FUTURES MAGAZINE, INC.
>
> NUCO BUSINESS INFORMATION, LLC
>
> AGENT MEDIA CORPORATION
>
> JUDY DIAMOND ASSOCIATES, INC.
>
> MINING INDABA, LLC
>
>
> By: _Thomas M Fly_
> Name: Thomas M. Flynn
> Title: Chief Financial Officer

[Signature Page to Restructuring Support Agreement]

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

ANTARES CAPITAL CORPORATION

By: _____
Name: Drew D. Miller
Title:   Duly Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

BANK OF MONTREAL, CHICAGO BRANCH,

By:_____

Name: James Jerz

Title: Vice President

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

[*] CIFC 2006 - II, Ltd.
CIFC 2007 - I, Ltd.

By: _____

Name: [*] Stephen Vaccaro

Title: [*] Co-Chief Investment Officer

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

ECP CREDIT LLC,
as a Lender

ECP CREDIT MM, LLC, As Manager

By: _____

Name: Steven Friedman
Title: Director

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

Emporia Preferred Funding I, LTD
By: Ivy Hill Asset Management, L.P., its Collateral Manager

By: _____
Name:
Title:       Ryan Cascade
             Duly Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

FirstLight Funding I, Ltd. as a Lender

By: FirstLight Asset Management, Inc., as Collateral Manager
By: Ivy Hill Asset Management, L.P., as Sub-Adviser

By: _____
Name: Ryan Cascade
Title: Duly Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

GENERAL ELECTRIC CAPITAL CORPORATION

By:_____
Name: Drew D. Miller
Title:   Duly Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

GE BUSINESS FINANCIAL SERVICES INC.

By:_____
Name: Drew D. Miller
Title:   Duly Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

IVY HILL MIDDLE MARKET CREDIT FUND, LTD.
By: Ivy Hill Asset Management, L.P.,
its Collateral Manager

By: _____
Name:       Ryan Cascade
Title:        Duly Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

Knightsbridge CLO 2007-1 LIMITED
By: ACKB LLC, as investment manager
By: Ivy Hill Asset Management, L.P., its Managing Member

By: _____
Name:
Title:
        **Ryan Cascade**
       **Duly Authorized** Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

Knightsbridge CLO 2008-1 Limited
By: ACKB LLC, as investment manager
By: Ivy Hill Asset Management, L.P., its Managing Member

By: _____
Name:
Title:         **Ryan Cascade**
               **Duly Authorized Signatory**

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

Merrill Lynch Capital Services, Inc.

By:_____
Name: Peter Wilson
Title: Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

NEWSTAR COMMERCIAL LOAN TRUST 2006-1

By: NewStar Financial, Inc., as Servicer

By: _____
Name: Robert Hornstein
Title: Managing Director


NEWSTAR WAREHOUSE FUNDING 2005 LLC

By: NewStar Financial, Inc., its Manager

By: _____
Name: Robert Hornstein
Title: Managing Director


NEWSTAR COMMERCIAL LOAN TRUST 2007-1

By: NewStar Financial, Inc., as Servicer

By: _____
Name: Robert Hornstein
Title: Managing Director


[Signature Page to Restructuring Support Agreement]

NEWSTAR CREDIT OPPORTUNITIES
FUNDING I LTD.

By: NewStar Financial, Inc., its Manager

By: _____
Name: Robert Hornstein
Title: Managing Director


NEWSTAR CREDIT OPPORTUNITIES
FUNDING II LTD.

By: NewStar Financial, Inc., its Manager

By: _____
Name: Robert Hornstein
Title: Managing Director


NEWSTAR LOAN FUNDING, LLC
By: NewStar Financial, Inc., its Manager

By: _____
Name: Robert Hornstein
Title: Managing Director

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

Webster Bank National Association

By:_____

Name: John Gilsenan

Title: Vice President

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

ARCC COMMERCIAL LOAN TRUST 2006

By: _Michael L. Smith_

Name: Michael L. Smith

Title: Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

ECP CREDIT LLC,
as a Lender

ECP CREDIT MM, LLC, As Manager

By: _____

Name: Steven Friedman
Title: Director

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

Emporia Preferred Funding I, LTD
By: Ivy Hill Asset Management, L.P., its Collateral Manager

By: _____
Name:
Title:       Ryan Cascade
             Duly Authorized Signatory

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

Emporia Preferred Funding II, LTD
By: Ivy Hill Asset Management, L.P., its Collateral Manager

By: _____
Name:
Title:          Ryan Cascade
            **Duly Authorized Signatory**

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**Global Leveraged Capital Credit Opportunity Fund I,** as Lender

**Global Leveraged Capital Management, LLC,** as Collateral Manager

By: _____
Name: Christian Giordano
Title: Principal

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

MCG CAPITAL CORPORATION

By: _____
Name: Andrew Jacobson
Title: Managing Director and Vice President

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**NEWSTAR COMMERCIAL LOAN TRUST 2007-1**
**By: NewStar Financial, Inc., as Servicer**

By: _____
Name: David C. Kilpatrick
Title:　Vice President


**NEWSTAR LOAN FUNDING, LLC**
**By: NewStar Financial, Inc., its Manager**

By: _____
Name: David C. Kilpatrick
Title:　Vice President

[Signature Page to Restructuring Support Agreement]

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

GOF CLASS A AND B LLC

By: _____

Name: **JULIAN WELDON**

Title: **SECRETARY**

IN WITNESS WHEREOF, each of the Parties listed below has caused this Restructuring Support Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

GOF CLASS C LLC

By: _____

Name: _____

Title: _____

**JULIAN WELDON**
**SECRETARY**

Schedule 1 - Supporting First Lien Term Lenders


ANTARES CAPITAL CORPORATION

BANK OF MONTREAL, CHICAGO BRANCH

CIFC FUNDING 2006-II, LTD.

CIFC FUNDING 2007-I, LTD.

ECP CREDIT LLC

EMPORIA PREFERRED FUNDING I, LTD

FIRSTLIGHT FUNDING I, LTD.

GE BUSINESS FINANCIAL SERVICES INC.

GENERAL ELECTRIC CAPITAL CORPORATION

IVY HILL MIDDLE MARKET CREDIT FUND, LTD.

KNIGHTSBRIDGE CLO 2007-1 LIMITED

KNIGHTSBRIDGE CLO 2008-1 LIMITED

NEWSTAR COMMERCIAL LOAN TRUST 2007-1

NEWSTAR CREDIT OPPORTUNITIES FUNDING I LTD.

NEWSTAR CREDIT OPPORTUNITIES FUNDING II LTD.

NEWSTAR LOAN FUNDING, LLC

WEBSTER BANK NATIONAL ASSOCIATION

<u>Schedule 2 - Supporting First Lien Revolving Lenders</u>

ANTARES CAPITAL CORPORATION

BANK OF MONTREAL, CHICAGO BRANCH

ECP CREDIT LLC

GE BUSINESS FINANCIAL SERVICES INC.

GENERAL ELECTRIC CAPITAL CORPORATION

NEWSTAR WAREHOUSE FUNDING 2005 LLC

WEBSTER BANK NATIONAL ASSOCIATION

<u>Schedule 3 - Supporting First Lien Secured Parties</u>

Merrill Lynch Capital Services, Inc.

<u>Schedule 4 - Supporting Second Lien Creditors</u>

ARCC COMMERCIAL LOAN TRUST 2006
ECP CREDIT LLC
EMPORIA PREFERRED FUNDING I, LTD.
EMPORIA PREFERRED FUNDING II, LTD.
GLOBAL LEVERAGED CAPITAL CREDIT OPPORTUNITY FUND I
GOF CLASS A AND B LLC
GOF CLASS C LLC
MCG CAPITAL CORPORATION
NEWSTAR COMMERCIAL LOAN TRUST 2007-1
NEWSTAR LOAN FUNDING, LLC