**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **Summit Business Media Holding Company, _et al._,**[1] | Case No. 11-10231 (PJW) |
| **Debtors.** | Jointly Administered |

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF FIRST AMENDED JOINT PLAN OF REORGANIZATION OF SUMMIT BUSINESS MEDIA HOLDING COMPANY AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

THIS FIRST AMENDED DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF SUMMIT BUSINESS MEDIA HOLDING COMPANY AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "PLAN"), THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS AND EQUITY INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTORS.

BY ORDER DATED _____, 2011, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AGAINST AND EQUITY

---

[1] The Debtors in these Cases are: (i) Summit Business Media Holding Company (5547); (ii) Summit Business Media Intermediate Holding Company, LLC (5392); (iii) The National Underwriter Company (8770); (iv) Research Holdings, LTD. (5228); (v) Futures Magazine, Inc. (1102); (vi) NUCO Business Information, LLC (7364); (vii) Agent Media Corporation (3991); (viii) Judy Diamond Associates, Inc. (0517); and (ix) Mining INDABA, LLC (4592). Individual case numbers are available on reasonable request.

US_ACTIVE-~~105458165.9~~105458165.12

INTERESTS IN THE DEBTORS TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>5:00 P.M., PREVAILING EASTERN TIME,                          , 2011 UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE.</u>**

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO EFFICIENTLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11. ADDITIONALLY, THE DEBTORS BELIEVE THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTORS' CREDITORS UNDER THE CIRCUMSTANCES OF THESE CASES AND THAT, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES. THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN BUT DOES NOT CONTAIN ALL OF ITS TERMS AND PROVISIONS. ALL PARTIES WHO ARE ENTITLED TO VOTE ON THE PLAN ARE STRONGLY ADVISED TO REVIEW THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN. TO THE EXTENT OF ANY

US_ACTIVE-~~105458165.9~~105458165.12

INCONSISTENCY BETWEEN THE PLAN OR ANY PLAN DOCUMENT AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE PLAN DOCUMENT ARE CONTROLLING.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE (IN CONJUNCTION WITH A REVIEW OF THE PLAN) WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN.

US_ACTIVE-~~105458165.9~~105458165.12

Table of Contents

I.      SUMMARY ................................................................................................................11
        A.      Why You Are Receiving This Document .............................................................11
        B.      Plan Overview ...................................................................................................12
                1.      Purpose – Reorganization ........................................................................12
                2.      Summary of Plan Treatment ....................................................................12
                3.      Executory Contracts and Unexpired Leases ............................................19
        C.      Voting and Confirmation ...................................................................................20
        D.      Risk Factors and Disclaimer .............................................................................20
II.     VOTING ON AND CONFIRMATION OF THE PLAN .............................................21
        A.      Deadline for Voting for or Against the Plan .......................................................21
        B.      Confirmation Hearing for the Plan .....................................................................23
        C.      Any Objections to Confirmation of the Plan ......................................................23
        D.      Recommendations for Voting .............................................................................25
III.    ORGANIZATION AND ACTIVITIES OF THE DEBTORS ......................................25
        A.      Overview of the Debtors' Corporate Structure and Business Operations ............25
                1.      Media Division........................................................................................25
                2.      Events Division; Conferences..................................................................26
                3.      Reference Division...................................................................................26
                4.      Data Division...........................................................................................26
        B.      Management.......................................................................................................26
                1.      Board of Directors of Summit..................................................................26
                2.      Existing Executive Officers of Summit ...................................................27
        C.      Compensation and Benefits ...............................................................................27
        D.      Severance Practices ...........................................................................................28
IV.     Pre-Petition Capitalization .........................................................................................28
V.      Events Leading to the Debtors' Bankruptcy Filing ......................................................28
VI.     Terms of the Debtors' Financial Restructuring ...........................................................30
VII.    The Bankruptcy Cases ...............................................................................................~~31~~32
        A.      Web Site .......................................................................................................~~31~~32
        B.      Summary of "First Day" Motions and Orders. .................................................~~31~~32
                1.      Post-Petition Financing...................................................................~~31~~32
                2.      Joint Administration Motion.............................................................~~32~~33
                3.      Motion for Consolidated List of Creditors..........................................~~32~~33
                4.      Cash Management Motion..................................................................~~32~~33
                5.      Employee Wages and Benefits Motion...............................................33
                6.      Critical Vendor Motion.....................................................................~~33~~34
                7.      Motion Confirming Priority of Section 503(b)(9) Administrative
                        Claims..............................................................................................34
                8.      Pre-Petition Tax Motion. ..................................................................34
                9.      Motion to Fix Time for Filing Disclosure Statement..........................~~34~~35
                10.     Customer Programs Motion...............................................................~~34~~35
                11.     Utilities Motion ...............................................................................35
                12.     Motion to Establish Claims Trading Procedures .................................~~35~~36

          US_ACTIVE-~~105458165.9~~105458165.12

| | | | |
|---|---|---|---|
| C. | Claims, Noticing and Balloting Agent Motion | | ~~35~~36 |
| D. | Ordinary Course Professionals Motion | | 36 |
| E. | Motion to Extend Time for Filing Statements of Financial Affairs and Schedules | | ~~36~~37 |
| F. | Motion to Approve Disclosure Statement | | ~~36~~37 |
| G. | Execution of Trade Agreements | | 37 |
| H. | Retention of Professionals | | 38 |
| I. | Rejection of Executory Contracts and Nonresidential Real Property Leases | | ~~38~~39 |
| J. | Appointment of Official Committee of Unsecured Creditors | | ~~38~~39 |
| K. | Schedules and Statements of Financial Affairs | | ~~38~~39 |
| | 1. | SOFAs | ~~38~~39 |
| | 2. | Debtor-in-Possession Operating Reports | 39 |
| L. | Claims Bar Date and Review Process | | ~~39~~40 |
| | 1. | Claims Bar Date | ~~39~~40 |
| | 2. | Claims Review Process | ~~39~~40 |
| M. | Litigation | | ~~40~~41 |
| **VIII.** | **SUMMARY OF THE PLAN OF REORGANIZATION** | | ~~40~~41 |
| A. | Overview of Chapter 11 | | ~~40~~41 |
| B. | Purpose of the Plan | | ~~42~~43 |
| C. | Treatment of General Unsecured Creditors | | ~~42~~43 |
| **IX.** | **CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** | | ~~42~~43 |
| A. | Introduction | | ~~42~~43 |
| B. | Classification of Claims and Equity Interests | | ~~42~~43 |
| | 1. | Unimpaired and Unclassified Claims. | ~~42~~43 |
| | 2. | Description of the Classes. | 43 |
| **X.** | **TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS** | | ~~43~~44 |
| A. | DIP Facility Claims | | ~~43~~44 |
| B. | Administrative Expense Claims | | ~~43~~44 |
| C. | Priority Tax Claims | | ~~44~~45 |
| D. | Class 1:  Pre-Petition First Lien Secured Claims | | ~~44~~45 |
| E. | Class 2, *et seq.*:  Other Secured Claims | | ~~45~~46 |
| F. | Class 3:  Other Priority Claims | | 46 |
| G. | Class 4:  Pre-Petition Second Lien Claims | | ~~46~~47 |
| H. | Class 5:  General Unsecured Claims | | ~~46~~47 |
| I. | Class 6:  Intercompany Claims | | 47 |
| J. | Class 6: Equity Interests in Summit | | **Error! Bookmark not defined.** |
| K. | Class 7:  Equity Interests in ~~Summit~~ | | 47 |
| ~~K.~~ | ~~Class 8:  Equity Interests in~~ All Debtors Other Than Summit | | ~~47~~48 |
| **XI.** | **MEANS FOR IMPLEMENTATION OF THE PLAN** | | ~~47~~48 |
| A. | Presumed Acceptance of Plan | | ~~47~~48 |
| B. | Voting Classes | | 48 |
| C. | Acceptance by Impaired Classes of Claims | | 48 |
| D. | Deemed Rejection of Plan | | 48 |
| E. | Cramdown | | 48 |
| F. | Continued Corporate Existence | | ~~48~~49 |
| G. | Cancellation of Existing Securities and Agreements | | ~~48~~49 |

US_ACTIVE-~~105458165.9~~105458165.12

|  | H. | Issuance of New Equity Interests | 49 |
|  | I. | Revesting of Assets | ~~49~~50 |
|  | J. | Rights of Action; Reservation of Rights | ~~49~~50 |
|  | K. | Effectuating Documents; Further Transactions | 50 |
|  | L. | Sources of Liquidity; Exit Credit Documents | ~~50~~51 |
| XII. | | RELEASES AND INJUNCTIONS RELATED TO RELEASES | 51 |
|  | A. | Exculpation | 51 |
|  | B. | Releases by Debtors | 51 |
|  | C. | Releases by Holders of Claims and Equity Interests | 52 |
|  | D. | Injunction Related to Releases | ~~52~~53 |
|  | E. | No Waiver | 53 |
|  | F. | Deemed Consent | 53 |
|  | G. | Survival of Indemnification Obligations to Personnel | 53 |
| XIII. | | CORPORATE STRUCTURE OF THE REORGANIZED DEBTORS | ~~53~~54 |
|  | A. | Corporate Action | ~~53~~54 |
|  | B. | Corporate Structure of Reorganized Debtors | 54 |
|  | C. | Board of Directors/Managers and Officers of Reorganized Debtors | ~~54~~55 |
|  |  | 1. NewCo LLC's Board of Managers and Officers. | ~~54~~55 |
|  |  | 2. Reorganized Summit's Board of Directors. | 55 |
|  |  | 3. Reorganized Summit's Officers. | 55 |
|  |  | 4. Reorganized Affiliates. | 55 |
|  | D. | Indemnification of Directors and Officers | 55 |
|  | E. | NewCo Operating Agreement, Registration Rights Agreement and OpCo Operating Agreement | ~~55~~56 |
| XIV. | | DISTRIBUTIONS UNDER THE PLAN | 56 |
|  | A. | Distributions to Holders of Allowed Claims Only | 56 |
|  | B. | Distribution Record Date | 56 |
|  | C. | Disbursing Agent | 56 |
|  | D. | Rights and Powers of the Disbursing Agent | ~~56~~57 |
|  | E. | Delivery of Distributions | ~~56~~57 |
|  | F. | Time Bar to Cash Payments | 57 |
|  | G. | Fractional Shares | 57 |
|  | H. | Set-Offs | ~~57~~58 |
| XV. | | PROCEDURES FOR DISPUTED CLAIMS | 58 |
|  | A. | Resolution of Disputed Claims; Estimation of Claims | 58 |
|  | B. | No Distributions Pending Allowance | 58 |
|  | C. | Distributions After Allowance | ~~58~~59 |
| XVI. | | EXECUTORY CONTRACTS | 59 |
|  | A. | Assumption of Executory Contracts and Unexpired Leases | 59 |
|  | B. | Cure of Defaults of Assumed Executory Contracts and Unexpired Leases | 59 |
|  | C. | Compensation and Benefit Programs | ~~59~~60 |
| XVII. | | CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE | 60 |
|  | A. | Conditions Precedent to Confirmation | 60 |
|  | B. | Conditions Precedent to the Effective Date | 60 |
|  | C. | Waiver of Conditions to Confirmation and Effective Date | 61 |

US_ACTIVE-~~105458165.9~~105458165.12

D. Effect of Failure of Conditions of the Effective Date..................................61

XVIII. EFFECT OF CONFIRMATION .........................................................~~61~~62
    A. Discharge of Claims and Termination of Equity Interests...............~~61~~62
    B. Binding Effect.........................................................................62
    C. Preservation of Insurance.........................................................62
    D. Section 1146 Exemption...........................................................63
    E. Compliance with Tax Requirements...........................................64
    F. Severability of Plan Provisions..................................................64
    G. Exemption from Securities Laws................................................64
    H. Allocation of Plan Distributions Between Principal and Interest. ..........64

XIX. RETENTION OF JURISDICTION.................................................................64
    A. Post Effective-Date Jurisdiction ...............................................64
    B. Jurisdiction Prior to the Effective Date......................................66

XX. MISCELLANEOUS PROVISIONS................................................................66
    A. Substantial Consummation.......................................................66
    B. Payment of Statutory Fees.......................................................66
    C. Retiree Benefits....................................................................66
    D. Professional Fee Claims..........................................................67
    E. Modifications and Amendments.................................................67
    F. Corrective Action..................................................................67
    G. Plan Revocation, Withdrawal or Non-Consummation ....................67
    H. Modification of Exhibits..........................................................68
    I. Governing Law ......................................................................68
    J. Time ..................................................................................68
    K. Section Headings...................................................................68
    L. Effectuating Documents and Further Transactions........................68
    M. Successors and Assigns...........................................................69
    N. Notices ...............................................................................69

XXI. CONFIRMATION REQUIREMENTS...........................................................70
    A. Feasibility of the Plan ............................................................71
    B. Best Interests Test .................................................................73
        1. Generally...................................................................73
        2. Best Interests of Creditors Test.......................................74
        3. Application of the "Best Interests" of Creditors Test to the
            Liquidation Analysis and the Valuations...........................75
    C. Confirmation Without Acceptance by All Impaired Classes: The
       'Cramdown' Alternative...........................................................75

XXII. IMPORTANT CONSIDERATIONS AND RISK FACTORS.................................76
    A. The Debtors Have no Duty to Update.........................................76
    B. No Representations Outside the Disclosure Statement Are Authorized................77
    C. Information Presented Is Based on the Debtors' Books and Records, and
       no Audit was Performed ...........................................................77
    D. All Information Was Provided by Debtors and Was Relied Upon by
       Professionals .........................................................................77
    E. Projections and Other Forward Looking Statements Are not Assured, and
       Actual Results Will Vary...........................................................77

|  | 1. | Claims Could Be More Than Projected | 77 |
|  | 2. | Projections | 78 |
| F. | | No Legal or Tax Advice Is Provided to You by This Disclosure Statement | 78 |
| G. | | No Admissions Made | 78 |
| H. | | No Waiver of Rights Except as Expressly Set Forth in the Plan | 78 |
| I. | | Business Factors and Competitive Conditions | 78 |
|  | 1. | General Economic Conditions | 78 |
|  | 2. | Business Factors | 78 |
|  | 3. | Competitive Conditions | 79 |
|  | 4. | Other Factors | 79 |
| J. | | Access to Financing and Trade Terms | 79 |
| K. | | Market for NewCo LLC Equity | 80 |
| L. | | Impact of Interest Rates | 80 |
| M. | | Bankruptcy Law Risks and Considerations | 80 |
|  | 1. | Confirmation of the Plan is Not Assured | 80 |
|  | 2. | The Plan May Be Confirmed Without the Approval of All Creditors Through So-Called "Cramdown" | 80 |
|  | 3. | The Effective Date Might Be Delayed or Never Occur | 81 |
|  | 4. | The Projected Value of Estate Assets Might Not Be Realized | 81 |
|  | 5. | Allowed Claims in the Various Classes May Exceed Projections | 81 |
| N. | | Tax Considerations | 81 |

XXIII. BINDING EFFECT OF CONFIRMATION ........ 81
| A. | | Binding Effect of Confirmation | 81 |
| B. | | Vesting of Assets Free and Clear of Liens, Claims and Interests | 81 |
| C. | | Good Faith | 82 |
| D. | | Discharge of Claims | 82 |
| E. | | Judicial Determination of Discharge | 82 |

XXIV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........ 82
| A. | | Federal Tax Consequences to the Debtors | 84 |
|  | 1. | Tax Classification of the Debtors and Certain Transactions Contemplated by the Plan. | 84 |
|  | 2. | Cancellation of Indebtedness Income Generally. | 84 |
|  | 3. | Bankruptcy Exception and the Reduction of Tax Attributes Generally. | 85 |
|  | 4. | Disregarded Entities Discharging Indebtedness Generally | 85 |
|  | 5. | Debtors' COD Income Attributable to the Plan. | 86 |
|  | 6. | Accrued Interest. | 86 |
|  | 7. | Alternative Minimum Tax. | 86 |
| B. | | Limitation of NOL Carryforwards and Other Tax Attributes | 86 |
|  | 1. | General Section 382 Limitation. | 86 |
|  | 2. | Special Bankruptcy Exceptions to the Section 382 Limitation | 87 |
| C. | | Federal Tax Consequences to the Claims and Equity Interests | 88 |
| D. | | Information Reporting and Backup Withholding. | 88 |

XXV. ALTERNATIVES TO THE PLAN ........ 89
| A. | | Liquidation Under Chapter 7 | 89 |
| B. | | Dismissal | 89 |

    C.      Alternative Plan ................................................................................89
XXVI. DEFINITIONS AND INTERPRETATION ....................................................89
    A.      Scope of Definitions. ........................................................................89
    B.      Definitions........................................................................................89
    C.      Rules of Interpretation. .....................................................................99
XXVII.      CONCLUSION.............................................................................100

US_ACTIVE 105458165.9 105458165.12

**TABLE OF EXHIBITS**

Exhibit l        The Plan

Exhibit 2        Solicitation Order

Exhibit 3        Projections

Exhibit 4        Liquidation Analysis

Exhibit 5        Valuations

US_ACTIVE-105458165.9105458165.12

## I.     SUMMARY

On January 25, 2011, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Debtors are operating their businesses and managing their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors are a leading business to business media and information provider for the insurance, investment, and professional services markets. In response to a variety of financial challenges summarized herein, the Debtors determined that the commencement of these chapter 11 cases would provide the best alternative to eliminate underproductive operations and to restructure their businesses and financial affairs.

As the culmination of their reorganization efforts, the Debtors are seeking confirmation of their chapter 11 plan of reorganization.  Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how to dispose of a debtor's assets and treat claims against, and interests in, such debtor.  A plan of reorganization typically may provide for a debtor-in-possession to reorganize by continuing to operate, to liquidate by selling assets of the estate or to implement a combination of both.  By the proposed plan, the Debtors seek to finally reorganize their operations and financial affairs and emerge from bankruptcy as strengthened businesses.

### A.     Why You Are Receiving This Document

The Bankruptcy Code requires that the party proposing a chapter 11 plan of reorganization prepare and file with the Bankruptcy Court a document called a "disclosure statement."  The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning the Plan.  In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the Plan to vote intelligently for or against the Plan or object to the Plan, as the case may be.  ***This document, together with its attached exhibits, is the Disclosure Statement for the Plan.  The Bankruptcy Court has reviewed this Disclosure Statement and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.***

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan.  The Disclosure Statement also discusses the events leading to the Debtors' filing their chapter 11 cases, describes the main events that have occurred in the Debtors' chapter 11 cases, and, finally, summarizes and analyzes the Plan.  The Disclosure Statement also describes certain U.S. Federal income tax consequences of the Plan to the Debtors and holders of Claims and Equity Interests, voting procedures and the confirmation process.

***All creditors should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan.  Indeed, creditors should not rely solely on the Disclosure Statement but should also read the Plan.  Moreover, the Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.***

B.    Plan Overview

1.    Purpose – Reorganization

The purpose of the Plan is to finalize the Debtors' chapter 11 reorganization by, among other things, providing the Debtors with a capital structure that can be supported by cash flows from operations.  The Debtors believe that the reorganization contemplated by the Plan is in the best interests of their creditors as a whole.  If the Plan is not confirmed, the Debtors believe that they will be forced either to file an alternate liquidating plan of reorganization or to liquidate under chapter 7 of the Bankruptcy Code.  In either event, the Debtors believe that the Debtors' unsecured creditors would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims.  See Article XXI hereof and the values set forth in the Liquidation Analysis attached hereto as Exhibit 4.

2.    Summary of Plan Treatment

**UNCLASSIFIED AND UNIMPAIRED CLAIMS**

| Unclassified Claims | Plan Treatment | Estimated Claims | Estimated %Recovery |
|---|---|---|---|
| DIP Facility Claims | The DIP Facility Claims shall be Allowed in full, including without limitation, (i) all Claims for unpaid principal, interest and other charges outstanding on the Effective Date and (ii) all Claims for fees and expenses and other charges provided for under the DIP Facility.  Except to the extent that a holder of an Allowed DIP Facility Claim and the Debtors, or the Reorganized Debtors, as the case may be, agree to a different treatment, on the Effective Date, each Allowed DIP Facility Claim shall be paid in full in Cash by wire transfer of immediately available funds from the proceeds of the revolving credit facility under the Exit Credit Documents. | None | 100%, if any |
| Administrative Expense Claims | Except to the extent that a holder of an Allowed Administrative Expense Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive a distribution of Cash in an amount equal to such Allowed Administrative Expense Claim, without interest, on or as soon as practicable after (but in no event more than ninety (90) days after, unless extended by the Bankruptcy Court) the later of (i) the Effective Date; and (ii) the first Business Day after the date that is ten (10) Business Days | $2.5 million | 100% |

US_ACTIVE-~~105458165.9~~105458165.12

| Unclassified Claims | Plan Treatment | Estimated Claims | Estimated %Recovery |
|---|---|---|---|
| | after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that (y) Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors (these Claims may include, without limitation, post-Petition Date salaries and other post-Petition Date benefits for employees, post-Petition Date rent for facilities and offices, amounts owed to vendors providing goods and services during the Debtors' Reorganization Cases and tax obligations incurred by the Debtors all in the ordinary course of business and after the Petition Date), as debtors or debtors-in-possession, may be paid in full and performed by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions and (z) Professional Fee Claims shall be paid in accordance with the applicable order of the Bankruptcy Court after filing a fee application, notice and a hearing pursuant to the procedures set forth in Section 13.4 of the Plan. | | |
| Priority Tax Claims | Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, on account of such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code and at the option of the Debtors, regular installment payments in Cash: (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code; (iii) over a period ending no later than 5 years after the Petition Date; and (iv) in a manner not less favorable than the most favored | $50,000` | 100% |

US_ACTIVE-105458165.9105458165.12

| Unclassified Claims | Plan Treatment | Estimated Claims | Estimated %Recovery |
|---|---|---|---|
| | nonpriority unsecured Claim provided for by the Plan (other than payments in Cash made to a Class of Creditors under section 1122(b) of the Bankruptcy Code). Each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided herein, and upon such full and final payment, such Lien shall be deemed to have been satisfied and shall be null and void and unenforceable for all purposes. | | |

US_ACTIVE 105458165.9 105458165.12

**CLASSIFIED CLAIMS**

| Class | Claim | Plan Treatment of Class | Estimated Claims | Estimated %Recovery |
|---|---|---|---|---|
| 1 | Pre-Petition First Lien Secured Claims | Class 1 Claims are impaired. Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.<br><br>On the Effective Date, the Pre-Petition First Lien Secured Claims shall be deemed Allowed, for all purposes of the Plan and the Debtors' Reorganization Cases, in an amount equal to all outstanding principal plus all unpaid interest accrued at the Allowed Interest Rate prior to the Petition Date, and all fees and expenses payable prior to the Petition Date in connection therewith in accordance with the terms of the Existing First Lien Credit Documents. On the Effective Date, holders of Allowed Class 1 Claims (or, with respect to clause (b) below, their designated affiliates) will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 1 Claim, (a) on the terms and conditions set forth in the Exit Credit Documents, and as set forth therein, a Pro Rata Share of participation in a $110 million first-priority first-lien term loan (the "Term Loan"), and (b) a Pro Rata Share of 94.7% of the Class A/B/C Units (with each holder (or designated affiliate) being entitled to choose Class A Units, Class B Units or Class C Units[2]). The Class A/B/C Units will be entitled to a total of 94.44% of the distributions made with respect to NewCo LLC Equity, subject to dilution by, among other things, NewCo LLC Equity Interests issued to officers and directors of the Reorganized Debtors pursuant to the Management Incentive Plan, all as provided by Section 6.01 of the NewCo Operating | $188 Million | 68% |

---

[2] Holders of Allowed Class 1 Claims who fail to make an election will be issued Class C Units.

US_ACTIVE-~~105458165.9~~105458165.12

| Class | Claim | Plan Treatment of Class | Estimated Claims | Estimated %Recovery |
|---|---|---|---|---|
| | | Agreement.<br><br>The holders of Allowed Class 1 Claims will be required to execute the Exit Credit Agreement prior to receiving any Pro Rata Share of the Term Loan.<br>The Exit Credit Documents shall be executed, delivered and performed by the Reorganized Debtors in accordance with their terms, and all fees and expenses and other amounts provided for thereunder shall be paid promptly when due. | | |
| 2 | Other Secured Claims | Class 2 Claims are unimpaired.  The Holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.  Each Class 2 Claim consists of Other Secured Claims against the applicable Debtor. ~~With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 2A, Class 2B and so on), so that each holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.~~<br>On the Effective Date, each Allowed Claim in Class 2 shall be, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 2 Claim, at the Debtors' option, (1) Reinstated, (2) satisfied by the Debtors' surrender of the collateral securing such Allowed Claim, (3) offset against, and to the extent of, the Debtors' claims against the holder of such Allowed Claim or (4) otherwise rendered not impaired, except to | $~~[*]~~30,000 | 100% |

US_ACTIVE-~~105458165.9~~105458165.12

| Class | Claim | Plan Treatment of Class | Estimated Claims | Estimated %Recovery |
|---|---|---|---|---|
| | | the extent that the Reorganized Debtors and such holder agree to a different treatment. | | |
| 3 | Other Priority Claims | Class 3 Claims are unimpaired. Holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 3 Claims are not entitled to vote to accept or reject the Plan. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment of such Allowed Other Priority Claim, each such holder will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 3 Claim, one of the following treatments, as determined by the Debtors after consultation with the Pre-Petition First Lien Agent and upon the consent of the Requisite Supporting First Lien Parties, when such Claim becomes Allowed: The Debtors will pay the Allowed Class 3 Claim in full, without interest, in Cash on the Effective Date or as soon thereafter as is practicable; provided that Allowed Class 3 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Allowed Class 3 Claims become due and owing in the ordinary course of business; or each such Allowed Class 3 Claim will be treated in any other manner so that such Claim shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code. | $[*]De Minimis | 100%, if any |
| 4 | Pre-Petition Second Lien Claims | Class 4 Claims are impaired. Holders of Class 4 Claims are entitled to vote to accept or reject the Plan. On the Effective Date, the Pre-Petition Second Lien Claims shall be deemed Allowed, for all purposes of the Plan and the Debtors' Reorganization Cases, in an amount equal to all outstanding principal plus all unpaid interest accrued prior to the | $55 Million | 4% |

US_ACTIVE 105458165.9 105458165.12

| Class | Claim | Plan Treatment of Class | Estimated Claims | Estimated %Recovery |
|---|---|---|---|---|
| | | Petition Date, and all fees and expenses payable in connection therewith prior to the Petition Date in accordance with the terms of the Existing Second Lien Credit Documents.<br><br>On the Effective Date, holders of Allowed Class 4 Claims (or, with respect to clause (b) below, their designated affiliates) will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 4 Claim, (a) a Pro Rata Share of $1 million by wire transfer of immediately available funds, and (b) a Pro Rata Share of the Class E Units. The Class E Units will be entitled to a total of 5.56% of the distributions made with respect to NewCo LLC Equity, subject to dilution by, among other things, NewCo LLC Equity Interests issued to officers and directors of the Reorganized Debtors pursuant to the Management Incentive Plan, all as provided by Section 6.01 of the NewCo Operating Agreement. | | |
| 5 | General Unsecured Claims | Class 5 Claims are impaired. Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.<br><br>Holders of Allowed Class 5 Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 5 Claim, a Pro Rata Share of the Class 5 Recovery, i.e. $100,000. | $6 Million | 2% |
| 6 | Intercompany Claims | Class 6 Claims are unimpaired. Holders of Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 6 Claims are not entitled to vote to accept or reject the Plan. The legal, equitable and contractual rights of the holders of Intercompany Claims are unimpaired by the Plan. On or as soon as practicable after the Effective Date, and after consultation with and approval by the | $[*] | 100% |

US_ACTIVE 105458165.9 105458165.12

| Class | Claim | Plan Treatment of Class | Estimated Claims | Estimated %Recovery |
|---|---|---|---|---|
| | | ~~Pre-Petition First Lien Agent, with such approval not to be unreasonably withheld, all Intercompany Claims will either be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors or adjusted, continued or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.~~ | | |
| ~~7~~6 | Equity Interests in Summit | Class ~~7~~6 Equity Interests are impaired. Therefore, holders of Class ~~7~~6 Equity Interests are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Holders of Class ~~7~~6 Equity Interests are not entitled to vote to accept or reject the Plan.<br>On the Effective Date, the Equity Interests in Summit shall be cancelled and be of no further force and effect. Holders of such Equity Interests are not entitled to receive or retain any property or distribution under the Plan on account of any Class ~~7~~6 Equity Interests. | N/A | 0% |
| ~~8~~7 | Equity Interests in all Debtors Other than Summit | Class ~~8~~7 Equity Interests are unimpaired. The holders of Class ~~8~~7 Equity Interests are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, holders of Class ~~8~~7 Equity Interests are not entitled to vote to accept or reject the Plan.<br>The legal, equitable and contractual rights of the holders of Equity Interests in any Debtor other than Summit are unimpaired the Plan. On the Effective Date, such Equity Interests shall be Reinstated. | N/A | 100% |

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE**

US_ACTIVE-~~105458165.9~~105458165.12

**BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CLAIM AND EQUITY INTEREST HOLDERS.**

3.   Executory Contracts and Unexpired Leases

As of the Effective Date, all executory contracts or unexpired leases listed on Exhibit 5 to the Plan shall be and shall be deemed to be rejected in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. All executory contracts or unexpired leases of the Reorganized Debtors not listed on Exhibit 5 to the Plan, and not otherwise the subject of a pending objection or pleading seeking to reject or otherwise contesting the executory contract or unexpired lease, are hereby assumed as of the Effective Date in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

C.   Voting and Confirmation

Each holder of a Claim in Classes 1, 4 and 5 shall be entitled to vote either to accept or reject the Plan. Class 7̶6 is deemed to reject the Plan. Classes 1, 4, and 5 shall have accepted the Plan if: (i) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing (as defined below) scheduled to commence on —,May 5, 2011 before the Bankruptcy Court.

Article II of this Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating ballots. The Bankruptcy Court has established —,March 28, 2011 (the "Voting Record Date") as the date for determining which holders of Claims are eligible to vote on the Plan. Ballots will be mailed to all registered holders of Claims as of the Voting Record Date who are entitled to vote to accept or reject the Plan. An appropriate return envelope to The Garden City Group, Inc. (the "Solicitation Agent") will be included with your ballot.

The Debtors have engaged the Solicitation Agent to assist in the voting process. The Solicitation Agent will answer questions, provide additional copies of all materials and oversee the voting tabulation. The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

D.   Risk Factors and Disclaimer

Prior to deciding whether and how to vote on the Plan, each holder of a Claim should carefully read this Disclosure Statement, with all attachments and enclosures, in its entirety, in order to formulate an informed opinion as to the manner in which the Plan affects their Claim(s)

US_ACTIVE-105458165.9105458165.12

against the Debtors and to determine whether to vote to accept the Plan.  Holders of Claims should particularly consider the risk factors described in Article XXII below.

Holders of Claims should also read the Plan carefully and in its entirety.  The Disclosure Statement contains a summary of the Plan for convenience, but the terms of the Plan, itself, supersede and control the summary.

In formulating the Plan, the Debtors relied on financial data derived from their books and records.  The Debtors therefore represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this Disclosure Statement.  The liquidation analyses, distribution projections and other information described herein are estimates only, and the timing and amounts of actual distributions to creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtors for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors and other professionals employed by the Debtors have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors and other professionals employed by the Debtors shall have no liability for the information in this Disclosure Statement.**

**The Debtors and their professionals also have made a diligent effort to identify in this Disclosure Statement and in the Plan pending litigation claims and projected Causes of Action and objections to Claims.  However, no reliance should be placed on the fact that a particular litigation Claim or projected Cause of Action or objection to Claim is, or is not, identified in this Disclosure Statement or the Plan.  The Debtors or Reorganized Debtors, as applicable, may seek to investigate, file and prosecute litigation Claims and projected Causes of Action and objections to Claims after the Confirmation Date or Effective Date of**

US_ACTIVE-~~105458165.9~~105458165.12

**the Plan irrespective of whether this Disclosure Statement or the Plan identifies any such Claims, Causes of Action or objections to Claims.**

## II.  VOTING ON AND CONFIRMATION OF THE PLAN

### A.  Deadline for Voting for or Against the Plan

If one or more of your Claims is in a voting Class, the Debtors have sent you one or more individual ballots, with return envelopes (WITHOUT POSTAGE ATTACHED) for voting to accept or reject the Plan.  The Debtors urge you to accept the Plan by completing, signing and returning the enclosed ballot(s) in the return envelope(s) (WITH POSTAGE AFFIXED BY YOU) to the Solicitation Agent as follows:

If sent by U.S. Mail:                                        If sent by courier service, overnight or hand
                                                            delivery:

The Garden City Group, Inc.
Attn: Summit Balloting Agent                                 The Garden City Group, Inc.
P.O. Box 9655                                                Attn: Summit Balloting Agent
Dublin, OH 43017-4955                                        5151 Blazer Pkwy., Suite A
                                                            Dublin, OH 43017

TO BE COUNTED, THE SOLICITATION AGENT MUST RECEIVE YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON                              , 2011** (THE "VOTING DEADLINE"), UNLESS THE BANKRUPTCY COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED. ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS IN THE SAME CLASS OR SUBCLASS HELD BY THE SAME HOLDER THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED AT THE DISCRETION OF THE DEBTORS.

Detailed voting instructions are printed on and/or accompany each ballot.  Any ballot sent by mail must be received by the Solicitation Agent at the appropriate address set forth above by no later than 5:00 p.m. prevailing Eastern Time on the Voting Deadline.  Any ballot sent by any other means must be physically received by the Solicitation Agent by the Voting Deadline or it shall not be counted.  Any unsigned ballot or any ballot that has no original signature, including any ballot received by facsimile or other electronic means, or any ballot with only a photocopy of a signature shall not be counted.  Any ballot that is not clearly marked as voting for or against the Plan, or marked as both voting for and against the Plan, shall not be counted.  Any ballot that is properly completed and timely received shall not be counted if such ballot was sent in error to, or by, the voting party, because the voting party did not have a Claim that was entitled to be voted in the relevant voting class as of the Voting Record Date. Whenever a holder of a Claim in a voting class casts more than one ballot voting the same Claim prior to the Voting Deadline, the

US_ACTIVE-~~105458165.9~~105458165.12

last ballot physically <u>received</u> by the Solicitation Agent prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus shall supersede and replace any prior cast ballot(s), and any prior cast ballot(s), shall not be counted. The Debtors, without notice, subject to contrary order of the Bankruptcy Court, may waive any defect in any ballot at any time, either before or after the close of voting. Such determinations will be disclosed in the voting report and any such determination by the Debtors shall be subject to de-novo review by the Bankruptcy Court.

On February 1, 2011, the Debtors filed their Plan [D.I. 47] and, on February 16, 2011, the Debtors filed their Disclosure Statement [D.I. 68] and their *Motion of Debtors and Debtors-in-Possession for an Order: (I) Approving Their Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Their Joint Plan of Reorganization, Including: (A) Approving the Form and Manner of Distribution of Solicitation Packages, (B) Approving the Form and Manner of Notice of the Confirmation Hearing, (C) Establishing a Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing the Deadline for Receipt of Ballots, and (F) Approving the Procedures for Vote Tabulations; (III) Establishing the Deadline and Procedures for Filing Objections to: (A) Confirmation of the Plan and (B) Proposed Cure Amounts Related to Contracts and Leases Assumed Under the Plan; and (IV) Granting Related Relief* (D.I. 69). The Bankruptcy Court has entered the solicitation order requested by that motion, which, among other things, approved the voting procedures addressed herein (D.I. _____) (the "Solicitation Order"). You should carefully read the Solicitation Order, which is annexed hereto as Exhibit 2. It establishes, among other things: (a) the deadlines, procedures and instructions for voting to accept or reject the Plan; (b) the Voting Record Date, which is March 28, 2011; (c) the applicable standards for tabulating ballots; (d) the deadline for filing objections to confirmation of the Plan; and (e) the date and time of the Confirmation Hearing (as defined below).

The Solicitation Order should be referred to if you have any questions concerning the procedures described herein. If there are any inconsistencies or ambiguities between this Disclosure Statement and the Solicitation Order, the Solicitation Order will control.

B.    Confirmation Hearing for the Plan

The Bankruptcy Court has set a hearing on the confirmation of the Plan (the "Confirmation Hearing") to consider objections to Confirmation, if any. The Confirmation Hearing shall commence at **3:30 p.m., Prevailing Eastern Time** on **May 5,** **2011**, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time, without notice, other than an announcement of a continuance date at such hearing or a continued hearing, or by posting such continuance on the Court's docket.

C.    Any Objections to Confirmation of the Plan

Any responses or objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court with a copy to the Court's Chambers, together with a proof of service thereof, and served on counsel for the Debtors and the Office of United States

Trustee **ON OR BEFORE** ~~—~~ APRIL 28, 2011 at **5:00 PM, Prevailing Eastern Time**.
Bankruptcy Rule 3020 governs the form of any such objection.

**Counsel on whom objections must be served are:**

Counsel for the Debtors
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Attn:   J. Andrew Rahl, Jr.
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
E-mail: arahl@reedsmith.com

Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Attn:   Kimberly E C Lawson
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
E-mail: klawson@reedsmith.com

Counsel for the United States Trustee
Office of the United States Trustee
844 N. King Street, Second Floor
Wilmington, DE 19801
Attn:   David Buchbinder

Counsel for the Pre-Petition First Lien Agent
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL 60606
Attn:   J. Robert Stoll
          John J. Voorhees, Jr.
Tel: (312) 782-0600
Fax: (312) 701-7711
Email: jstoll@mayerbrown.com
          jvoorhees@mayerbrown.com

Counsel for Pre-Petition Second Lien Agent
Bingham McCutchen LLP
399 Park Avenue
New York, NY  10022-4699
Attn:   Katherine G. Weinstein
Tel: (212) 705-7761
Fax: (212) 702-3691
Email: katherine.weinstein@bingham.com

Counsel for the Agent for the Revolving
Lenders

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Attn:   John Box
Tel: (312) 853-7425
Fax: (312) 853-7036
Email: jbox@sidley.com

US_ACTIVE- ~~105458165.9~~ 105458165.12

D.    Recommendations for Voting

The Debtors strongly recommend that you vote in favor of the Plan.  Nonacceptance of the Plan may result in protracted delays, a chapter 7 liquidation or the confirmation of another less favorable chapter 11 plan.  These alternatives may not provide for distribution of as much value to holders of Allowed Claims as does the Plan.  The Debtors believe that unsecured creditors will receive a greater distribution under the Plan than they would in a chapter 7 liquidation, as more fully discussed in Article XXI below.

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS AS A WHOLE.  THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN.**

III.    **ORGANIZATION AND ACTIVITIES OF THE DEBTORS**

A.    Overview of the Debtors' Corporate Structure and Business Operations

Summit is a Delaware corporation that wholly owns Summit Business Media Intermediate Holding Company, LLC, a Delaware limited liability company ("Summit Intermediate").  Summit Intermediate wholly owns The National Underwriter Company, an Ohio corporation ("National Underwriter"), which in turn wholly owns six (6) distinct subsidiary companies which comprise the remaining Debtors (collectively, the "Subsidiaries").

While certain managerial and related financial functions are centralized at the Summit and Summit Intermediate levels, National Underwriter is the operating company that holds substantially all of the Debtors' assets.  Through various management agreements with the Subsidiaries, National Underwriter also obtains the benefits and burdens of certain contracts, permits, and other assets that the Subsidiaries hold for various business and tax purposes.

The Debtors collectively employ approximately 400 people (including open positions) across the United States and are a leading business to business media and information provider for the insurance, investment, and professional services markets.  The Debtors' business is organized into four divisions: Media, Event, Reference, and Data:

1.    Media Division.

The Media Division is divided into two groups: Insurance and Financial/Professional Services.

a.    *Insurance Media Group*.  Consisting of ten magazines and related web properties and producing many custom media products for clients, the Insurance Media Group provides information for insurance industry professionals with titles geared to the life, health, and benefits markets and property/casualty insurance markets.

US_ACTIVE-~~105458165.9~~105458165.12

b. *Financial and Professional Services Media Group.* The Financial and Professional Services Media Group serves two key markets: the investment advisory market and the financial and professional services market. The Advisor Media Group has three magazines and a number of related web properties and produces many custom media products for clients. The Professional Services Group serves executives in Fortune 1,000 companies and practitioners and specialists in the futures and credit union industries; products include weekly newspapers, monthly magazines, and a suite of digital and custom products.

2. Events Division; Conferences.

The Live Events Division produces conferences for the insurance, accounting, financial services, banking, legal, professional services, mining, and natural resources investment industries.

3. Reference Division.

The Reference Division issues over 200 titles and services including FC&S Online, Tax Facts Series, Online AUS, and OCS. The Reference Division also offers training and CE Administration Services.

4. Data Division.

The Data Division is divided into two groups, the Highline Data Group and Marketing Data Group.

a. Highline Data Group. The Highline Data Group is headquartered in Cambridge, MA, and provides insurance industry financial performance data, market data, and education services. Its suite of products publishes financial information on more than 8,000 U.S. insurance companies.

b. Marketing Data Group. The Marketing Data Group provides marketing lists of executives and insurance and benefits producers and creates promotional programs for customers to reach prospects and recruits.

B. Management

1. Board of Directors of Summit

The Summit board of directors ("Board") oversees the Debtors' management, reviews their long-term strategic plans and exercises direct decision-making authority in key areas. Summit's current Board is:

- James P. TenBroek

- Efrem Zimbalist III

- Andrew Goodenough

US_ACTIVE-105458165.9105458165.12

- James Alic

- Anthony Reilly

The members of the Board of Reorganized Summit will be disclosed in the Plan Supplement.

### 2. Existing Executive Officers of Summit

The following are Summit's current senior executive officers:

- Andrew L. Goodenough, President & CEO

- Thomas M. Flynn, COO, CFO, Treasurer and Secretary

~~The~~ It is anticipated that these individuals also will be the senior executives of Reorganized Summit ~~will be disclosed in the Plan Supplement~~holding substantially the same offices.

### C. Compensation and Benefits

The Debtors historically have provided a competitive compensation and benefit package to their employees consistent with their belief that the success of their businesses is dependent to a significant extent upon the efforts and abilities of its employees.

Upon completion of the Debtors' financial statements in February or March of the year following the year in which the Debtors' and the individual's performance is reviewed, the Board reviews the Debtors' and each eligible bonus participant's performance to determine the incentive bonus amounts, if any, to be paid to each eligible employee.

In addition, ~~certain members of~~Summit's senior ~~management~~executives described above and certain other key employees are subject to employment agreements that are renewable annually and provide for base salary ~~and~~, discretionary bonus compensation and severance payments in the event of their termination without good reason (as defined) or in the event that Summit exercises its annual right not to renew such employment.

Under the Plan, except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of the Debtors entered into before or after the Petition Date and not since terminated, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under the Plan, but only to the extent that rights under such programs are held by the debtors or Persons who are employees of the debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive confirmation of the Plan, except for (a) executory contracts or plans specifically rejected pursuant to the Plan, and (b) executory contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts. Notwithstanding any other provision of the Plan, any entitlement to acquire Interests held as of the Effective Date by any officer, director or employee of any of the Debtors, whether automatic or contained in a compensation and benefit

US_ACTIVE-~~105458165.9~~105458165.12

program, shall be terminated and any resulting claims shall be disallowed.  Further, future compensation and benefit decisions will be made by the Board of Reorganized Summit. Depending upon such decisions, there is no assurance that key employees will continue in the employ of the Reorganized Debtors.

The compensation and benefits of the members of the Board and the senior executives executive officers of Reorganized Summit will be disclosed in the Plan Supplement. The Plan also provides for the approval of the Management Incentive Plan, pursuant to which the Board may issue Class D Units to the senior executives of Reorganized Summit that would dilute the economic interests represented by the NewCo LLC Equity to be issued pursuant to the Plan.

D.    Severance Practices

Certain of Summit's management and key employees described above are subject to employment agreements containing fixed severance terms.  With respect to employees who do not have an employment agreement, the The Debtors historically have awarded an employee severance pay if employment is terminated for reasons such as a reduction in the work force or job elimination.  Except as described above, there are no contractual severance arrangements in place for employees of the Debtors.

## IV.    Pre-Petition Capitalization

The Debtors began operations in November 2006 following their acquisition of two of their present businesses.  The Debtors made five additional acquisitions over the next two years to assume their present form.  These acquisitions were financed by a combination of equity investment of an aggregate of approximately $110 million and debt provided by the Pre-Petition First Lien Secured Lenders and Pre-Petition Second Lien Lenders and their predecessors as outlined below.  From inception until the present, 85% of the Debtors' equity interests have been owned by affiliates of Wind Point Partners, and the balance of 15% has been owned by members of the Debtors' management.  The Debtors have never paid any dividends or made other comparable payments on account of their equity interests.

As of the Petition Date, the Debtors collectively had unpaid pre-petition debt and general unsecured claims in an aggregate amount of approximately $252 million.  Of this total, Summit Intermediate had approximately $188,618,143 outstanding under the Pre-Petition First Lien Credit Agreement.  Each other Debtor has guaranteed and pledged substantially all of its assets as collateral security for Summit Intermediate's obligations under the Pre-Petition First Lien Credit Agreement.

As of the Petition Date, Summit Intermediate had approximately $55,224,420 outstanding under the Pre-Petition Second Lien Credit Agreement.  Each other Debtor has guaranteed and pledged substantially all of its assets as collateral security for Summit Intermediate's obligations under the Pre-Petition Second Lien Credit Agreement.  The Debtors' obligations under the Pre-Petition Second Lien Credit Agreement are subordinated to their obligations under the Pre-Petition First Lien Credit Agreement.

As of the Petition Date, the Debtors had incurred other unsecured claims in an estimated aggregate amount of $8,150,000.

US_ACTIVE-105458165.9105458165.12

## V.      Events Leading to the Debtors' Bankruptcy Filing

Over the past two and a quarter years, the global economy has experienced a prolonged recession.  In these difficult economic circumstances, the Debtors have faced a challenging operating environment in which, as with other business to business media companies including Cygnus Business Media, Inc. (Case No. 09-12765, Bank. D. Del. August 3, 2009), Questex Media Group, Inc. (Case No. 09-13423, Bankr. D. Del. October 5, 2009), and Penton Media, Inc. (Case No. 10-10689, Bankr. S.D.N.Y. February 20, 2010), they have been compelled to restructure.

In addition to the economic downturn, the media industry as a whole and the business to business media industry in particular are undergoing structural change through a shift from print products to digital media.  For the Debtors, electronic revenue has grown from 22% of total revenue in 2008 to 29% of total revenue for 2009, and 32% of total revenue in 2010.  From 2008 to 2009, on a same product basis, print revenue decreased by 33%, event revenue decreased by 15%, and electronic revenue increased by 3%, despite the economic issues confronting their core audience industries.  Digital advertising continues to convert from print at a similar rate but overall advertising has remained flat over the depressed 2009 levels since April of 2010.

As a result, various Events of Default occurred under the Pre-Petition First Lien Credit Agreement and Pre-Petition Second Lien Credit Agreement because of the Debtors' failure (a) to comply with certain financial covenants for the fiscal quarters ended December 31, 2008, March 31, 2009, and June 30, 2009, (b) to deliver unqualified audited financial statements for the fiscal year ended December 31, 2008, and (c) to comply with certain other terms of the Pre-Petition First Lien Credit Agreement and Pre-Petition Second Lien Credit Agreement relating to earn out payments and asset sales (collectively, the "Existing Defaults").

Starting in the fourth quarter of 2008, the Debtors embarked on a large scale cost-cutting initiative which included divestitures, closures of non-performing assets, and layoffs of approximately 25% of its workforce.  The Debtors also instituted a 10% salary reduction furlough program and curtailed their 401k match program.

These efforts significantly reduced expenses and maintained an approximate 20% profit margin but could not completely address the Debtors' over leveraged capital structure and resulting lack of adequate liquidity.

On August 19, 2009, the Debtors entered into amendments of both their Pre-Petition First Lien Credit Agreement and Pre-Petition Second Lien Credit Agreement (the "2009 Amendments") pursuant to which the Pre-Petition First Lien Secured Lenders and Pre-Petition Second Lien Lenders, respectively, agreed to waive the Existing Defaults for the period from June 30, 2009 until the earlier to occur of June 30, 2010 or the occurrence of any Event of Default other than the Existing Defaults.

The 2009 Amendments anticipated a restructuring of the outstanding liabilities of the Debtors by requiring them to deliver to the Pre-Petition First Lien Secured Lenders and Pre-Petition Second Lien Lenders (together, the "Lenders") a 2010 budget and five year forecast by January 30, 2010 and a restructuring proposal by April 1, 2010, and thereafter to discuss these

US_ACTIVE 105458165.9 105458165.12

deliveries with the Lenders and reach agreement on a restructuring of the Debtors' liabilities by June 30, 2010. Failure to reach such an agreement was a default under the 2009 Amendments and would result in a reinstatement of the Existing Defaults. The Debtors did deliver their budget, five year forecast, and restructuring proposal by the required dates, but a restructuring agreement was not reached by June 30, 2010, and the Debtors accordingly went into default under both their Pre-Petition First Lien Credit Agreement and Pre-Petition Second Lien Credit Agreement.

## VI.    Terms of the Debtors' Financial Restructuring

The Debtors continued their restructuring discussions with the Lenders throughout 2010 and into this year. Given their highly leveraged capital structure and their current and projected liquidity profile, the Debtors, in consultation with their professionals, concluded that a full balance sheet restructuring was necessary.

The Debtors carefully evaluated a number of options to address their financial issues. Those efforts included sharing information and engaging in discussions with a variety of the Debtors' stakeholders with the goal of restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities. These discussions resulted in an agreement on the terms of a financial restructuring between the Debtors and (a) the holders of approximately 83% in amount and 65% in number of the Claims outstanding under the Pre-Petition First Lien Credit Agreement and (b) the holders of approximately 85% in amount and 78% in number of the Claims outstanding under the Pre-Petition Second Lien Credit Agreement.

The terms of the Debtors' financial restructuring provide for the cancellation of an aggregate of approximately $140 million of pre-petition debt and other Claims as follows:

(a)      the Pre-Petition First Lien Obligations will be restructured into a $110 million term loan facility (the "Exit Term Debt"), and the balance of the Pre-Petition First Lien Obligations will be cancelled and the holders of the Pre-Petition First Lien Obligations will receive pro rata shares of the Exit Term Debt and 94.7% of the Class A/B/C Units (with each holder (or designated affiliate) being entitled to choose Class A Units, Class B Units or Class C Units). The Class A/B/C Units will be entitled to a total of 94.44% of the distributions made with respect to NewCo LLC Equity, subject to dilution by, among other things, NewCo LLC Equity Interests issued to officers and directors of the Reorganized Debtors pursuant to the Management Incentive Plan, all as provided by Section 6.01 of the NewCo Operating Agreement. Each class of the Class A/B/C units will have different voting rights and each holder of the Pre-Petition Term Loan Obligations will have the right to elect which of such class(es) of units it receives under the Plan. Holders who fail to make an election will be issued Class C Units.

(b)      the Debtors will also receive a new revolving credit loan facility of up to $6 million (the "Exit Revolving Credit Facility"), and the initial drawing upon the Exit Revolving

US_ACTIVE-~~105458165.9~~105458165.12

Credit Facility concurrent with the Debtors' emergence from bankruptcy will be applied to repay any amounts then outstanding under the Debtors' DIP Facility[3];

      (c)     the Pre-Petition Second Lien Obligations will be cancelled in their entirety and the holders of the Pre-Petition Second Lien Obligations will receive pro rata distributions of: (i) $1 million in Cash, and (ii) the Class E Units. The Class E Units will be entitled to a total of 5.56% of the distributions made with respect to NewCo LLC Equity, subject to dilution by, among other things, NewCo LLC Equity Interests issued to officers and directors of the Reorganized Debtors pursuant to the Management Incentive Plan, all as provided by Section 6.01 of the NewCo Operating Agreement;

      (d)     $100,000 will be distributed on a pro rata basis to the Debtors' general unsecured creditors and all of their General Unsecured Claims will be cancelled; and

      (e)     all of the Debtors' Equity Interests will be cancelled, for which holders of such interests will receive no distribution on account of such interests.

The terms of this restructuring have been documented in the Restructuring Support Agreement between the Debtors and (a) the holders of approximately 83% in amount and 65% in number of the Claims outstanding under the Pre-Petition First Lien Credit Agreement and (b) the holders of approximately 85% in amount and 78% in number of the Claims outstanding under the Pre-Petition Second Lien Credit Agreement, which Restructuring Support Agreement was filed with the Bankruptcy Court on February 2, 2011 (D.I. 51). The Restructuring Support Agreement provides that the parties have agreed to and will support the Plan, which was filed with the Bankruptcy Court on February 1, 2011 (D.I. 47). It further provides for the specific terms of the Debtors' Exit Term Debt, Exit Revolving Credit Facility, New Equity, and the most important of the organizational documents to be entered into upon confirmation of the Plan, all as reflected in the agreements and other documents attached as exhibits to the Restructuring Support Agreement.

The Class A/B/C Units will not be evidenced by certificates. Each Class A/B/C Unit will have one vote with respect to matters on which it is entitled to vote. Generally, Class A Units will have voting rights on all matters which affect NewCo LLC, and the Class A Units also will vote as a class to approve any changes in the voting rights or conversion rights of the Class A Units or any changes to the economic interests of the Class A Units that are not equally applicable to the Class B Units. Class B Units will have voting rights with respect to mergers, asset sales, redemption or purchase of equity interests of NewCo LLC, liquidation or dissolution, the entry into new operating businesses and certain other organic changes, and the Class B Units also will vote as a class on the approval of any changes to the voting rights or conversion rights of the Class B Units or any changes to the economic interests of the Class B Units that are not equally applicable to the Class A Units. The Class C Units will vote as a class on the approval of any changes to the voting rights or conversion rights of the Class C Units or

---

[3] The providers of the Exit Revolving Credit Facility will receive 5% (subject to dilution) of the New Equity in connection with providing that facility.

US_ACTIVE-~~105458165.9~~105458165.12

any changes to the economic interests of the Class C Units that are not equally applicable to the Class A Units.  Each Class A Unit, Class B Unit and Class C Unit will be entitled to distributions and allocations of income in equal proportion to every other Class A/B/C Unit.  Each Class A Unit, Class B Unit and Class C Unit may, at the option of holder, be converted to Units of any other Class of the Class A/B/C Units upon giving notice of such conversion to NewCo LLC.

## VII.  The Bankruptcy Cases

### A.  Web Site

The Debtors have established a web site which contains copies of the motions, orders and other documents referred to below, as well as other information about the Debtors' affairs, at: www.summitreorg.com.

### B.  Summary of "First Day" Motions and Orders.

#### 1.  Post-Petition Financing.

*Motion of Debtors for Interim and Final Orders (I) Authorizing Post-Petition Secured Financing Pursuant to Sections 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), 364(E) and 503(B) of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral; (III) Providing Adequate Protection to the Existing First Lien Secured Parties and Existing Second Lien Lenders Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code; (IV) Modifying the Automatic Stay Pursuant to Section 362(D) of the Bankruptcy Code; and (V) Scheduling a Final Hearing* (D.I. 11). On January 28, 2011, the Bankruptcy Court approved the DIP Facility by and among the Debtors and the DIP Lenders of up to $5 million in debt financing and granted the Debtors the ability to borrow $2.5 million immediately from the DIP Lenders, pending entry of a Final Order on the DIP Facility (D.I. 32).  The DIP Facility is secured by virtually all of the Debtors' assets on a superpriority basis.  On ―,March 1, 2011, the Bankruptcy Court entered a Final Order approving the DIP Facility (D.I.  108).  Specifically, the Bankruptcy Court:

a.  authorized the Debtors to use cash collateral;

b.  authorized the Debtors to obtain post-petition financing and execute and enter into the DIP Facility and all documents, agreements or instruments in connection with the DIP Facility or related thereto and to perform such other and further acts as may be required in connection with the DIP Facility;

c.  granted priming liens and super-priority claims to and on behalf of and for the benefit of the DIP Lenders on virtually all of the Debtors' assets  to secure any and all of the DIP Obligations;

d.  granted adequate protection to the Lenders;

e.  approved certain stipulations by the Debtors;

US_ACTIVE 105458165.9105458165.12

f.      modified the automatic stay, under Section 362 of the Bankruptcy Code, to, among other things, permit the DIP Lenders to accelerate the repayment of amounts due and to terminate all commitments under the DIP Facility upon the earlier to occur of: (i) the termination, acceleration or maturity of the DIP Obligations; and (ii) the DIP Order ceasing to be in full force and effect; and

g.      limited the Debtors' right to surcharge against collateral pursuant to Section 506(c) of the Bankruptcy Code.

2.      Joint Administration Motion.

*Debtors' Motion Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 for Order Authorizing Joint Administration* (D.I. 3).  On January 28, 2011, the Bankruptcy Court granted the Debtors' request to authorize the joint administration, for procedural purposes only, of the Debtors' chapter 11 cases as set forth in the *Order Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 Authorizing Joint Administration* (D.I. 24).

3.      Motion for Consolidated List of Creditors

*Debtors' Motion for Order Authorizing the Debtors to File (I) Consolidated List of Creditors and (II) Consolidated List of Debtors' Top Thirty (30) Creditors* (D.I. 5).  On January 28, 2011, the Bankruptcy Court granted the Debtors' request to file a consolidated list of creditors and the consolidated top 30 list as set forth in the *Order Authorizing the Debtors to File (I) Consolidated List of Creditors and (II) Consolidated List of Debtors' Top Thirty Creditors* (D.I. 26).

4.      Cash Management Motion.

*Debtors' Motion for an Order (I) Authorizing and Approving Continued Use of Existing Cash Management System, (II) Authorizing Continued Use of Existing Bank Accounts and Business Forms, (III) Authorizing Intercompany Transactions, (IV) Waiving the Requirements of 11 U.S.C. § 345(B) on an Interim Basis, and (V) Allowing Banks to Continue to Set Off Against the Debtors' Bank Accounts Ordinary Administrative Fees* (the "Cash Management Motion") (D.I. 6).  In an effort to lessen the disruption caused by the bankruptcy filings and maximize the value of their estates, the Debtors requested authorization from the Bankruptcy Court to continue to utilize the centralized cash management system, bank accounts and investment practices, among other things, that had been in place prior to the Petition Date, as more particularly set forth in the Cash Management Motion.  On January 28, 2011, the Bankruptcy Court granted the Debtors' request pursuant to the *Order (I) Authorizing and Approving Continued Use of Existing Cash Management System, (II) Authorizing Continued Use of Existing Bank Accounts and Business Forms, (III) Authorizing Intercompany Transactions, (IV) Waiving the Requirements of 11 U.S.C. § 345(B) on an Interim Basis, and (V) Allowing Banks to Continue to Set Off Against the Debtors' Bank Accounts Ordinary Administrative Fees* (D.I. 27).

5.      Employee Wages and Benefits Motion.

*Debtors' Motion for an Order (I) Authorizing the Debtors, in Their Discretion, to Pay Certain Pre-Petition Employee Wages, Compensation, and Employee Benefits and Continue*

*Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business and (II) Authorizing the Debtors' Banks and Other Financial Institutions to Process, Honor, and Pay Certain Checks Presented for Payment and Fund Transfer Requests* (the "Employee Motion") (D.I. 7).

Pursuant to the Employee Motion, the Debtors requested authorization to pay certain obligations to employees and former employees that arose prior to the Petition Date. Specifically, the Debtors requested permission to pay earned, but unpaid pre-petition wages and salaries, inclusive of withholding for payroll taxes, and severance in an aggregate amount not to exceed $1.8 million with no single employee receiving more than $11,725. Additionally, the Debtors requested authorization to reimburse employees for pre-petition business expenses and pay and/or remit applicable accrued and outstanding tax obligations, other withholdings, employee benefit obligations, and medical, dental and life insurance obligations, 401k contributions, and other miscellaneous benefits. On January 28, 2011, the Bankruptcy Court granted the relief requested in the Employee Motion upon the terms and conditions set forth in the *Order (I) Authorizing the Debtors, in Their Discretion, to Pay Certain Pre-Petition Employee Wages, Compensation, and Employee Benefits and Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business and (II) Authorizing the Debtors' Banks and Other Financial Institutions to Process, Honor, and Pay Certain Checks Presented for Payment and Fund Transfer Requests* (D.I. 28).

6.      Critical Vendor Motion

*Debtors' Motion for an Order Authorizing the Payment of Certain Pre-Petition Claims of Certain Critical Vendors* (the "Critical Vendor Motion") (D.I. 8). Pursuant to the Critical Vendor Motion, the Debtors requested authority to pay outstanding pre-petition claims, in an aggregate amount not to exceed $2.5 million, to certain vendors deemed critical to the Debtors' operations. The Critical Vendor Motion contemplated that any critical vendor receiving payment of its pre-petition claim, could be required, at the Debtors' discretion, to execute a trade agreement obligating such vendor to extend customary trade terms (consistent with the parties' pre-petition dealings) to the Debtors post-petition. On January 28, 2011, the Bankruptcy Court authorized the relief requested as set forth in the *Order Authorizing the Payment of Certain Pre-Petition Claims of Certain Critical Vendor* (D.I. 29).

7.      Motion Confirming Priority of Section 503(b)(9) Administrative Claims.

*Motion for an Order Authorizing Debtors to Pay Certain Pre-Petition Claims of Suppliers and Vendors of Goods Entitled to Administrative Priority* (D.I. 9) (the "Motion to Pay Section 503(b)(9) Claims"). Pursuant to the Motion to Pay Section 503(b)(9) Claims, the Debtors requested an order confirming the administrative expense priority of claims of certain vendors for outstanding pre-petition claims that were undisputed obligations arising from goods received by the Debtors in the ordinary course of business within the 20 days prior to the Petition Date and entitled to administrative priority under Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code. The Debtors sought authorization to pay such Section 503(b)(9) claims up to a limit of $500,000. On January 28, 2011, the Bankruptcy Court granted the relief requested in the *Order Authorizing Debtors to Pay Certain Pre-Petition Claims of Suppliers and Vendors of Goods Entitled to Administrative Priority* (D.I. 30).

8.      Pre-Petition Tax Motion.

*Debtors' Motion for Order Authorizing (I) Payment of Certain Pre-Petition Taxes and (II) Financial Institutions to Process and Cash Checks and Transfers Related Thereto* (the "Pre-Petition Tax Motion") (D.I. 10).  Pursuant to the Pre-Petition Tax Motion, the Debtors requested approval to pay up to $350,000 on account of sales/use, excise, value-added, business and occupation taxes arising before the Petition Date.  On January 28, 2011, the Bankruptcy Court granted the relief requested in the *Order Authorizing (I) Payment of Certain Pre-Petition Taxes and (II) Financial Institutions to Process and Cash Checks and Transfers Related Thereto* (D.I. 31).

9.      Motion to Fix Time for Filing Disclosure Statement

*Debtors' Motion for Order Fixing the Time for Filing the Disclosure Statement* (D.I. 12).  Pursuant to this motion, the Debtors requested approval to file this Disclosure Statement within twenty-one (21) days of filing the Plan.  On January 28, 2011, the Bankruptcy Court granted the relief requested in the *Order Fixing the Time for Filing the Disclosure Statement* (D.I. 33).

10.     Customer Programs Motion

*Debtors' Motion for Order Authorizing the Debtors to (I) Honor Certain Pre-Petition Obligations to Customers and (II) Continue Their Customer Programs and Practices in the Ordinary Course of Business* (the "Customer Program Motion") (D.I. 13).  Pursuant to the Customer Program Motion, the Debtors requested authorization to maintain, in current effect, rebate and other customer programs and to make refund payments to customers for any credit balances in customer accounts to sustain the loyalty and confidence of the Debtors' customers and avoid irreparable harm to the Debtors' estates.  On January 28, 2011, the Bankruptcy Court granted the Debtors' request as set forth in the *Order Authorizing the Debtors to (I) Honor Certain Pre-Petition Obligations to Customers and (II) Continue Their Customer Programs and Practices in the Ordinary Course of Business* (D.I. 34).

11.     Utilities Motion

*Debtors' Motion for Interim and Final Orders (I) Finding Utilities Adequately Assured of Payment and (II) Establishing Further Procedures* (the "Utilities Motion")  (D.I. 15).  Pursuant to the Utilities Motion, the Debtors requested that the Bankruptcy Court enter an order (i) prohibiting Debtors' utility providers (the "Utility Providers") from altering, refusing, or discontinuing services; (ii) approving the Debtors' establishment of a deposit account to be held by Harris Bank in an amount equal to $33,000 (the "Deposit") as affording the Utility Providers with adequate assurance of payment, and deeming the Utility Providers to have received adequate assurance of payment pursuant to Section 366(b) of the Bankruptcy Code; (iii) establishing procedures and mechanisms under which the parties may determine adequate assurance of future payment; and (iv) authorizing the Debtors to supplement, as necessary, the utility service list of Utility Providers and providing that any newly added Utility Provider will be subject to the terms of the order.  On January 28, 2011, the Bankruptcy Court granted the Debtors' request on an interim basis as set forth in the *Interim Order (I) Finding Utilities Adequately Assured of Payment and (II) Establishing Further Procedures* (D.I. 35). On

,March 1, 2011, the Bankruptcy Court granted the Debtors' request on a final basis as set forth in the *Final Order (I) Finding Utilities Adequately Assured of Payment and (II) Establishing Further Procedures* (D.I. 103).

12.     <u>Motion to Establish Claims Trading Procedures</u>

*Debtors' Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code (I) for Interim and Final Orders Establishing Notification Procedures Regarding Restrictions on Certain Transfers of Claims Against and Equity Interests in the Debtors and (II) Scheduling a Final Hearing* (D.I. 16). Pursuant to this motion, consistent with the automatic stay in the Debtors' chapter 11 cases, the Debtors obtained the ability to monitor and possibly object to and preclude changes in the ownership of stock of and claims against the Debtors to ensure that an ownership change does not occur prior to the Effective Date of the Plan or applicable court order *and* that the Debtors would have the opportunity to avail themselves of relief under Section 382(1)(5) of the Internal Revenue Code of 1986, as amended, to preserve and use on a going forward basis consolidated net operating loss carryforwards incurred by the Debtors before the Petition Date. On January 28, 2011, the Bankruptcy Court granted the Debtors' request on an interim basis as set forth in the *Interim Order Establishing Notification Procedures Regarding Restrictions on Certain Transfers of Claims Against and Equity Interests in the Debtors and (II) Scheduling a Final Hearing* (D.I. 36). On ―February 22, 2011, the Bankruptcy Court granted the Debtors' request on a final basis as set forth in the *Final Order Establishing Notification Procedures Regarding Restrictions on Certain Transfers of Claims Against and Equity Interests in the Debtors and (II) Scheduling a Final Hearing* (D.I. 84_____).

C.     <u>Claims, Noticing and Balloting Agent Motion</u>

*Debtors' Application for Entry of an Order Authorizing the Employment and Retention of The Garden City Group, Inc. as Claims, Noticing, and Balloting Agent for the Clerk of the Court and Approving Related Agreement* (D.I. 40). The Bankruptcy Court granted the Debtors' request authorizing them to appoint The Garden City Group, Inc. as Claims, Noticing, and Balloting Agent in these chapter 11 cases as set forth in the *Order Authorizing the Employment and Retention of The Garden City Group, Inc. as Claims, Noticing, and Balloting Agent for the Clerk of the Court and Approving Related Agreement* (D.I. ―82).

D.     <u>Ordinary Course Professionals Motion</u>

*Debtors' Motion for an Order Authorizing the Debtors to Employ and Compensate Professionals Utilized by the Debtors in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date* (the "Ordinary Course Professionals Motion") (D.I. 60). Pursuant to the Ordinary Course Professionals Motion, the Debtors requested that the Bankruptcy Court enter an order authorizing the employment and retention of certain professionals, including, without limitation, attorneys and accountants (the "Ordinary Course Professionals") and authorizing the Debtors to pay the Ordinary Course Professionals, without application to the Court, 100% of their post-petition fees and expenses, not to exceed $100,000 per month individually and $350,000 in the aggregate. On ―,March 1, 2011, the Bankruptcy Court granted the Debtors' request as set forth in the *Order Authorizing the Debtors to Employ and Compensate Professionals Utilized by the Debtors in the Ordinary Course of Business Nunc Pro Tunc to the Petition Date* (D.I. ―107).

E.      Motion to Extend Time for Filing Statements of Financial Affairs and Schedules

*Debtors' Motion for Order Extending the Time to File Schedules and Statements of Financial Affairs* (the "SOFAs and Schedules Motion") (D.I. 61).  Pursuant to the SOFAs and Schedules Motion, the Debtors requested an order extending the time by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs with the Bankruptcy Court to until March 4, 2011.  On —,March 1, 2011, the Bankruptcy Court granted the Debtors' request as set forth in the *Order Extending the Time to File Schedules and Statements of Financial Affairs* (D.I. _109).

F.      Motion to Approve Disclosure Statement

*Motion of Debtors and Debtors-in-Possession for an Order: (I) Approving Their Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Their Joint Plan of Reorganization, Including: (A) Approving the Form and Manner of Distribution of Solicitation Packages, (B) Approving the Form and Manner of Notice of the Confirmation Hearing, (C) Establishing a Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing the Deadline for Receipt of Ballots, and (F) Approving the Procedures for Vote Tabulations; (III) Establishing the Deadline and Procedures for Filing Objections to: (A) Confirmation of the Plan and (B) Proposed Cure Amounts Related to Contracts and Leases Assumed Under the Plan; and (IV) Granting Related Relief* (the "Disclosure Statement Motion") (D.I. —69).  Pursuant to the Disclosure Statement Motion, the Debtors requested an order approving the disclosure statement, establishing voting procedures for acceptance or rejection of the Plan, and establishing the deadline and procedures for filing objections to the confirmation of the Plan and proposed cure amounts related to contracts and leases assumed under the Plan.

On _____, 2011, the Bankruptcy Court granted the Disclosure Statement Motion pursuant to the terms set forth in the *Order: (I) Approving Their Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Their Joint Plan of Reorganization, Including: (A) Approving the Form and Manner of Distribution of Solicitation Packages, (B) Approving the Form and Manner of Notice of the Confirmation Hearing, (C) Establishing a Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing the Deadline for Receipt of Ballots, and (F) Approving the Procedures for Vote Tabulations; (III) Establishing the Deadline and Procedures for Filing Objections to: (A) Confirmation of the Plan and (B) Proposed Cure Amounts Related to Contracts and Leases Assumed Under the Plan; and (IV) Granting Related Relief* (D.I. _____).

G.      Execution of Trade Agreements

Pursuant to the authority granted by the Final Orders approving the Motion to Pay Section 503(b)(9) Claims and the Critical Vendor Motion, the Debtors have entered into certain trade agreements (the "Trade Agreements") with certain of their key vendors and suppliers (the "Priority Vendors").  Generally, the Trade Agreements provide for:

a.      the Priority Vendor's agreement to be bound by the customary trade terms (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), which were favorable to the Debtors and in effect between the Priority Vendor and the Debtors on a historical basis at any time during the period within one hundred twenty (120) days of the Petition Date (the "Customary Trade Terms"), or such other trade terms as mutually agreed to by the Debtors and such Priority Vendor;

b.      the Priority Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay the Priority Vendor in accordance with such terms;

c.      the Priority Vendor's agreement not to file or otherwise assert against any of the Debtors, their estates or any of their respective assets or property (real or personal) any Lien related in any way to any remaining pre-petition amounts allegedly owed to the Priority Vendor by the Debtors arising from goods or services provided to the Debtors prior to the Petition Date, and that, to the extent that the Priority Vendor has previously obtained such a Lien, the Priority Vendor shall immediately take all necessary actions to release such Lien;

d.      the Priority Vendor's acknowledgment that it has reviewed the terms and provisions of the applicable Bankruptcy Court order authorizing the Debtors to enter into Trade Agreements and consents to be bound thereby;

e.      the Priority Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

f.      the Priority Vendor's agreement that to the extent that it has received payment of a Claim but subsequently refuses to supply goods to the Debtors on Customary Trade Terms, any payments received by the Priority Vendor on account of its Claim will be deemed to have been in payment of then outstanding undisputed post-petition obligations owed to such Priority Vendor, and the Debtors shall be entitled to exercise any and all of their rights and remedies to seek recovery of any payments received by the Priority Vendor on account of its Claim to the extent that the aggregate amount of such payments exceed the undisputed post-petition obligations then outstanding, without the right of setoff or reclamation.

H.      Retention of Professionals

At various times through the Debtors' chapter 11 cases, the Bankruptcy Court has approved or has before it pending approval applications for the retention of certain professionals to represent and assist the Debtors in connection with the chapter 11 cases. These professionals were intimately involved with the negotiation and development of the Plan. These professionals include, among others: (i) Lincoln Partners Advisors LLC as financial advisor (D.I. 54 and 106); (ii) Reed Smith LLP as bankruptcy counsel (D.I. 91); (iii) Whiteford Taylor Preston LLC as conflicts counsel (D.I. 89); (iv) Garden City Group, LLC as the claims, notice, and balloting agent (D.I. ___); and (v) Marketcom Public Relations as public relations consultant (D.I. 40 and 82); and (v) Clark Schaefer Hackett & Co. as general accountants (D.I. 90).

US_ACTIVE-105458165.9 105458165.12

I.    Rejection of Executory Contracts and Nonresidential Real Property Leases

*Debtors' First Omnibus Motion for an Order Authorizing the Rejection of Executory Contracts and Non-Residential Real Property* (the "First Rejection Motion") (D.I. 41) and *Debtors' Second Omnibus Motion for an Order Authorizing the Rejection of Executory Contracts and Non-Residential Real Property* (the "Second Rejection Motion" and, together with the First Rejection Motion, the "Rejection Motions") (D.I. 99).  The Debtors filed the First Rejection Motion on January 31, 2011 and the Second Rejection Motion on February 28, 2011.  Pursuant to the Rejection Motions, the Debtors requested the authority to reject certain contractual agreements and unexpired leases.  The Debtors determined that the leases and agreements at issue were overly burdensome, not necessary to ongoing business operations or restructuring efforts, and that they did not hold any value to the Debtors or their estates.  The Debtors further determined that, in order to avoid additional administrative expense to the estate, it made sound business sense to reject the lease and agreements.  On February 22, 2011 and ___ _____, 2011, respectively, the Bankruptcy Court granted the Debtors' requests as set forth in the orders entered on those dates (D.I. 81 and ___).

J.    Appointment of Official Committee of Unsecured Creditors

To date, the Office of the United States Trustee has determined that there has not been sufficient interest among eligible creditors to appoint an Official Committee of Unsecured Creditors.

K.    Schedules and Statements of Financial Affairs

1.    SOFAs

The Debtors filed their respective schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "SOFAs") with the Bankruptcy Court on March 4, 2011. (D.I. 120, 121, 122, 134).  The Schedules and SOFAs can be reviewed at the office of the Clerk of the Bankruptcy Court for the District of Delaware or can be obtained on the Debtors' website www.summitreorg.com.

2.    Debtor-in-Possession Operating Reports

Consistent with the operating guidelines and reporting requirements established by the United States Trustee (the "Guidelines") in these chapter 11 cases, the Debtors have satisfied their initial reporting requirements (D.I. ____), have filed their first consolidated Monthly Operating Report and will continue to file such Monthly Operating Reports as required by the Guidelines.  Each Monthly Operating Report includes for the relevant period, among other things, (a) information regarding the Debtors' cash receipts and disbursements, (b) an income statement (prepared on an accrual basis), (c) a balance sheet (prepared on an accrual basis), (d) a statement regarding the status of the Debtors' post-petition taxes and (e) statement regarding the status of accounts receivable reconciliation and aging.

US_ACTIVE-105458165.9105458165.12

L.     Claims Bar Date and Review Process

      1.     Claims Bar Date

On _____, 2011, the Bankruptcy Court entered an order (the "Bar Date Order") (D.I. ____) establishing _____ as the bar date (the "Non-Governmental Claims Bar Date") for all non-governmental Persons and Entities to file Claims in these chapter 11 cases and _____, 2011 as the bar date (the "Governmental Bar Date") for all governmental Persons and Entities to file Claims, including Claims arising under Section 503(b)(9) of the Bankruptcy Code, in these chapter 11 cases.  The Bar Date Order further provides that, among other things, any Person or Entity that is required to file a Proof of Claim in these chapter 11 cases but fails to do so in a timely manner shall not be treated as a creditor with respect to such Claim for purposes of voting and distribution in these chapter 11 cases, and such Person or Entity shall not be permitted to vote to accept or reject any chapter 11 plan or participate in any distribution in the Debtors' chapter 11 cases on account of such claim.

      2.     Claims Review Process

The Debtors are in the beginning stages of evaluating the numerous Claims filed in the Debtors' Reorganization Cases to determine, among other things, whether it is necessary and appropriate to file objections seeking to disallow, reduce and/or reclassify such Claims.  The Debtors expect to also reconcile the Claims against their Schedules in an effort to (a) eliminate duplicative or erroneous Claims and (b) ensure that the Bankruptcy Court allows only valid Claims.  As provided in Article VIII of the Plan, after the Effective Date, the Reorganized Debtors shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims on behalf of the Debtors and Reorganized Debtors.  If the Debtors or Reorganized Debtors, as applicable, object to a Claim, a hearing regarding such objection will be held and notice of such objection and notice of the related hearing will be provided to affected Claim holders as well as to other parties entitled to receive notice.  To the extent necessary, the Bankruptcy Court will rule on the objection and ultimately determine whether, and in what amount and priority, to allow the applicable Claim.  If the Debtors or Reorganized Debtors, as applicable, do not object to a Claim by the Claims Objection Bar Date, such Claim will be deemed Allowed and will receive the treatment accorded such Claim under the Plan.  As appropriate, the Debtors or Reorganized Debtors, as applicable, may seek to negotiate and/or settle disputes regarding a Claim or Claims as an alternative to filing objections to the allowance or treatment of such Claims.

The Debtors for some time have been undertaking a review of potential recoveries from possible avoidance actions.  In view of the fact that the Debtors have paid or soon will pay all of the Claims of their critical vendors, the Debtors have determined that there are no potential avoidance actions against those creditors which have any value.  The Debtors also have reviewed the perfection of the Liens of the Lenders and the circumstances under which their Claims were incurred and have determined that there are no potential claims of value against such creditors. In light of the fact that the Debtors have filed their Schedules and SOFAs substantially contemporaneously with this Disclosure Statement, their review of the lien perfect of secured creditors other than the Lenders and the possibility of recoveries from other potential avoidance actions is still ongoing.  The remaining class of creditors as to which potential avoidance actions

US_ACTIVE-105458165.9105458165.12

of value may exist as to which the Debtors have not yet completed their review is Class 5 General Unsecured Claims.  The Debtors are pursuing a review of their payments to, and other potential claims against, members of that class of creditors, but it is not possible to estimate at this time what recoveries from avoidance actions will be, if any.  The Debtors reserve their rights to pursue any and all such claims which may come to their attention.

M.    Litigation

The Debtors are not party to any pending or threatened material litigation.

## VIII.  SUMMARY OF THE PLAN OF REORGANIZATION

A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and interest holders.  Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes.  A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan

US_ACTIVE 105458165.9 105458165.12

divides Claims and Equity Interests into various Classes and sets forth the treatment for each Class. The Debtors also are required under Section 1122 of the Bankruptcy Code to classify Claims and Equity Interests into Classes that contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in such Classes. The Debtors believe that the Plan has classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code, but it is possible that a holder of a Claim or Equity Interest may challenge the classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The Debtors (and each of their respective agents, directors, officers, employees, advisors and attorneys) have, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities under the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

ARTICLES VIII-XX HEREOF PROVIDE A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS TO AND DEFINITIONS IN THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS INCORPORATED INTO THE PLAN CONTROL THE ACTUAL, TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER

OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

     B.     <u>Purpose of the Plan</u>

The Plan provides for the final reorganization of the Debtors' businesses. The Debtors believe that the Plan provides the best and most prompt possible recovery to holders of Claims by maximizing the Debtors' value as a going concern. For purposes of this Disclosure Statement, the term holder refers to the holder of a Claim or Equity Interest in a particular Class under the Plan. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Effective Date or as soon as practicable thereafter, the Debtors will make distributions in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against, and Equity Interests in, the Debtors created under the Plan, the treatment of those Classes under the Plan and distributions to be made under the Plan are described below.

     C.     <u>Treatment of General Unsecured Creditors</u>

The Plan provides that Class 5 General Unsecured Creditors will receive a recovery of a Pro Rata Share of $100,000. The Debtors estimate the percentage recovery of Claims in Class 5 to be two percent or less.

## IX. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

     A.     <u>Introduction</u>

The classification and treatment of Claims and Equity Interests for purposes of the Plan is set forth below. In accordance with Section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims have not been classified. Other Claims and Equity Interests shall be included in a particular Class only to the extent such Claims or Equity Interests qualify for inclusion in such Class.

     B.     <u>Classification of Claims and Equity Interests</u>

          1.     <u>Unimpaired and Unclassified Claims.</u>

               a.     DIP Facility Claims

               b.     Administrative Expense Claims

               c.     Priority Tax Claims

          2.     <u>Description of the Classes.</u>

               a.     Class 1: Pre-Petition First Lien Secured Claims (Impaired)

               b.     Class 2: Other Secured Claims (Unimpaired)

                c.     Class 3: Other Priority Claims (Unimpaired)

US_ACTIVE-~~105458165.9~~105458165.12

d. Class 4: Pre-Petition Second Lien Claims (Impaired)

e. Class 5: General Unsecured Claims (Impaired)

f. ~~Class 6: Intercompany Claims (Unimpaired)~~

f. ~~g.~~ Class ~~7~~6: Equity Interests in Summit (Impaired)

g. ~~h.~~ Class ~~8~~7: Equity Interests in the Debtors other than Summit (Unimpaired)

## X. TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS

Other than as specifically set forth herein, the treatment of and consideration to be received by holders of Claims or Equity Interests pursuant to this Article X shall be in full satisfaction, settlement, release and discharge of such holder's respective Claim or Equity Interest. Except as expressly set forth herein or in the Confirmation Order, such discharge shall not affect the liability of any other person or entity on, or the property of any other person or entity encumbered to secure payment of, any such Claim or Equity Interest; nor shall it affect the Reorganized Debtors' obligations pursuant to this Plan.

A. DIP Facility Claims

DIP Facility Claims are unimpaired and unclassified claims.

The DIP Facility Claims shall be Allowed in full, including without limitation, (i) all Claims for unpaid principal, interest and other charges outstanding on the Effective Date and (ii) all Claims for fees and expenses and other charges provided for under the DIP Facility. Except to the extent that a holder of an Allowed DIP Facility Claim and the Debtors, or the Reorganized Debtors, as the case may be, agree to a different treatment, on the Effective Date, each Allowed DIP Facility Claim shall be paid in full in Cash by wire transfer of immediately available funds from the proceeds of the revolving credit facility under the Exit Credit Documents.

B. Administrative Expense Claims

Administrative Expense Claims are unimpaired and unclassified claims.

Except to the extent that a holder of an Allowed Administrative Expense Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim will receive a distribution of Cash in an amount equal to such Allowed Administrative Expense Claim, without interest, on or as soon as practicable after (but in no event more than ninety (90) days after, unless extended by the Bankruptcy Court) the later of (i) the Effective Date; and (ii) the first Business Day after the date that is ten (10) Business Days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that (y) Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors (these

Claims may include, without limitation, post-Petition Date salaries and other post-Petition Date benefits for employees, post-Petition Date rent for facilities and offices, amounts owed to vendors providing goods and services during the Debtors' Reorganization Cases and tax obligations incurred by the Debtors all in the ordinary course of business and after the Petition Date), as debtors or debtors-in-possession, may be paid in full and performed by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions and (z) Professional Fee Claims shall be paid in accordance with the applicable order of the Bankruptcy Court after filing a fee application, notice and a hearing pursuant to the procedures set forth in Section 13.4 of the Plan.

      C.      <u>Priority Tax Claims</u>

Priority Tax Claims are unimpaired and unclassified claims.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, on account of such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code and at the option of the Debtors, regular installment payments in Cash: (i) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code; (iii) over a period ending not later than 5 years after the Petition Date; and (iv) in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan (other than payments in Cash made to a Class of Creditors under section 1122(b) of the Bankruptcy Code). Each holder of an Allowed Secured Tax Claim shall retain the Lien securing its Allowed Secured Tax Claim as of the Effective Date until full and final payment of such Allowed Secured Tax Claim is made as provided herein, and upon such full and final payment, such Lien shall be deemed to have been satisfied and shall be null and void and unenforceable for all purposes.

      D.      <u>Class 1: Pre-Petition First Lien Secured Claims</u>

Class 1 Claims are impaired. Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

On the Effective Date, the Pre-Petition First Lien Secured Claims shall be deemed Allowed, for all purposes of the Plan and the Debtors' Reorganization Cases, in an amount equal to all outstanding principal plus all unpaid interest accrued at the Allowed Interest Rate prior to the Petition Date, and all fees and expenses payable prior to the Petition Date in connection therewith in accordance with the terms of the Existing First Lien Credit Documents.

On the Effective Date, holders of Allowed Class 1 Claims (or, with respect to clause (b) below, their designated affiliates) will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 1 Claim, (a) on the terms and conditions set forth in the Exit Credit Documents, and as set forth therein, a Pro Rata Share of participation in a $110 million first-priority first-lien term loan (the "<u>Term Loan</u>"), and (b) a Pro

US_ACTIVE-~~105458165.9~~105458165.12

Rata Share of 94.7% of the Class A/B/C Units (with each holder (or designated affiliate) being entitled to choose Class A Units, Class B Units or Class C Units[4]). The Class A/B/C Units will be entitled to a total of 94.44% of the distributions made with respect to NewCo LLC Equity, subject to dilution by, among other things, NewCo LLC Equity Interests issued to officers and directors of the Reorganized Debtors pursuant to the Management Incentive Plan, all as provided by Section 6.01 of the NewCo Operating Agreement.

The holders of Allowed Class 1 Claims will be required to execute the Exit Credit Agreement prior to receiving any Pro Rata Share of the Term Loan.

The Exit Credit Documents shall be executed, delivered and performed by the Reorganized Debtors in accordance with their terms, and all fees and expenses and other amounts provided for thereunder shall be paid promptly when due.

E.     Class 2, *et seq*.:  Other Secured Claims

Class 2 Claims are not impaired.  Holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.  Each Class 2 Claim consists of Other Secured Claims against the applicable Debtor.  ~~With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 2A, Class 2B and so on), so that each holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.~~

On the Effective Date, each Allowed Claim in Class 2 shall be, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 2 Claim, at the Debtors' option, (1) Reinstated, (2) satisfied by the Debtors' surrender of the collateral securing such Allowed Claim, (3) offset against, and to the extent of, the Debtors' claims against the holder of such Allowed Claim or (4) otherwise rendered not impaired, except to the extent that the Reorganized Debtors and such holder agree to a different treatment.

F.     Class 3:  Other Priority Claims

Class 3 Claims are not impaired.  Holders of Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment of such Allowed Other Priority Claim, each such holder will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 3 Claim, one of the following treatments, as determined by the Debtors after consultation with the

---

[4] Holders of Allowed Class 1 Claims who fail to make an election will be issued Class C Units.

Pre-Petition First Lien Agent and upon the consent of the Requisite Supporting First Lien Parties, when such Claim becomes Allowed:

a.      the Debtors will pay the Allowed Class 3 Claim in full, without interest, in Cash on the Effective Date or as soon thereafter as is practicable; provided that Allowed Class 3 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Allowed Class 3 Claims become due and owing in the ordinary course of business; or

b.      each such Allowed Class 3 Claim will be treated in any other manner so that such Claim shall otherwise be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code.

G.      Class 4:  Pre-Petition Second Lien Claims

Class 4 Claims are impaired.  Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

On the Effective Date, the Pre-Petition Second Lien Claims shall be deemed Allowed, for all purposes of the Plan and the Debtors' Reorganization Cases, in an amount equal to all outstanding principal plus all unpaid interest accrued prior to the Petition Date, and all fees and expenses payable in connection therewith prior to the Petition Date in accordance with the terms of the Existing Second Lien Credit Documents.

On the Effective Date, holders of Allowed Class 4 Claims (or, with respect to clause (b) below, their designated affiliates) will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 4 Claim, (a) a Pro Rata Share of $1 million by wire transfer of immediately available funds and (b) a Pro Rata Share of the Class E Units.  The Class E Units will be entitled to a total of 5.56% of the distributions made with respect to NewCo LLC Equity, subject to dilution by, among other things, NewCo LLC Equity Interests issued to officers and directors of the Reorganized Debtors pursuant to the Management Incentive Plan, all as provided by Section 6.01 of the NewCo Operating Agreement.

H.      Class 5:  General Unsecured Claims

Class 5 Claims are impaired.  Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

Holders of Allowed Class 5 Claims will receive, in full and final satisfaction, settlement, release and discharge and in exchange for each such Allowed Class 5 Claim, a Pro Rata Share of the Class 5 Recovery, i.e. $100,000.

I.      Class 6: Intercompany Claims

Class 6 Claims are not impaired.  Holders of Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

US_ACTIVE-105458165.9105458165.12

The legal, equitable and contractual rights of the holders of Intercompany Claims are unimpaired by the Plan. On or as soon as practicable after the Effective Date, and after consultation with and approval by the Pre-Petition First Lien Agent, with such approval not to be unreasonably withheld, all Intercompany Claims will either be Reinstated to the extent determined to be appropriate by the Debtors or Reorganized Debtors or adjusted, continued or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

J. Class 7: Equity Interests in Summit

Class 76 Equity Interests are impaired.

On the Effective Date, the Equity Interests in Summit shall be cancelled and be of no further force and effect. Holders of such Equity Interests are not entitled to receive or retain any property or distribution under the Plan on account of any Class 76 Equity Interests. Therefore, holders of Class 76 Equity Interests are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Holders of Class 76 Equity Interests are not entitled to vote to accept or reject the Plan.

J. K. Class 87: Equity Interests in All Debtors Other Than Summit

Class 87 Equity Interests are not impaired. The holders of Class 87 Equity Interests are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, holders of Class 87 Equity Interests are not entitled to vote to accept or reject the Plan.

The legal, equitable and contractual rights of the holders of Equity Interests in any Debtor other than Summit are unimpaired the Plan. On the Effective Date, such Equity Interests shall be Reinstated.

## XI. MEANS FOR IMPLEMENTATION OF THE PLAN

A. Presumed Acceptance of Plan

Classes 2, 3, 6 and 87 are not impaired under the Plan, and are, therefore, conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

B. Voting Classes

Classes 1, 4 and 5 are impaired under the Plan, and holders of Class 1, 4 and 5 Claims shall be entitled to vote to accept or reject the Plan.

C. Acceptance by Impaired Classes of Claims

Pursuant to Section 1126(c) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, an impaired Class of Claims entitled to vote to accept or reject the Plan has accepted the Plan if the holders of at least two-thirds in dollar amount and

- 48 -

more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

    D.    <u>Deemed Rejection of Plan</u>

Class 76 is impaired under the Plan and shall receive no property or distribution under the Plan on account of their Equity Interests and are, therefore, deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.

    E.    <u>Cramdown</u>

The Debtors request Confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to Section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Section 13.5 of the Plan to the extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

    F.    <u>Continued Corporate Existence</u>

The Reorganized Debtors will continue to exist as separate corporate entities or limited liability companies following confirmation and consummation of the Plan in accordance with the laws of their respective states of incorporation and pursuant to their respective certificates or articles of incorporation or organization and bylaws or limited liability company operating agreements in effect prior to the Effective Date, except to the extent that the Debtors' certificates or articles of incorporation or organization and bylaws or limited liability company operating agreements are amended or replaced pursuant to the Plan.  On or as soon as practicable after the Effective Date, the Reorganized Debtors will issue new equity interests pursuant to Section 4.8 of the Plan.  From and after the Effective Date, each of the Reorganized Debtors will be deemed a separate and distinct entity, properly capitalized, vested with all of the assets of such debtor as they existed prior to the Effective Date and having the liabilities and obligations provided for under the Plan.

    G.    <u>Cancellation of Existing Securities and Agreements</u>

Except for purposes of evidencing a right to distributions under the Plan or as otherwise provided herein, on the Effective Date, (a) all agreements and other documents (other than the assumed executory contracts and unexpired leases) evidencing Claims or Equity Interests or rights of any holder of a Claim or Equity Interest against any of the Debtors or Reorganized Debtors, and (b) all notes and share certificates and other documents evidencing such Claims and Equity Interests and any agreements or guarantees related thereto will be canceled and terminated and deemed null and void, satisfied and discharged and of no force and effect as against any of the Debtors or the Reorganized Debtors without further act or action under any applicable agreement, law, regulation, order or rule except to the extent specifically provided otherwise in the Plan.  Except as otherwise provided herein, all obligations of the Debtors and Reorganized Debtors under such agreements and other documents governing such Claims and Equity Interests, as the case may be, will be discharged.

US_ACTIVE:105458165.9105458165.12

H.    Issuance of New Equity Interests

On or as soon as practicable after the Effective Date, the Reorganized Debtors shall issue all securities to be issued in accordance with the Plan, NewCo Operating Agreement and Exit Credit Agreement, including, without limitation, the NewCo LLC Equity and New Summit Equity, each of which shall be distributed as referenced in the Plan, NewCo Operating Agreement and Exit Credit Agreement. Notwithstanding the foregoing or anything to the contrary in the Plan, in the event that the Bankruptcy Court determines that the Pre-Petition Second Lien Claims are not Secured Claims and, therefore, are not entitled to any or all of the distributions described in Section 3.7 of the Plan (such distributions to which the holders of Pre-Petition Second Lien Claims are entitled, collectively, the "Second Lien Plan Distributions"), (a) the Reorganized Debtors shall issue all Second Lien Plan Distributions to the Pre-Petition First Lien Agent on behalf of the holders of Pre-Petition First Lien Secured Claims (in addition to all other distributions to be made to the holders of Pre-Petition First Lien Secured Claims pursuant to the Plan), and (b) the Pre-Petition First Lien Agent, on behalf of the holders of Pre-Petition First Lien Secured Claims, shall contribute to the holders of the Pre-Petition Second Lien Claims all such Second Lien Plan Distributions.

I.    Revesting of Assets

Pursuant to Section 1141(b) of the Bankruptcy Code, all property of the respective estate of each Debtor, together with any property of each Debtor that is not property of its estate and that is not specifically disposed of pursuant to the Plan, or by order of the Bankruptcy Court, will revest in the applicable Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court.  As of the Effective Date, all property of each Reorganized Debtor will be free and clear of all Liens, Claims and Equity Interests except as specifically provided pursuant to the Plan, the Confirmation Order, and the Exit Credit Documents.

J.    Rights of Action; Reservation of Rights

Except as otherwise provided pursuant to the Plan or the Confirmation Order, or any other order of the Bankruptcy Court, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and except with respect to the Released Parties to the extent set forth herein, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will reserve and retain and may enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) all rights, claims, Causes of Action, rights of set off, suits, proceedings or other legal or equitable defenses accruing to the Debtors or their estates pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including, without limitation, any avoidance or recovery actions and, to the extent permissible under applicable non-bankruptcy law, any suits or proceedings for recovery under any policies of insurance issued to or on behalf of the Debtors or any judgment obtained on behalf of any of the Debtors.  Except as otherwise expressly set forth in the Plan, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or the relinquishment of any right or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Debtors or the Reorganized Debtors may choose to assert on behalf of

US_ACTIVE-~~105458165.9~~105458165.12

their respective estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Claims against any Person, to the extent such Person asserts a cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against any of the Debtors, the Reorganized Debtors, their officers, directors, managers or representatives and (ii) the turnover of any property of any of the Debtors' or the Reorganized Debtors' estates. The Plan provides that the Reorganized Debtors will be deemed the appointed representative to, and may pursue, litigate, compromise, settle, transfer or assign any such rights, claims, Causes of Action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their respective successors who hold such rights. Any person or entity defending against a Potentially Insured Claim, the Debtors, the Reorganized Debtors, and any Insurer shall have the right to assert all rights and defenses of the Debtors, both legal and equitable (including setoff or recoupment), with respect to any Potentially Insured Claims.

K.      Effectuating Documents; Further Transactions

The chief executive officer, chief financial officer or any other appropriate officer of Summit or any applicable Debtor, as the case may be, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary or assistant secretary of Summit or any applicable Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

L.      Sources of Liquidity; Exit Credit Documents

On or prior to the Effective Date, the Exit Credit Documents, in the forms attached to the Plan or as otherwise approved by (i) the Debtors, (ii) the Requisite Supporting First Lien Parties, and, (iii) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties shall become effective. On the Effective Date, the Revolving Lenders (or their designated affiliates) shall receive a Pro Rata Share of 5.3% of the Class A/B/C Units.

**XII.    RELEASES AND INJUNCTIONS RELATED TO RELEASES**

A.      **Exculpation**

**The Debtors, the Reorganized Debtors and the other Released Parties shall have no liability to any Person for any act or omission in connection with, or arising out of, the Debtors' Reorganization Cases, the Disclosure Statement, the Plan, the solicitation of votes for and the pursuit of confirmation of the Plan, the formulation, preparation, implementation or consummation of the Plan or the transactions contemplated thereby, including the pre-petition and post-petition negotiations with respect thereto, the administration of the Plan or the property to be distributed under the Plan or the Debtors' Reorganization Cases or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan. All Causes of Action based upon or arising out of all of the foregoing will be forever waived and released by any Person as of**

US_ACTIVE ~~105458165.9~~105458165.12

the Effective Date; **provided, however, that nothing in this section shall affect the liability (if any) of any Person that otherwise would result from any action or omission to the extent that such action or omission is determined in a Final Order to have constituted (i) a breach of any of its obligations under the Plan or any contract, release or other agreement or document entered into in connection therewith or (ii) intentional acts that constitute fraud or willful misconduct.**

B. **Releases by Debtors**

**Pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties shall be deemed released and discharged by the Debtors, the Reorganized Debtors and their estates, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of the Debtors, the Reorganized Debtors or their estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' Reorganization Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Debtors' Reorganization Cases, the negotiation, formulation or preparation of the Plan, the related Disclosure Statement, or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final and non-appealable order of a court of competent jurisdiction to constitute willful misconduct or gross negligence by such Released Party.**

C. **Releases by Holders of Claims and Equity Interests**

**As of the Effective Date of the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed,** (i) **each holder of a Claim other than a Debtor that votes to accept the Plan, solely in its capacity as the holder of such Claim,** and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each person or entity (other than a Debtor), **which has held, holds or may hold a Claim or Equity Interest in or relating to the Debtors and solely in its capacity as the holder of such Claim or Equity Interest, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Equity Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, asserted or that could be asserted by or on behalf of any**

US_ACTIVE~~105458165.9~~105458165.12

such holder, person or entity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such holder, person or entity would have been legally entitled to assert in its own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Reorganization Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Debtors' Reorganization Cases, the negotiation, formulation or preparation of the Plan, the related Disclosure Statement, any Plan Documents or related agreements, instruments or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a final and non-appealable order of a court of competent jurisdiction to constitute willful misconduct or gross negligence of such Released Party.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in Sections 5.2 and 5.3 of the Plan do not release (i) any Claims or liabilities assumed by any Reorganized Debtor pursuant to the Plan or any other Plan Documents or otherwise arising on or after the Effective Date under any of the Plan Documents or (ii) any post-Effective Date obligations of any party under the Plan or any other Plan Document.

D. **Injunction Related to Releases**

Except as provided in the Plan, the other Plan Documents or the Confirmation Order, as of the Confirmation Date, subject to the occurrence of the Effective Date, all Persons that have held, currently hold or may hold Claims or Equity Interests that (x) are subject to exculpation pursuant to Section 5.1 of the Plan, (y) have been released pursuant to Sections 5.2 and 5.3 of the Plan, or (z) are discharged pursuant to Section 11.1 of the Plan, are permanently enjoined from taking any of the following actions against the Debtors or their property, or any of the Released Parties, on account of Claims or Equity Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, or right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing any action, in each case in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

By accepting distribution pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in Section 5.4 of the Plan.

E.    No Waiver

The release set forth in the Plan does not limit, abridge or otherwise affect the rights of the Reorganized Debtors to enforce, sue on, settle or compromise the rights, claims and other matters retained by the Reorganized Debtors pursuant to the Plan.

F.    Deemed Consent

~~By voting~~Each holder of a Claim who votes to accept the Plan ~~or accepting any distribution directly under the Plan, each holder of a Claim~~ will be deemed to the fullest extent permitted by applicable law to have specifically consented to the releases and injunctions set forth in Article V of the Plan.

G.    Survival of Indemnification Obligations to Personnel

As to Causes of Action arising or relating to events taking place prior to, on and subsequent to the Petition Date, the Debtors shall defend, indemnify, reimburse or limit the liability of any of their respective directors, managers and officers who serve as directors, managers or officers on and after the Effective Date, including, without limitation, those directors, officers and managers who are listed in the Disclosure Statement, to the fullest extent permitted under applicable state law (collectively, the "Indemnification Obligations") for any liabilities asserted against such persons by reason of their service as directors, managers or officers of the Debtors, other than in respect of any claims conclusively determined to have arisen by virtue of fraud or willful misconduct.  Such Indemnification Obligations will survive confirmation of the Plan, remain unaffected thereby and will not be discharged and shall, on the Effective Date, become obligations of the Reorganized Debtors; provided, that such indemnification, defense, reimbursement or limitation will be limited to the extent such directors, mangers or officers have been released pursuant to the Plan as Released Parties under the Plan and provided further that the Debtors shall be required to indemnify a director, manager or officer in connection with a proceeding (or part thereof) initiated by such director, manager or officer only if such proceeding (or part thereof) was authorized by the board of directors or managers of the applicable Debtor.  Pursuant to the Plan and Bankruptcy Code Section 502(e), all contingent and unliquidated Claims of Debtors' respective current and former directors, managers, officers and employees for indemnification, defense or reimbursement of any liability shall be deemed expunged and withdrawn as of the Effective Date.

XIII.    CORPORATE STRUCTURE OF THE REORGANIZED DEBTORS

A.    Corporate Action

Each Reorganized Debtor will file its Amended Certificate, as appropriate, (each in such form as shall be consistent with Section 1123(a)(6) of the Bankruptcy Code, and otherwise as may be acceptable to (i) such Debtor, (ii) the Requisite Supporting First Lien Parties, ~~and,~~ (iii) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties) with the Secretary of State of the jurisdiction of its respective organization on the Effective Date.  Any filings or other actions to be taken with respect to the Reorganized Debtors will be done as soon as practicable on or after the Effective Date.

On the Effective Date, the adoption of each Amended Certificate and each of the Amended Bylaws and the NewCo Operating Agreement and the OpCo Operating Agreement will be deemed to have been authorized and approved in all respects to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or shareholders or members of the Reorganized Debtors pursuant to applicable corporation, limited liability company and limited partnership law of jurisdictions in which the Reorganized Debtors are incorporated, organized or formed.

In addition, on the Effective Date, the cancellation of all Equity Interests in Summit, the authorization and issuance of the NewCo LLC Equity and New Summit Equity, the Reinstatement of the Equity Interests in all Debtors other than Summit, and all other matters provided herein involving the corporate and capital structure of the Debtors or the Reorganized Debtors or corporate or other action by any of the Debtors or the Reorganized Debtors will be deemed to have occurred, be authorized, and will be in effect from and after the Effective Date without requiring further action under applicable law, regulation, order or rule, including without limitation, any action by the stockholders, shareholders, members, managers, officers or directors of any of the Debtors, any of the Reorganized Debtors pursuant to applicable corporation, limited liability company and limited partnership law of jurisdictions in which the Reorganized Debtors are incorporated, organized or formed. Entry of the Confirmation Order will constitute approval of the Plan Documents and all such transactions subject to the occurrence of the Effective Date.

B.      Corporate Structure of Reorganized Debtors

Each Amended Certificate will, among other things: (a) include, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, (b) to the extent necessary or appropriate, include such provisions as may be necessary to effectuate the Plan and (c) with respect to the Amended Certificate for Reorganized Summit, to the extent necessary or appropriate, include any restrictions on the transfer of the New Summit Equity. The Amended Bylaws, Amended Certificates, the NewCo Operating Agreement, and the OpCo Operating Agreement will provide for the corporate governance of the Reorganized Debtors.

C.      Board of Directors/Managers and Officers of Reorganized Debtors

1.      NewCo LLC's Board of Managers and Officers.

On or after the Effective Date, the Board of Managers and officers of NewCo LLC will be appointed in accordance with the NewCo Operating Agreement and other related governance documents of NewCo LLC.

2.      Reorganized Summit's Board of Directors.

On or after the Effective Date, the Board of Directors of Reorganized Summit shall be designated in accordance with the Amended Certificate and other related governance documents of Reorganized Summit.

US_ACTIVE-105458165.9105458165.12

3. <u>Reorganized Summit's Officers</u>.

The initial officers of Reorganized Summit will be the same individuals who served as officers of Summit immediately prior to the Effective Date.  After the Effective Date, the new board of managers of Reorganized Summit will determine the officers of Reorganized Summit.

4. <u>Reorganized Affiliates</u>.

The initial Boards of Directors or Managers, as appropriate, of the Reorganized Affiliates shall be constituted as provided in Section 8.03(b) of the NewCo Operating Agreement.  The members of such boards shall be appointed by Reorganized Summit and may include one or more executive officers or managers or directors of Reorganized Summit.  Each of the members of these initial Boards of Directors or Managers will serve in accordance with the Reorganized Affiliates' respective certificates or articles of incorporation or organization or formation, as appropriate, and bylaws or operating agreements, as the same may be amended from time to time, and applicable non-bankruptcy laws.

The officers of the Reorganized Affiliates will be the individuals who serve as officers of such Debtors immediately prior to the Effective Date.  Such officers will serve in accordance with the bylaws of the Reorganized Affiliates, as applicable, any employment agreement with such Reorganized Affiliates and applicable non-bankruptcy law.  After the Effective Date, the respective new boards of directors or managers of the Reorganized Affiliates, as appropriate, will determine the officers of the Reorganized Affiliates.

D. <u>Indemnification of Directors and Officers</u>

The Amended Certificates and the certificates or articles of incorporation or organization or formation of the Reorganized Affiliates will authorize the Reorganized Debtors to indemnify and exculpate their respective officers, directors, managers and agents to the fullest extent permitted under applicable state law.

E. <u>NewCo Operating Agreement, Registration Rights Agreement and OpCo Operating Agreement</u>

The NewCo Operating Agreement will be in the form attached as Exhibit 4 to the Plan. The Registration Rights Agreement will be in the form attached as Exhibit ~~12~~11 to the Plan.  The NewCo Operating Agreement and Registration Rights Agreement shall be binding on (a) all holders of Allowed Pre-Petition First Lien Secured Claims and (b) all holders of Allowed Pre-Petition Second Lien Claims regardless of whether the holders of such claims execute the agreements or either of them. The OpCo Operating Agreement will be in the form attached as Exhibit ~~11~~10 to the Plan.

US_ACTIVE ~~105458165.9~~105458165.12

## XIV. DISTRIBUTIONS UNDER THE PLAN

### A. Distributions to Holders of Allowed Claims Only

Until a Disputed Claim becomes an Allowed Claim, distributions of Cash, securities and/or other instruments or property otherwise available to the holder of such Claim will not be made.

### B. Distribution Record Date

As of the close of business on the date the Clerk of the Bankruptcy Court enters the Confirmation Order or such other date prior to the Effective Date as may be designated in the Confirmation Order, the various transfer registers for each of the Classes of Claims or Equity Interests (other than Class 1) as maintained by the Debtors or their agents will be deemed closed, and there will be no further changes in the record holders of any of the Claims or Equity Interests (other than Class 1). The Debtors will have no obligation to recognize any transfer of any Claims or Equity Interests occurring on or after the Distribution Record Date (other than Class 1). The Debtors or Reorganized Debtors, as applicable, will recognize only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date. The Distribution Record Date is the record date for purposes of making distributions under the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and if so completed will be deemed to have been completed as of the required date.

### C. Disbursing Agent

Reorganized Summit, as Disbursing Agent, or such other entity designated by Reorganized Summit as a Disbursing Agent, will make all distributions under the Plan when required by the Plan. A Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### D. Rights and Powers of the Disbursing Agent

The Disbursing Agent will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated thereby, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### E. Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Equity Interest will be made at the address of such holder as set forth in the Debtors' books and records and/or on the Schedules filed with the Bankruptcy Court unless the Debtors or their

Disbursing Agent have been notified in writing of a change of address, including without limitation, by the filing of a Proof of Claim by such holder that contains an address for such holder different from the address reflected on such books and records or Schedules for such holder; provided, however, that all distributions to the DIP Lenders under the Plan will be made by the Disbursing Agent to the DIP Agent for further disbursement to the DIP Lenders.

In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent will use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution will be made to such holder without interest or accruals of any kind. Such distributions will be deemed unclaimed property under Section 347(b) of the Bankruptcy Code on the one year anniversary of the Effective Date. After that date, all unclaimed property or interest in property will revert to the Reorganized Debtors and the Claim of any other holder to such property or interest in property will be discharged and forever barred.

F.     <u>Time Bar to Cash Payments</u>

Checks issued by the Reorganized Debtors on account of Allowed Claims will be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Holders of Allowed Claims shall make all requests for reissuance of checks to the Reorganized Debtors. Any Claim in respect of a voided check must be made on or before the one year anniversary of the date of issuance. After such date, all Claims and respective voided checks will be discharged and forever barred and the Reorganized Debtors will retain all moneys related thereto.

G.     <u>Fractional Shares</u>

No fractional shares or units of NewCo LLC Equity will be issued or distributed under the Plan. The actual distribution of shares and units of NewCo LLC Equity will be rounded to the next higher or lower whole number as follows: (a) fractions of one-half (1/2) or less shall be rounded to the next lower whole number, and (b) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number. The total number of shares or units, as applicable, of NewCo LLC Equity to be distributed herein will be adjusted as necessary to account for such rounding. No consideration will be provided in lieu of fractional shares or units that are rounded down.

H.     <u>Set-Offs</u>

Other than with respect to the Claims of Pre-Petition First Lien Secured Parties, the DIP Agent and DIP Lenders (as to which any and all rights of setoff or recoupment have been waived by the Debtors and the Reorganized Debtors), the Debtors or the Reorganized Debtors may, but are not required to, set off or recoup against any Allowed Claim, any claims, rights, or cause of action of any nature whatsoever that the Debtors or Reorganized Debtors may have against the holder of such Claim. Neither the failure to set-off nor the allowance of any Claim under this Plan will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim, right or cause of action.

## XV.   PROCEDURES FOR DISPUTED CLAIMS

### A.   Resolution of Disputed Claims; Estimation of Claims

Except as set forth in any order of the Bankruptcy Court, any holder of a Claim against the Debtors shall file a Proof of Claim with the Bankruptcy Court or with the agent designated by the Debtors for this purpose on or before the Claims Bar Date.  ~~If any such holder of a Claim disagrees with the Debtors' determination with respect to the Allowed amount of such holder's Claim, the Claim will be a Disputed Claim.~~  The Debtors prior to the Effective Date, and thereafter the Reorganized Debtors, shall have the exclusive authority to file objections on or before the Claims Objection Bar Date, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether classified or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  Notwithstanding the foregoing, the Reorganized Debtors must receive the prior written approval of the administrative agent under the Exit Credit Agreement prior to entering into any settlement or compromise of any Disputed Claim if the face amount of the Disputed Claim is in excess of $100,000.

Any Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

### B.   No Distributions Pending Allowance

Notwithstanding any other provision in the Plan, except as otherwise agreed by the Debtors or the Reorganized Debtors, no partial payments or distributions will be made with respect to a Disputed Claim or Equity Interest unless and until all objections to such Disputed Claim or Equity Interest have been settled or withdrawn or have been determined by Final Order.

### C.   Distributions After Allowance

To the extent a Disputed Claim or Equity Interest becomes an Allowed Claim or Equity Interest, the Disbursing Agent will distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan.  Any such distributions will be made in accordance with, and at the time mandated by the Plan.  No interest will be paid on any Disputed Claim or Equity Interest that later becomes an Allowed Claim or Equity Interest.

US_ACTIVE ~~105458165.9~~105458165.12

## XVI. EXECUTORY CONTRACTS

### A.    Assumption of Executory Contracts and Unexpired Leases

As of the Effective Date, all executory contracts or unexpired leases listed on Exhibit 5 to the Plan shall be and shall be deemed to be rejected in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  All executory contracts or unexpired leases of the Reorganized Debtors not listed on Exhibit 5 to the Plan, and not otherwise the subject of a pending objection or pleading seeking to reject or otherwise contesting the executory contract or unexpired lease, are hereby assumed as of the Effective Date in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to Section 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

The Claims Bar Date for each Claim for damages from the rejection of an executory contract or unexpired lease, including those listed on Exhibit 5 attached to the Plan, which has been rejected by the Debtors shall be 35 days after notice of such rejection is mailed by the Solicitation Agent to each known address of the holder(s) of the Claim in question.

### B.    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied by payment of the default amount in Cash on the Effective Date, or on such other terms as the parties to such executory contracts or unexpired leases may agree.  The Debtors in their discretion may file with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to any matter pertaining to the assumption.  All such objections shall be litigated to Final Order, provided, however that the Debtors may compromise and settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections.  In the event of a dispute regarding:  (a) the amount of any Cure Payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the Cure Payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption of any executory contracts or unexpired leases; provided, however, that based on the Bankruptcy Court's resolution of any such dispute, the applicable Debtor or Reorganized Debtor shall have right, within 30 days after the entry of such Final Order and subject to approval of the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, to reject the applicable executory contract or unexpired lease.

US_ACTIVE-~~105458165.9~~105458165.12

C.    Compensation and Benefit Programs

Except as otherwise expressly provided under the Plan, all employment and severance policies and all compensation, incentive and benefit plans, policies and programs of the Debtors applicable to their employees, retirees and non-employee directors or members of the boards of directors, including, without limitation, the Employee Retirement Plans and all other savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of Sections 365 and 1123 of the Bankruptcy Code.

## XVII. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

A.    Conditions Precedent to Confirmation

This Plan will not be confirmed and the Confirmation Order will not be entered until and unless the Confirmation Order and all of the Plan Documents are acceptable in form and substance to (a) the Debtors, (b) the Requisite Supporting First Lien Parties, and, (c) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties.

B.    Conditions Precedent to the Effective Date

The Effective Date of the Plan will not occur unless and until all of the following conditions have occurred or will occur contemporaneously with the consummation of the Plan:

a.    the Confirmation Order shall have been entered, shall have become a Final Order, and shall be acceptable to (i) the Debtors and (ii) the DIP Agent and shall otherwise be in full force and effect;

b.    all actions, documents and agreements necessary to implement the Plan and the transactions contemplated by the Plan shall have been executed or become effective;

c.    the commitments under the DIP Facility shall have terminated, and all of the DIP Obligations shall have been paid in full in Cash by wire transfer of immediately available funds or assumed by the Reorganized Debtors as contemplated by the Plan and in accordance with the terms of the DIP Facility and the Exit Credit Documents, and the commitments thereunder terminated, satisfied or assumed as contemplated by the Plan and the terms of the DIP Facility and the Exit Credit Documents;

d.    the Exit Credit Documents shall have been executed and delivered by all parties thereto, and all conditions to the initial draw thereunder shall have been satisfied in accordance with the terms thereof;

e.    the New Equity to be issued under the Plan shall have been duly authorized and, upon issuance, shall be validly issued and outstanding;

US_ACTIVE 105458165.9 105458165.12

f.      any alteration of any term or provision of the Plan or any other Plan Document by the Bankruptcy Court shall be acceptable to (i) the Debtors, (ii) the Requisite Supporting First Lien Parties, and, (iii) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties;

g.      all fees, costs and expenses required to be paid under the DIP Facility, the Existing First Lien Credit Documents, the Exit Credit Documents or the Plan, including, without limitation, those of the DIP Agent incurred under the DIP Facility and the Pre-Petition First Lien Agent incurred under the Pre-Petition First Lien Credit Agreement, shall have been paid on or prior to the Effective Date;

h.      Each Reorganized Debtor, as appropriate, shall have filed with the Secretary of State of the jurisdiction of its organization its Amended Certificate; and

i.      Reorganized Summit and each of the other parties thereto shall have executed the OpCo Operating Agreement and the Exit Credit Documents.

C.      Waiver of Conditions to Confirmation and Effective Date

The Debtors, with the consent of (a) the Requisite Supporting First Lien Parties and, (b) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties, may waive, in whole or in part, any of the conditions to the confirmation or effectiveness of the Plan.  Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

D.      Effect of Failure of Conditions of the Effective Date

Unless extended by the mutual agreement of (a) the Debtors, (b) the Requisite Supporting First Lien Parties, and, (c) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties, in the event the conditions specified in Section 10.2 of the Plan have not been satisfied or waived in accordance with Section 10.3 of the Plan by the date that is thirty (30) days after entry of the Confirmation Order, (a) the Confirmation Order will be vacated; (b) no distributions under the Plan will be made; (c) the Debtors and all holders of Claims and Equity Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) all of the Debtors' obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained in the Plan will be deemed to constitute a waiver or release of any Claims or claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any proceedings further involving the Debtors

## XVIII. EFFECT OF CONFIRMATION

A.      Discharge of Claims and Termination of Equity Interests

Except as otherwise provided in the Plan or in the Plan Documents, the treatment of all Claims against, or Equity Interests in, the Debtors hereunder will be in exchange for and in complete satisfaction, discharge and release of all (a) Claims against, or Equity Interests in, the

US_ACTIVE-105458165.9105458165.12

Debtors of any nature whatsoever, known or unknown, including without limitation, any interest accrued or expenses incurred thereon from and after the Petition Date, and (b) all Claims against and Equity Interests in the Debtors' estates or properties or interests in property. Except as otherwise provided in the Plan or in the Plan Documents, upon the Effective Date, all Claims against and Equity Interests in the Debtors will be satisfied, discharged and released in full exchange for the consideration provided hereunder. Except as otherwise provided in the Plan or in the Plan Documents, all entities will be precluded from asserting against the Debtors or the Reorganized Debtors or their respective properties or interests in property any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

Nothing in the Confirmation Order or the Plan shall release, discharge, enjoin, or preclude any environmental Claim of any governmental unit against the Debtors (a) that had not arisen (and therefore could not have been asserted) as of the Effective Date or (b) under environmental statutes or regulations that any entity would be subject to subsequent to the Effective Date as the owner or operator of property after the Effective Date and cannot, as a matter of law, be discharged under the Bankruptcy Code. Moreover, nothing in the Confirmation Order or the Plan releases, nullifies, enjoins, or precludes any liability of non-Debtors to governmental units arising exclusively under environmental statutes or regulations.

B.  Binding Effect.

Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan. The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests and their respective successors and assigns, including without limitation, the Reorganized Debtors.

C.  Preservation of Insurance.

The Debtors' discharge from all Claims and Equity Interests as provided herein, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any Insurance Policy that may cover Claims against the Debtors, the Reorganized Debtors (including without limitation, such entities' officers, directors and managers) or any other person or entity. Notwithstanding the discharge of the Debtors from all Claims and Interests pursuant to the Plan, the Reorganized Debtors shall continue to cooperate with the Insurers in the defense, investigation, and settlement of Potentially Insured Claims to the extent such cooperation does not impose a significant cost or burden on the Reorganized Debtors; it being understood that nothing herein shall affect or impair the right of any Insurer to disclaim coverage with respect to a given claim based on a failure of the Reorganized Debtors to cooperate to the full extent required by the language of a relevant Insurance Policy with respect to that Claim. Nothing in the Plan or the Confirmation Order shall affect or impair the right of any Insurer to disclaim coverage to the extent permissible under any Insurance Policy or applicable law. Notwithstanding the foregoing, the fact that the holder of an Insured Claim has received a

US_ACTIVE-105458165.9105458165.12

distribution under the Plan in lieu of being paid in Cash with respect to any deductible or self insured retention amount shall not be a basis upon which an Insurer may disclaim coverage.

In no event may a holder of a Claim proceed against or recover from any Insurer on any Claim that has been either (a) released by the Plan or (b) Disallowed. However, if a Claim has not been released or Disallowed, even though the Claim has been discharged, then to the extent the Claim is a Potentially Insured Claim, the holder of such Claim shall be entitled, solely to the extent allowed under applicable non-bankruptcy law, to commence and/or maintain an action, in the first instance, in the Bankruptcy Court against the Insurer or Insurers who issued such Insurance Policy or Insurance Policies and, for nominal purposes only, against such Debtor(s); provided, however, that any award granted in any such action shall be enforceable or recoverable only from the then-remaining applicable limits of any applicable Insurance Policy in an amount equal to (a) the lesser of (i) the amount of the award and (ii) the then-remaining applicable limits of any applicable Insurance Policy, minus (b) the amount of any deductible, self insured retention or similar contractual undertaking contained or incorporated in such Insurance Policy or Insurance Policies. As to all Claims, including all Potentially Insured Claims, the Bankruptcy Court shall determine, in the first instance pursuant to applicable bankruptcy law, in what forum such Claim shall be determined. Moreover, none of the Insurers shall advance or pay to any third party alleging a Potentially Insured Claim any amount representing or corresponding to any deductible, self insured retention or similar contractual undertaking, and the Insurers shall be required to pay, at most, to any third party alleging a Potentially Insured Claim, only those amounts that are in excess of any applicable deductible, self insured retention or similar contractual undertaking.

Nothing in the Plan or the Confirmation Order shall affect or impair the right of any Insurer who pays a Potentially Insured Claim, or who is the subject of an action by the holder of a Potentially Insured Claim brought pursuant to the preceding paragraph, to seek contribution or indemnification from another Insurer who issued one or more Insurance Policies. The Reorganized Debtors shall comply with all reasonable requests (not requiring a significant expenditure of funds) by an Insurer for information relating to other Insurers or Insurance Policies that do or may provide coverage for a particular Potentially Insured Claim to the extent such information is available.

D. <u>Section 1146 Exemption.</u>

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or issuance of debt or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or other similar tax. Unless expressly provided otherwise, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Petition Date through and including the Effective Date, including without limitation, the sales, if any, by the Debtors of owned property or assets pursuant to Section 363(b) of the Bankruptcy Code and the assumptions, assignments and sales, if any, by the Debtors of

US_ACTIVE-105458165.9105458165.12

unexpired leases of non-residential real property pursuant to Section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, therefore, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or other similar tax law.

E.    Compliance with Tax Requirements.

In connection with the implementation and consummation of the Plan, the Debtors will comply with all withholding and reporting requirements imposed by any taxing authority, and all distributions thereunder will be subject to such withholding and reporting requirements.

F.    Severability of Plan Provisions.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power, with the consent of the (a) the Requisite Supporting First Lien Parties and, (b) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

G.    Exemption from Securities Laws.

The issuance of New Equity and any other securities that may be deemed to be issued pursuant to the Plan shall be exempt from state and federal securities laws pursuant to Section 1145 of the Bankruptcy Code.

H.    Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated, for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## XIX.   RETENTION OF JURISDICTION

A.    Post Effective-Date Jurisdiction

On and after the Effective Date, the Bankruptcy Court will retain and have jurisdiction, to the fullest extent permissible under law, over all matters arising in, arising under, or related to the Debtors' Reorganization Cases, or that relate to any of the following:

a. To hear and determine all matters with respect to the assumption or rejection of executory contracts or unexpired leases, resolution of disputes pertaining to Cure Payment amounts and the allowance of the Claims resulting therefrom.

b. To hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

c. To hear and determine any application under Sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by professionals prior to the Effective Date, provided, however, that from and after the Effective Date, the payment of fees and expenses incurred from and after the Effective Date of the retained professionals of the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

d. To hear and determine any dispute or reconcile any inconsistency arising in connection with the Plan, any of the Plan Documents or the Confirmation Order or the interpretation, implementation or enforcement of the Plan, any of the Plan Documents, the Confirmation Order, any transaction or payment contemplated hereby or any agreement, instrument or other document governing or relating to any of the foregoing.

e. To hear and determine any matter concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code.

f. To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and Title 28 of the United States Code.

g. To hear and determine any rights, claims or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code.

h. To hear and determine any dispute arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar claims pursuant to Section 105(a) of the Bankruptcy Code.

h. i. To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court.

i. j. To take any action, and issue such orders as may be necessary or appropriate, to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation.

j. k. To take any action to ensure that all distributions are accomplished as provided herein.

US_ACTIVE 105458165.9105458165.12

k. l. To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, Administrative Expense Claim or Equity Interest.

l. m. To enter, implement or enforce such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated.

m. n. To take any action to recover all assets of the Debtors and property of the Debtors' estates wherever located.

n. o. To enter a final decree closing the Debtors' Reorganization Cases.

o. p. To hear and determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date.

p. q. To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Debtors' Reorganization Cases with respect to any Person.

q. r. To hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge.

r. s. To hear and determine any other matter that may arise in connection with or is related to this Plan, the Disclosure Statement, the Confirmation Order, any of the Plan Documents or any other contract, instrument, release or other agreement or document related to the Plan or the Disclosure Statement.

B. Jurisdiction Prior to the Effective Date

Prior to the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters over which it may exercise jurisdiction pursuant to 28 U.S.C. §1334.

## XX. MISCELLANEOUS PROVISIONS

A. Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.

B. Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Reorganized Debtors shall pay all fees required to be paid pursuant to Section 1930 of title 28 of the United States Code.

US_ACTIVE 105458165.9 105458165.12

C.     Retiree Benefits

On and after the Effective Date, pursuant to Section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors for the duration of the period for which the Debtors have obligated themselves to provide such benefits.

D.     Professional Fee Claims

All final requests for Professional Fee Claims must be filed with the Court not later than forty-five (45) days after the Effective Date.  Objections to the applications of such professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Debtors and their counsel and the requesting professional or other entity not later than two (2) weeks prior to the hearing date of the applications.  The hearing date on any Professional Fee Claims will be set to allow a reasonable time for objections to be filed.

E.     Modifications and Amendments

Subject to the prior written consent of the (a) the Requisite Supporting First Lien Parties and, (b) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties, the Plan may be amended, modified or supplemented by the Debtors or Reorganized Debtors in the manner provided for by Section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to Section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct.  In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims and Equity Interests under the Plan, the Debtors may institute proceedings in the Bankruptcy Court, to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, provided, however, any material amendment or modification will require the consent of the (a) the Requisite Supporting First Lien Parties and, (b) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties.

F.     Corrective Action

Prior to the Effective Date, upon the prior written consent of the (a) the Requisite Supporting First Lien Parties and, (b) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims and Equity Interests.

G.     Plan Revocation, Withdrawal or Non-Consummation

Subject to the prior written consent of the (a) the Requisite Supporting First Lien Parties and, (b) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties, the Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if confirmation or consummation of the Plan does not occur,

US_ACTIVE-~~105458165.9~~105458165.12

then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan and no acts taken in preparation for consummation of the Plan shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interest in, any Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by the Debtors or any other Person. None of the filing of the Plan, the taking by the Debtors of any action with respect to the Plan or any statement or provision contained in the Plan or herein will be or deemed to be an admission by any of the Debtors, the holders of any Claims or any other Person against interest or will be or deemed to be a waiver of any rights, claims or remedies that the Debtors may have, and until the Effective Date all such rights and remedies are and will be specifically reserved. In the event the Plan is not confirmed and the Confirmation Order is not entered, the Plan and the Plan Documents, and any statement contained herein or therein, may not be used by any Person, party or entity against any the Debtors.

H.    Modification of Exhibits

Subject to obtaining the consents of the (a) the Requisite Supporting First Lien Parties and, (b) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties, the Debtors explicitly reserve the right to modify or make additions to or subtractions from any schedule to the Plan or the Disclosure Statement and to modify any exhibit to the Plan or the Disclosure Statement prior to the Objection Deadline.

I.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an Exhibit to the Plan or Plan Document provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

J.    Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply. With regard to all dates and periods of time set forth or referred to in the Plan, time is of the essence.

K.    Section Headings

The section headings and other captions contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

US_ACTIVE-105458165.9105458165.12

L. Effectuating Documents and Further Transactions

Each of the officers of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary, appropriate or desirable to effectuate and further evidence the terms and provisions of the Plan, the Plan Documents and any securities issued pursuant to the Plan.

M. Successors and Assigns

The rights, benefits and obligations of any Person named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person; provided, however, that nothing in the Plan or the Confirmation Order shall be deemed to permit the assignment of an Insurance Policy that is non-assignable to any party other than the Reorganized Debtors without the Insurer's consent under applicable non-bankruptcy law.

N. Notices

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Summit Business Media Holding Company
> 5081 Olympic Boulevard
> Erlanger, KY  41018
> Attention:  Chief Financial Officer
> Facsimile: (859) 692-2000

and copies to counsel for the Debtors and the Reorganized Debtors:

> Reed Smith LLP
> 599 Lexington Avenue
> 22nd Floor
> New York, NY  10022
> Attn:  J. Andrew Rahl, Jr.
> Tel: (212) 521-5400
> Fax: (212) 521-5450
> Email: arahl@reedsmith.com

  -and-

US_ACTIVE-105458165.9105458165.12

Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, DE  19801
Attn:  Kimberly E. Lawson
Tel: (302) 778-7500
Fax: (302) 778 7575
Email: klawson@reedsmith.com

and copies to counsel for the Pre-Petition First Lien Agent:

Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL 60606
Attn:   J. Robert Stoll
           John J. Voorhees, Jr.
Tel: (312) 782-0600
Fax: (312) 701-7711
Email: jstoll@mayerbrown.com
           jvoorhees@mayerbrown.com

and copies to counsel for the Pre-Petition Second Lien Agent:

Bingham McCutchen LLP
399 Park Avenue
New York, NY  10022-4689
Attn:   Katherine G. Weinstein
Tel: (212) 705-7761
Fax: (212) 702-3691
Email: katherine.weinstein@bingham.com

and copies to counsel for the administrative agent for the Revolving Lenders:

Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
Attn:   John Box
Tel: (312) 853-7425
Fax: (312) 853-7036
Email: jbox@sidley.com

Any delivery after 5:00 p.m., prevailing Central time, on a Business Day, or on a day that is not a Business Day, shall be deemed to have been made on the immediately following Business Day.

US_ACTIVE-105458165.9105458165.12

# XXI.  CONFIRMATION REQUIREMENTS

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Court have been satisfied.  If so, the Bankruptcy Court will enter the Confirmation Order.  Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Class of Impaired Claims or Equity Interests, either each holder of a Claim or Equity Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be impaired under the Plan, or the Plan may be confirmed without the approval of each voting Class pursuant to Section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative, Allowed Priority Tax Claims and Allowed Other Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims or Equity Interests will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- 72 -

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code, (b) they have complied, or will have complied, with all of the requirements of chapter 11 and (c) the Plan has been proposed in good faith.

A.     <u>Feasibility of the Plan</u>

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors have prepared and relied upon the financial projections, which are annexed to this Disclosure Statement as Exhibit 3 (the "<u>Projections</u>"), ~~and~~ the Liquidation Analysis, which is annexed hereto as Exhibit ~~4~~4 and the Valuations annexed hereto as Exhibit 5.   **EXHIBITS 3~~3~~, 4 AND 4~~5~~ AND THE NOTES THERETO ARE AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND THE PLAN.**

The Debtors will be required to estimate the Debtors' reorganization value, the fair value of their assets, and their actual liabilities as of the Effective Date. Such determination will be based upon the fair values as of that date, which could be materially greater or less than the value assumed in the Financial Projections. Any fresh-start reporting adjustments that may be required in accordance with Statement of Position 90-7 – Financial Reporting by Entities in Reorganization under the Bankruptcy Code, including any allocation of the Debtors' reorganization value to the Debtors' assets in accordance with the procedures specified in Financial Accounting Standards Board Statement 141 – Business Combinations will be made when the Debtors emerge from bankruptcy. The Projections do not reflect any fresh-start reporting adjustments that may be required to be made on the Effective Date.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. The Debtors caution that no representations can be made as to the Reorganized Debtors' ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of the Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtors' financial results. As disclosed in the Projections, these estimates have not been audited and may not comply with the requirements of Generally Accepted Accounting Principles ("<u>GAAP</u>"). The Debtors' management believes these estimates are reasonable and are the best estimate of the future operations of the Reorganized

Debtors. However, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY ANY INDEPENDENT ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.**

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: This Disclosure Statement and the financial projections contained herein and in the Projections include "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical fact included in this Disclosure Statement are forward-looking statements, including, without limitation, financial projections, the statements, and the underlying assumptions, regarding the timing of, completion of and scope of the current restructuring, the Plan, debt and equity market conditions, the cyclicality of the Debtors' industry, current and future industry conditions, the potential effects of such matters on the Debtors' business strategy, results of operations or financial position, the adequacy of the Debtors' liquidity and the market sensitivity of the Debtors' financial instruments. The forward-looking statements are based upon current information and expectations. Estimates, forecasts and other statements contained in or implied by the forward-looking statements speak only as of the date on which they are made, are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to evaluate and predict. Although the Debtors believe that the expectations reflected in the forward-looking statements are reasonable, parties are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Certain important factors that could cause actual results to differ materially from the Debtors' expectation or what is expressed, implied or forecasted by or in the forward-looking statements include developments in the Debtors' Reorganization Cases, adverse developments in the timing or results of the Debtors' business plan (including the time line to emerge from chapter 11), the timing and extent of changes in economic conditions, the supply-demand balance for the Debtors' services, competitive products and pricing pressures, federal and state regulatory developments, the Debtors' financial leverage, motions filed or actions taken in connection with the bankruptcy

US_ACTIVE-~~105458165.9~~105458165.12

proceedings, the availability of skilled personnel, the Debtors' ability to attract or retain high quality employees and operating risks attendant to the industry. Additional factors that could cause actual results to differ materially from the Projections or what is expressed, implied or forecasted by or in he forward-looking statements are stated herein in cautionary statements made in conjunction with the forward looking statements or are included elsewhere in this Disclosure Statement.

B.     <u>Best Interests Test</u>

1.     <u>Generally</u>

The Bankruptcy Code requires the bankruptcy court to determine that a plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court find that each holder of a claim or interest in an impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. A liquidation under chapter 7 does not affect the priority of several holders of claims to be paid first. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity

US_ACTIVE-105458165.9105458165.12

security holders under a debtor's plan, then such plan is not in the "best interests" of creditors and equity security holders.

2.      <u>Best Interests of Creditors Test</u>

For purposes of the best interests test and in order to determine the liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as Exhibit 4 (the "<u>Liquidation Analysis</u>"), which concludes that in a chapter 7 liquidation, other than the Pre-Petition First Lien Secured Parties, no holders of prepetition Claims would receive any recovery whatsoever.  The Plan, which proposes to pay the Class 5 Recovery in Cash to holders of General Unsecured Claims and $1 million in Cash plus the Class E Units to the holders of the Pre-Petition Second Lien Secured Claims, thus proposes to distribute more to these classes than the Debtors believe they would receive in a chapter 7 liquidation.  The Plan also proposes that the Reorganized Debtors will distribute the $110 million Term Loan and 94.7% of the Class A/B/C Units to the holders of the Pre-Petition First Lien Secured Claims and thereby provide them with consideration that materially exceeds what the Liquidation Analysis projects as a recovery to such creditors in a chapter 7 liquidation. Thus, the Debtors believe that the Pre-Petition First Lien Secured Parties too are materially better off under the Plan than in a chapter 7 liquidation.  These conclusions are premised upon the Liquidation Analysis, and the Debtors and their financial advisors believe they are reasonable.

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative.  The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims.  Claims estimated are based solely upon the Debtors' books and records.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to holders of Allowed Claims.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of the Allowed Claims under the Plan.

3.      <u>Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuations</u>

It is impossible to determine with certainty the value each holder of a Pre-Petition First Lien Secured Claim, Pre-Petition Second Lien Claim or General Unsecured Claim will receive under the Plan as a percentage of any Allowed Claim.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained herein imply a greater recovery to holders of Claims in creditor classes that are impaired under the Plan than the recovery available to them in a chapter 7 liquidation.  Accordingly, the Debtors believe that the "best interests" test of Section 1129 of the Bankruptcy Code is satisfied.

US_ACTIVE-105458165.9105458165.12

C.   Confirmation Without Acceptance by All Impaired Classes:  The 'Cramdown' Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan may be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it.  The Bankruptcy Court may confirm a plan at the request of a debtor notwithstanding the plan's rejection (or deemed rejection) by impaired classes as long as the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.  The votes of the class(es) of unsecured claims will be tabulated on an individual debtor-by-debtor basis and, to the extent that a class of such claimants of any individual Debtor(s) votes to reject the Plan, the Debtors intend to seek confirmation of the Plan for such Debtor(s) notwithstanding any such rejection via 'Cramdown.'

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Equity Interests under Class 76 are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Equity Interests.  Such Class therefore is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Accordingly, the Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to

US_ACTIVE-105458165.9105458165.12

such Class and may seek confirmation of the Plan as to other Classes if such Classes vote to reject the Plan. Notwithstanding the deemed rejection by such Class, the Debtors believe that Class 76 is being treated fairly and equitably under the Bankruptcy Code. The Debtors therefore believe the Plan may be confirmed despite its deemed rejection by this Class.

## XXII. IMPORTANT CONSIDERATIONS AND RISK FACTORS

### A. The Debtors Have no Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### B. No Representations Outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the chapter 11 cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance, or rejection, of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to Debtors' counsel and the Office of the United States Trustee.

### C. Information Presented Is Based on the Debtors' Books and Records, and no Audit was Performed

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of Debtors' financial difficulties, as well as the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate. The financial information contained herein, unless otherwise expressly indicated, is unaudited.

### D. All Information Was Provided by Debtors and Was Relied Upon by Professionals

Reed Smith LLP was approved by the Bankruptcy Court to represent the Debtors effective as of the Petition Date as general bankruptcy counsel. Lincoln Partners Advisors LLC was approved by the Bankruptcy Court to represent the Debtors effective as of the Petition Date as their financial advisor. All counsel, financial advisors, and other professionals for the Debtors have relied upon information provided by the Debtors in connection with preparation of this Disclosure Statement. Although counsel and the financial advisor for the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel and the financial advisor have not verified independently the information contained herein.

E.    Projections and Other Forward Looking Statements Are not Assured, and Actual Results Will Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be allowed.

1.    Claims Could Be More Than Projected

The allowed amount of Claims in each Class could be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. If Administrative Claims and/or Other Secured claims or Other Priority Claims exceed projections, it may impair the value of the NewCo LLC Equity being distributed under the Plan.

2.    Projections

While the Debtors believe that their projections are reasonable, there can be no assurance that they will be realized, resulting in recoveries that could be significantly less than projected.

F.    No Legal or Tax Advice Is Provided to You by This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or Equity Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

G.    No Admissions Made

Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Debtors) or to be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Equity Interests.

H.    No Waiver of Rights Except as Expressly Set Forth in the Plan

A creditor's vote for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or estate assets, regardless of whether any Claims of the Debtors or their respective estates are specifically or generally identified herein.

US_ACTIVE-105458165.9105458165.12

I.	Business Factors and Competitive Conditions

1.	General Economic Conditions

In their Financial Projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years.  An improvement of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.  There is no guarantee that economic conditions will improve in the near term.

2.	Business Factors

The Debtors believe that they will succeed in implementing and executing their operational restructuring for the benefit of all constituencies.  However, there are risks that the goals of the Debtors' going-forward business plan and operational restructuring strategy will not be achieved.  In such event, the Debtors may be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.  Also, in the event of further restructurings or insolvency proceedings, the recoveries of those who receive distributions of the Term Loan or NewCo LLC Equity under the Plan could be substantially diluted or rendered valueless.

3.	Competitive Conditions

In addition to uncertain economic and business conditions, the Reorganized Debtors will likely face competitive pressures and other third party actions, including pressures from pricing and other promotional activities of competitors as well as new competition.  The Reorganized Debtors' anticipated operating performance will be impacted by these and other unpredictable activities by competitors.

4.	Other Factors

Other factors that Holders of Claims should consider are potential regulatory and legal developments that may impact the Reorganized Debtors' businesses.  Although these and other such factors are beyond the Debtors' control and cannot be determined in advance, they could have a significant impact on the Reorganized Debtors' operating performance.

J.	Access to Financing and Trade Terms

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support.  The Debtors' post-petition operations have been financed from operating cash flow and borrowings pursuant to the DIP Facility.  The Debtors believe that substantially all of their need for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by projected operating cash flow, the DIP Facility, the Exit Revolving Credit Facility, trade terms supplied by vendors, and collections related to Causes of Action.  However, if the Reorganized Debtors require working

US_ACTIVE-105458165.9105458165.12

capital and trade financing greater than that provided by such sources, they may be required either to (a) obtain other sources of financing or (b) curtail their operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors. The Debtors believe that it is important to their going-forward business plan that their performance meets projected results in order to ensure continued support from vendors and factors. There are risks to the Reorganized Debtors in the event such support erodes after emergence from chapter 11 that could be alleviated by remaining in chapter 11. Chapter 11 affords a debtor the opportunity to close facilities and liquidate assets relatively expeditiously, tools that will not be available to the Reorganized Debtors upon emergence. However, the Debtors believe that the benefits of emergence from chapter 11 at this time outweigh the potential costs of remaining in chapter 11, and that emergence at this time is in the long-term operational best interests of the Debtors and their creditors.

K.      Market for NewCo LLC Equity

There can be no assurance that an active market for the NewCo LLC Equity to be distributed pursuant to the Plan will develop, and no assurance can be given as to the prices at which such securities might be traded. Moreover, the NewCo LLC Equity will not be registered pursuant to the Securities Exchange Act of 1934, as amended, and therefore not listed on a public exchange or automated trading system. The liquidity of the NewCo LLC Equity will also depend on, among other things, the number of holders of the NewCo LLC Equity, the Reorganized Debtors' financial performance, and other factors beyond the Reorganized Debtors' control, including war, terrorist attacks, recession or further weakening of the economy, none of which can be determined or predicted with certainty. The Debtors do not expect the Reorganized Debtors to declare dividends in the foreseeable future with respect to the NewCo LLC Equity, which may also adversely impact the market for and value of the NewCo LLC Equity.

L.      Impact of Interest Rates

Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets and the NewCo LLC Equity, adversely impact the Debtors' financial results, and/or cause the Debtors' to be in violations of financial covenants contained in the Exit Credit Agreement.

M.      Bankruptcy Law Risks and Considerations

1.      Confirmation of the Plan is Not Assured

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

US_ACTIVE 105458165.9 105458165.12

2. The Plan May Be Confirmed Without the Approval of All Creditors Through So-Called "Cramdown"

If one or more Impaired Classes of Claims does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan at the Debtors' request if all other conditions for confirmation have been met and at least one impaired Class of Claims has accepted the Plan (without including the vote of any insider in that Class) and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable.

The votes of holders of Equity Interests under Class 76 are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Equity Interests. Such Class therefore is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Accordingly, the Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Class and may seek confirmation of the Plan as to other Classes if such Classes vote to reject the Plan. Notwithstanding the deemed rejection by such Class, the Debtors believe that Class 76 is being treated fairly and equitably under the Bankruptcy Code. The Debtors therefore believe the Plan may be confirmed despite its deemed rejection by this Class.

3. The Effective Date Might Be Delayed or Never Occur

There can be no assurance as to the timing of the Effective Date or that it will occur. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived, the Confirmation Order shall be vacated in accordance with the Plan and such Confirmation Order. In that event, no distributions would be made, and the Holders of Claims and Equity Interests would be restored to their previous position as of the moment before confirmation, and the Debtors' obligations for Claims and the Equity Interests would remain unchanged.

4. The Projected Value of Estate Assets Might Not Be Realized

In the Financial Projections, the Debtors project the value of the estates' assets which would be available for payment of expenses and distributions to Holders of Allowed Claims, as set forth in the Plan. The Debtors have made certain assumptions, as described in the notes to the Financial Projections contained in Exhibit 3 attached hereto, and which should be read carefully.

5. Allowed Claims in the Various Classes May Exceed Projections

The Debtors have also projected the allowed amount of Claims in each Class. Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

N. Tax Considerations

There are significant tax consequences to the Debtors and Holders of Claims and Equity Interests. These are discussed below in the section entitled "Certain U.S. Federal Income Tax

US_ACTIVE-105458165.9105458165.12

Consequences of the Plan." You should consult your own tax advisor about your particular circumstances.

## XXIII. BINDING EFFECT OF CONFIRMATION

A.      Binding Effect of Confirmation

Confirmation will legally bind the Debtors, all creditors, Equity Interest holders and other parties in interest to the provisions of the Plan, whether or not the Claim or Equity Interest holder is impaired under the Plan, and whether or not such creditor or Equity Interest holder has accepted the Plan.

B.      Vesting of Assets Free and Clear of Liens, Claims and Interests

Pursuant to Section 1141(b) of the Bankruptcy Code, all property of the respective estate of each Debtor, together with any property of each Debtor that is not property of its estate and that is not specifically disposed of pursuant to the Plan, or by order of the Bankruptcy Court, will revest in the applicable Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor will be free and clear of all Liens, Claims and Equity Interests except as specifically provided pursuant to the Plan, this Disclosure Statement, the Confirmation Order, and the Exit Credit Documents.

C.      Good Faith

Confirmation of the Plan shall constitute a finding that the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code.

D.      Discharge of Claims

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction, discharge and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and alter the Petition Date, against any Debtor or any of its respective assets or properties. On the Effective Date, all such Claims against, and Equity Interests in, any Debtor shall be satisfied, discharged and released in full and all Persons and Entities shall be precluded from asserting against any Reorganized Debtor, its successor or its assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

E.      Judicial Determination of Discharge

All Holders of Claims and Equity Interests are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against the Debtors, their estates, or the Reorganized Debtors; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their estates, or the

Reorganized Debtors; and (c) creating, perfecting, or enforcing any encumbrance of any kind against the property or interests in property of the Debtors, their estates, or the Reorganized Debtors.  The Confirmation Order shall be a judicial determination of discharge of all Claims against the Debtors pursuant to Sections 524 and 1141 of the Bankruptcy Code, and shall void any judgment obtained or entered against Debtors at any time, to the extent the judgment relates to a discharged Claim.

With respect to the matters within the scope of Article XI of the Plan, all Persons and entities shall be and are permanently enjoined from commencing or continuing any action with respect thereto except in the Bankruptcy Court and the Bankruptcy Court shall retain exclusive jurisdiction over such matters.

## XXIV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan which is for general information purposes only and does not purport to be a complete analysis or listing of all potential tax consequences.  Moreover, such summary should not be relied upon for purposes of determining the specific tax consequences of the Plan to the Debtors or with respect to a particular holder of a Claim or Equity Interest.  This summary assumes that the various indebtedness and other arrangements to which a Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder ("Regulations"), judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"), as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below.  Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below.

No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to the holders of Claims or Equity Interests with respect to the U.S. federal income tax consequences described herein.  This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan.  Additionally, this summary does not purport to address the U.S. income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions thrifts, small business investment companies, regulated investment companies, tax exempt organizations, certain expatriates, non-Debtor pass-through entities or investors in non-Debtor pass-through entities).

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX

US_ACTIVE-105458165.9105458165.12

CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE, FEDERAL, STATE, LOCAL AND, TO THE EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF THE U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON; (2) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT; AND (3) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    Federal Tax Consequences to the Debtors.

1.    Tax Classification of the Debtors and Certain Transactions Contemplated by the Plan.

Summit is classified as a 'C' corporation for U.S. federal income tax purposes and owns all of the stock of Summit-Intermediate. Summit-Intermediate is classified as a disregarded entity for U.S. federal income tax purposes and owns all of the stock of National Underwriter. National Underwriter is classified as a 'C' corporation for U.S. federal income tax purposes and owns all of the stock of the Subsidiaries. Of the Subsidiaries (A) Research Holdings, LTD. is classified as a 'C' corporation for U.S. federal income tax purposes, (B) Futures Magazine is classified as a 'C' corporation for U.S. federal income tax purposes, (C) NUCO Business Information, LLC is classified as a disregarded entity for U.S. federal income tax purposes, (D) Agent Media Corporation is classified as a 'C' corporation for U.S. federal income tax purposes, (E) Judy Diamond Associates, Inc. is classified as a 'C' corporation for U.S. federal income tax purposes, and (F) Mining INDABA, LLC is classified as a disregarded entity for U.S. federal income tax purposes.

Summit-Intermediate is the borrower under the Pre-Petition First Lien Credit Agreement and Pre-Petition Second Lien Credit Agreement. Summit, National Underwriter, and each of the Subsidiaries are a guarantor of the Pre-Petition First Lien Obligations and Pre-Petition Second Lien Obligations.

As discussed above, the terms of the Debtors' financial restructuring provide for the cancellation of an aggregate of approximately $[135]140 million of indebtedness. As of the close of the 2010 taxable year,As discussed below, the amount of the Debtors estimate that they collectively will have approximately $[*] million of available net operating losses ("NOLS"). However, the amount of the Debtors' NOLS will not be determined until the U.S. federal income tax return for the 2010 taxable year is prepared. Accordingly, the amount of the Debtors' NOLS

US_ACTIVE-105458165.9105458165.12

ultimately may vary from the estimate set forth above. As discussed below, and in connection with the implementation of the Plan, the amount of the Debtors' NOLS and any other applicable Tax Attributes (as defined below) may be eliminated or significantly reduced and the use of any remaining NOLS may be limited will be reduced by the amount of COD Income (as defined below) attributable to implementation of the Plan. The Debtors believe that the COD Income attributable to implementation of the Plan will be in excess of the Debtors' NOLS and, as a result, such NOLS will therefore be eliminated.

2.  <u>Cancellation of Indebtedness Income Generally.</u>

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must include income from the cancellation of indebtedness ("<u>COD Income</u>") to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (A) the adjusted issue price of the discharged indebtedness less (B) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness including cash, property and the issue price of any new indebtedness. If a new debt instrument is issued to the creditor, then the issue price of such debt instrument is determined under either Section 1273 or Section 1274 of the Tax Code. Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for adequate stated interest. A non publicly-traded debt instrument has adequate stated interest if the interest exceeds the applicable IRS federal rate. The elimination of a guarantee should not result in the inclusion of COD Income.

3.  <u>Bankruptcy Exception and the Reduction of Tax Attributes Generally.</u>

Section 108(a)(l)(A) of the Tax Code provides an exception to the recognition of COD Income, however, where a taxpayer discharging indebtedness is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and where the discharge is granted, or is effected pursuant to a plan approved, by a U.S. Bankruptcy Court (the "<u>Bankruptcy Exception</u>"). Under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to Section 108(b) of the Tax Code, to reduce certain of that taxpayer's tax attributes to the extent thereof by the amount of COD Income. The attributes of the taxpayer are generally reduced in the following order: net operating losses ("<u>NOLS</u>"), general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit tax carryforwards (collectively, "<u>Tax Attributes</u>"). If the amount of the COD Income is sufficiently large, it can eliminate these favorable Tax Attributes. To the extent the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, such excess is excluded from income. Pursuant to Section 108(b)(4)(A) of the Tax Code, the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized.

Section 108(e)(2) of the Tax Code provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.  Unlike Section 108(b) of the Tax Code, Section 108(e)(2) does not require a reduction in the taxpayer's Tax Attributes as a result of the non-recognition of COD Income.  Thus, the effect of Section 108(e)(2) of the Tax Code, where applicable, is to allow a taxpayer to discharge indebtedness without recognizing income and without reducing its Tax Attributes.

4.      Disregarded Entities Discharging Indebtedness Generally.

Pursuant to Section 301.7701-2(a) of the Regulations, an entity that is treated as a disregarded entity for U.S. federal income tax purposes is treated in the same manner as a sole proprietorship, branch or division of such entity's owner.  Thus, assets and liabilities owned, or owed, by a disregarded entity should generally be treated as owned by, or liabilities of, the disregarded entity's owner.  Pursuant to Section 301.7701-1 of the Regulations, a classification as a disregarded entity applies for all U.S. federal tax purposes.  Accordingly, a discharge of a disregarded entity's indebtedness should generally be treated as the discharge of debt owed by such disregarded entity's owner.

As a result the Bankruptcy Exception will be applied to the Reorganized Debtors.

5.      Debtors' COD Income Attributable to the Plan.

Any COD Income attributable to the transactions contemplated by the Plan should be realized by the Debtors.  However, as a result of the Bankruptcy Exception, such COD Income will not be included in the Debtors' gross income.  The Tax Attributes of the Debtors will be reduced or eliminated as of the end of the taxable year after such Tax Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized if COD Income is realized but not included in gross income on implementation of the Plan.  [If As indicated above, the Debtors believe that the COD Income that may be realized on implementation of the Plan exceedswill exceed the amount of the Debtors' NOLS as of the end of the year in which the planPlan is implemented and, as a result, the Debtors' wouldwill not have any NOLS to carryforward to the year following the year in which the Plan is implemented.  In addition, ifIf, as anticipated, the realized COD Income exceeds the amount of the Debtors' NOLS, the Debtors will be required to reduce additional Tax Attributes pursuant to Section 108(b) of the Tax Code to the extent of such excess in the manner described above.]

6.      Accrued Interest.

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the applicable Debtor should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the applicable Debtor has not already deducted such amount. The Debtors should not have COD Income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment

- 87 -

of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Tax Code, as discussed above.

### 7. Alternative Minimum Tax.

Generally, a corporation may incur alternative minimum tax liability even where NOLS carryovers and other Tax Attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible that the Debtors will be liable for the alternative minimum tax.

### B. Limitation of NOL Carryforwards and Other Tax Attributes.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its NOLS and built-in losses (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally is subject to an annual limitation.

### 1. General Section 382 Limitation.

In general, pursuant to Section 382 of the Tax Code, the annual limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (A) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (B) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (such rate for the month of [February 2011 is 4.47%]) (the "Section 382 Limitation"). The Section 382 Limitation may be increased to the extent that the Debtor recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Summit Equity and the NewCo LLC Equity is expected to cause an ownership change with respect to the Debtors on the Effective Date. As a result, unless an exception applies, Section 382 of the Tax Code should apply to limit the Reorganized Debtors' use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of Tax Attributes described in the preceding section resulting from the exclusion of COD Income.

### 2. Special Bankruptcy Exceptions to the Section 382 Limitation

An exception to the foregoing Section 382 Limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "Section 382(l)(5) Exception"). Under the Section 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLS are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year

US_ACTIVE-~~105458165.9~~105458165.12

period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the applicable plan of reorganization, in respect of all debt converted into stock in the reorganization. If the Section 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the Section 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the Section 382(l)(5) Exception), a second special rule will generally apply (the "Section 382(l)(6) Exception"). When the Section 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The Section 382(l)(6) Exception also differs from the Section 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLS by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

[The Debtors believe it will be beneficial for them to qualify for, and utilize, the Section 382(1)(5) Exception. However, as mentioned above, if the Debtors do utilize the Section 382(l)(5) Exception and another ownership change were to occur within the two-year period after consummation, then the Debtors' Pre-Change Losses would effectively be eliminated.]

It is possible that the Debtor will not qualify for the Section 382(l)(5) Exception. In that case, the Debtor expects that its use of its NOLS thereafter will be subject to limitation based on the rules discussed above, but taking into account the Section 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the Section 382(l)(5) Exception or the Section 382(l)(6) Exception, the Reorganized Debtors' use of its Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the Tax Code were to occur after the Effective Date.

C.    Federal Tax Consequences to the Claims and Equity Interests

Generally, a holder of a Claim or Equity Interest should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim or Equity Interest and such holder's adjusted tax basis in the Claim or Equity Interest. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under the Plan in respect of a holder's Claim or Equity Interest. The tax basis of a holder in a Claim or Equity Interest will generally be equal to the holder's cost therefore.

To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim or Equity Interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim or Equity Interest, and the extent to

US_ACTIVE-105458165.9105458165.12

which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim or Equity Interest.  Generally, if the Claim or Equity Interest is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim or Equity Interest for more than one year.

D. <u>Information Reporting and Backup Withholding.</u>

Certain distributions and exchanges made with respect to Claims and Equity Interests pursuant to the Plan may be subject to information reporting by the relevant Debtor-payor to the IRS.  Moreover, such reportable distributions and exchanges may be subject to backup withholding (currently at a rate of 28%) under certain circumstances.  Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND, TO THE EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XXV.  ALTERNATIVES TO THE PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include:  (a) the conversion to a chapter 7 case and accompanying liquidation of the Debtors' assets on a "forced sale" basis; (b) dismissal of the case(s); or (c) an alternative plan of reorganization.

A. <u>Liquidation Under Chapter 7</u>

If no plan can be confirmed, the chapter 11 cases may be converted to chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  For the reasons previously discussed above, the Debtors believe that confirmation of the Plan will provide each holder of a General Unsecured Claim entitled to receive a distribution under the Plan with a recovery that is expected to be substantially more than it would receive in a liquidation under chapter 7 of the Bankruptcy Code.

B. <u>Dismissal</u>

Dismissal of the Debtors' Reorganization Cases would leave the secured creditors in a position to exercise their state law rights under their existing securities interest, including foreclosure of such liens.  The Debtors believe that in a dismissal scenario the unsecured creditors would not receive any distribution.

US_ACTIVE 105458165.9 105458165.12

C.     <u>Alternative Plan</u>

The Debtors believe that any alternative plan would not result in as favorable treatment of Claims as proposed under the Plan.

## XXVI. DEFINITIONS AND INTERPRETATION

A.     <u>Scope of Definitions.</u>

Any term used in this Disclosure Statement that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules or the Plan, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules or the Plan. Whenever the context requires defined terms shall include the plural as well as the singular and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and neutral.

B.     <u>Definitions.</u>

In addition to such other terms as are defined in other sections of this Disclosure Statement, the following terms (which appear in this Disclosure Statement as capitalized terms) shall have the meanings ascribed to them in this Article XXVI:

**"Administrative Expense Claim"** means a Claim for payment of an administrative expense of a kind specified in Section 503(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, other than ~~a Priority Tax Claim,~~ a DIP Facility Claim or Other Priority Claim.

**"Allowed"** means, with respect to any Claim or Equity Interest, except as otherwise provided herein, any of the following: (a) ~~the amount set forth on the Debtors' books and records, that is not otherwise the subject of a pending objection or dispute~~<u>a claim for which a Proof of Claim has been timely filed and as to which no objection has been made on or prior to the Claims Objection Bar Date</u>; (b) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which ~~(i)~~ the Debtors or any other party in interest have not filed an objection ~~and (ii) no contrary Proof of Claim has been filed~~; (c) a Claim or Equity Interest that either is not a Disputed Claim or Equity Interest or has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation with the Debtors of the amount and nature of such Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with the Debtors of the amount and nature of such Claim executed on or after the Confirmation Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture or other agreement entered into or assumed in connection with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (f) a Claim or Equity Interest that is allowed pursuant to the terms of the Plan.

**"Allowed Interest Rate"** means, with respect to Pre-Petition First Lien Secured Loans, the applicable default rate of interest under the Pre-Petition First Lien Credit Agreement (including LIBOR pricing options available in accordance with the Pre-Petition First Lien Credit Agreement).

US_ACTIVE:~~105458165.9~~105458165.12

**"Amended Bylaws"** means the amended and restated bylaws or operating agreement, as appropriate, of each of the Reorganized Debtors, other than Summit-Intermediate, in the form attached as Exhibit 2 to the Plan.

**"Amended Certificate"** means the amended and restated certificate of incorporation or organization or formation, as appropriate, of each of the Reorganized Debtors in the form attached as Exhibit 3 to the Plan.

**"Bankruptcy Code"** means Title 11 of the United States Code, as amended from time to time, as applicable to the Debtors' Reorganization Cases.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Debtors' Reorganization Cases.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of Title 28 of the United States Code, as amended from time to time, as applicable to the Debtors' Reorganization Cases, and any Local Rules of the Bankruptcy Court, as applicable to the Debtors' Reorganization Cases.

**"BMO"** means Bank of Montreal, Chicago Branch.

**"Business Day"** means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which banking institutions in New York, NY are required or authorized to close by law or executive order.

**"Cash"** means legal tender of the United States of America and cash equivalents, including but not limited to bank deposits, checks and other similar items.

**"Causes of Action"** means, without limitation, any and all claims, causes of action, demands, rights, actions, suits, damages, injuries, remedies, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses and franchises of any kind or character whatsoever, known, unknown, accrued or to accrue, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or under any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise.

**"Claim"** has the meaning set forth in Section 101(5) of the Bankruptcy Code.

**"Claims Bar Date"** means the bar date for ~~objecting to~~timely filing proofs of claim for the applicable Class or other type of Claim in question.

**"Claims Objection Bar Date"** means the bar date for objecting to proofs of claim, which date shall be set by order of the Bankruptcy Court, provided that the Debtors and/or the Reorganized Debtors may seek additional extensions of this date from the Bankruptcy Court.

**"Class"** means a group of substantially similar Claims or Equity Interests classified by the Plan pursuant to Section 1122(a)(1) of the Bankruptcy Code.

**"Class A Units"** means the "Class A Units" as defined in and to be issued pursuant to the NewCo Operating Agreement.

**"Class A/B/C Units"** means, collectively, the Class A Units, Class B Units and Class C Units.

**"Class B Units"** means the "Class B Units" as defined in and to be issued pursuant to the NewCo Operating Agreement.

**"Class C Units"** means the "Class C Units" as defined in and to be issued pursuant to the NewCo Operating Agreement.

**"Class D Units"** means the "Class D Units" as defined in the NewCo Operating Agreement.

**"Class E Units"** means the "Class E Units" as defined in and to be issued pursuant to the NewCo Operating Agreement.

**"Class 5 Recovery"** means $100,000 in Cash to be set aside by the Debtors for the payment of the aggregate of Allowed Class 5 Claims.

**"Collateral"** means any property or interest in property of the estate of any Debtor subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

**"Confirmation Date"** means that date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Debtors' Reorganization Cases.

**"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

**"Cure Payment"** means payment on an Allowed Claim arising in connection with the Debtors' obligation under Section 365(b)(1)(A) or (B) of the Bankruptcy Code relating to an assumed executory contract or unexpired lease.

**"Debtors"** means Summit and its affiliated debtors listed on Exhibit 1 of the Plan.

**"Debtors' Reorganization Cases"** means the chapter 11 cases commenced by the Debtors in the Bankruptcy Court.

**"DIP Agent"** means BMO, in its capacity as administrative agent under the DIP Facility.

**"DIP Facility"** means the Senior Secured Superpriority Debtor-in-Possession Credit Agreement (as amended, supplemented or otherwise modified from time to time) to be entered into by and among the Debtors, the DIP Agent, and the DIP Lenders, in the form attached as Exhibit 7 to the Plan, together with the exhibits, schedules and annexes attached thereto.

US_ACTIVE-105458165.9105458165.12

**"DIP Facility Claim"** means any Claim against any of the Debtors arising under, in connection with or related to the DIP Facility, the DIP Order, or the DIP Obligations, including all interest, fees, expenses and other amounts payable thereon.

**"DIP Lenders"** means, collectively, the financial institutions from time to time party to the DIP Facility as "Lenders" thereunder, including any predecessors or successors and assigns, in each case, in their respective capacities as such.

**"DIP Obligations"** means any "Obligations", as defined in the DIP Facility, including credit extended in respect of overdrafts and related liabilities and other depository, treasury, and cash management services and other clearing services provided by BMO or its affiliates.

**"DIP Order"** means any interim order or Final Order approving the DIP Facility.

**"Disbursing Agent"** means any entity (including any Debtor) that acts in the capacity as a Disbursing Agent under the Plan.

**"Disclosure Statement"** means the disclosure statement filed in connection with the Plan, together with the exhibits, schedules and annexes attached thereto.

**"Disputed Claim or Equity Interest"** means a Claim or Equity Interest, or any portion thereof: (a) to the extent listed on the Schedules, as unliquidated, disputed or contingent; or (b) that is the subject of an objection or request for estimation filed or is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; (c) that is in excess of the amount scheduled as other than disputed, contingent or unliquidated or (d) that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved or overruled by Final Order.

**"Distribution Record Date"** means the record date for purposes of making any distribution under the Plan on account of Allowed Claims and Equity Interests, which shall be as of the close of business on the Confirmation Date or other such date prior to the Effective Date as may be designated in the Confirmation Order.

**"Effective Date"** means the first Business Day on or after the Confirmation Date on which all the conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the provisions of the Plan.

**"Equity Interest"** means any equity interest in any of the Debtors, including, but not limited to, all issued, unissued, authorized or outstanding limited liability company interests, membership interests, units, shares or stock (including common stock or preferred stock), together with any warrants, options or contract rights to purchase or acquire such interest at any time.

**"Existing First Lien Credit Documents"** means the Pre-Petition First Lien Credit Agreement, the Pre-Petition First Lien Security Agreement, all other Pre-Petition First Lien Security Documents, all other "Loan Documents", as defined in the Pre-Petition First Lien Credit Agreement, and all other documentation executed in connection with any of the foregoing, as such documents may have been amended, supplemented or otherwise modified.

US_ACTIVE 105458165.9105458165.12

**"Existing Second Lien Credit Documents"** means the Pre-Petition Second Lien Credit Agreement and all other "Loan Documents", as defined in the Pre-Petition Second Lien Credit Agreement, and all other documentation executed in connection with any of the foregoing, as such documents may have been amended, supplemented or otherwise modified.

**"Exit Borrower"** means The National Underwriter Company, an Ohio corporation, from and after the Effective Date.

**"Exit Credit Agreement"** means a Credit Agreement, in the form attached as Exhibit 8 to the Plan, together with the exhibits, schedules and annexes attached thereto.

**"Exit Credit Documents"** means ~~the "Loan Documents" as defined in the Exit Credit Agreement. For the avoidance of doubt, the term "Exit Credit Documents" shall include~~ (a) the Exit Credit Agreement and (b) ~~the notes,~~ the mutual release agreement~~, and~~ the guaranty agreements pursuant to which the Reorganized Debtors (other than the Exit Borrower) and NewCo LLC will guarantee the obligations of the Exit Borrower under the Exit Credit Agreement, and ~~the security agreements, intellectual property security agreements, deposit account control agreements, and mortgages pursuant to which each of the Reorganized Debtors and NewCo LLC will grant the Secured Parties (as defined in the Exit Credit Agreement) a valid and perfected first priority lien and security interest in substantially all of its assets, in each case under this clause (b) consistent with the terms and conditions of the Exit Credit Agreement and in the forms attached as Exhibit 9 to the Plan, and~~(c) each other agreement, certificate, document, or instrument delivered in connection with the Exit Credit Agreement, from time to time, together with the exhibits, schedules and annexes attached thereto.

**"Final Order"** means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in the Debtors' Reorganization Cases or the docket of such other court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

**"General Unsecured Claim"** means any Claim against any of the Debtors that is not an Administrative Expense Claim, an Other Priority Claim, a Priority Tax Claim, a Pre-Petition First Lien Secured Claim, a Pre-Petition Second Lien Claim, a DIP Facility Claim, an Other Secured Claim, or an Intercompany Claim.

**"Indemnification Obligations"** shall have the meaning set forth in Section 5.7 of the Plan.

US_ACTIVE-~~105458165.9~~105458165.12

**"Insurance Policy"** means any liability insurance policy or other insurance policy that was issued to a Debtor or Debtors or under which the Debtor(s) has or claims a right to insurance coverage.

**"Insurer"** means any insurance company or insurance carrier that issued an Insurance Policy.

> **"Intercompany Claim"** means any Claim held by a Debtor against another Debtor, including without limitation: (a) any account reflecting intercompany book entries by a Debtor with respect to another Debtor, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

**"Lien"** has the meaning set forth in Section 101(37) of the Bankruptcy Code.

**"Management Incentive Plan"** means a Management Incentive Plan in the form attached as Exhibit ~~10~~9 to the Plan, together with the exhibits, schedules and annexes attached thereto.

**"NewCo LLC"** means the limited liability company to be owned by the Pre-Petition First Lien Secured Parties, the Revolving Lenders, the Pre-Petition Second Lien Lenders, and certain officers and directors of the Reorganized Debtors, which limited liability company will receive all of the New Summit Equity.

**"NewCo LLC Equity"** means the new limited liability company interests of NewCo LLC.

**"NewCo Operating Agreement"** means the operating agreement, to be dated as of the Effective Date, among the Pre-Petition First Lien Secured Parties, Revolving Lenders, Pre-Petition Second Lien Lenders, and certain officers and directors of the Reorganized Debtors, which will govern the governance and other terms of NewCo LLC, in the form attached as Exhibit 4 to the Plan.

**"New Equity"** means, as applicable, the new stock, new membership interests or new limited liability company interests of each of the Reorganized Debtors.

**"New Summit Equity"** means the new stock of Reorganized Summit.

**"Objection Deadline"** means the date and time to be set forth in an order of the Bankruptcy Court by which a creditor or interest holder or other party in interest must file an objection to confirmation of the Plan.

**"OpCo Operating Agreement"** means the operating agreement, to be dated as of the Effective Date, of Reorganized Summit which will govern the governance and other terms of Summit-Intermediate, in the form attached as Exhibit ~~11~~10 to the Plan.

**"Other Priority Claim"** means any Claim (other than an Administrative Expense Claim, Priority Tax Claim, or DIP Facility Claim) entitled to priority of payment under Section 507(a) of the Bankruptcy Code.

**"Other Secured Claim"** means a Secured Claim other than a DIP Facility Claim, a Pre-Petition First Lien Secured Claim, or a Pre-Petition Second Lien Claim.

**"Person"** means an individual, partnership, corporation, business trust, estate, limited liability company, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or other entity or any government, governmental agency or any subdivision, department or other instrumentality thereof.

**"Petition Date"** means the date on which the Debtors filed voluntary petitions with the Bankruptcy Court commencing the Debtors' Reorganization Cases.

**"Plan"** means the joint chapter 11 plan of the Debtors, including all exhibits, supplements, appendices and schedules thereto, either in its or their present form or as the same may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan.

**"Plan Documents"** means the agreements, instruments and documents to be executed, delivered and/or performed in conjunction with the consummation of the Plan, including without limitation, (a) the Plan, (b) the Plan Supplement, (c) the Amended Certificates, (d) the Amended Bylaws, (e) the NewCo Operating Agreement, (f) the Exit Credit Documents, (g) the Management Incentive Plan, and (h) the OpCo Operating Agreement.

    **"Plan Supplement"** means the compilation of documents that the Debtors shall file with the Bankruptcy Court in support of the Plan on or before the date that is five days prior to the confirmation hearing.

**"Potentially Insured Claim"** means a Claim against a Debtor or Debtors ~~that~~by a party who has received timely notice of the Debtors' Reorganization Cases, which claim was or could have been asserted in, and otherwise is ~~therefore~~ subject to discharge in, the Debtors' Reorganization Cases and that is alleged to be covered, in whole or in part, by an Insurance Policy. "Potentially Insured Claims" are within the class of General Unsecured Claims. Claims for workers' compensation benefits are not included in the term "Potentially Insured Claims."

**"Pre-Petition First Lien Agent"** means BMO, in its capacity as administrative agent under the Pre-Petition First Lien Credit Agreement.

**"Pre-Petition First Lien Credit Agreement"** means that certain Amended and Restated First Lien Credit Agreement, dated as of July 6, 2007, by and among Summit-Intermediate, the Pre-Petition First Lien Secured Lenders, and the Pre-Petition First Lien Agent, as amended, supplemented or otherwise modified.

**"Pre-Petition First Lien Obligations"** means the "Obligations" as defined in the Pre-Petition First Lien Credit Agreement.

**"Pre-Petition First Lien Security Agreement"** means the "Security Agreement" as defined in the Pre-Petition First Lien Credit Agreement.

**"Pre-Petition First Lien Secured Lenders"** means the "Lenders" as defined in the Pre-Petition First Lien Credit Agreement, and their respective successors and assigns, in each case in their respective capacities as such.

US_ACTIVE:~~105458165.9~~105458165.12

**"Pre-Petition First Lien Secured Loans"** means the "Loans" as defined in the Pre-Petition First Lien Credit Agreement.

**"Pre-Petition First Lien Secured Parties"** means the Pre-Petition First Lien Secured Lenders, the Pre-Petition First Lien Agent and the other "Secured Parties", as defined in the Pre-Petition First Lien Credit Agreement, and their respective successors and assigns, in each case, in their respective capacities as such.

**"Pre-Petition First Lien Secured Claims"** means any and all Claims of the Pre-Petition First Lien Secured Parties in respect of, in connection with or related to the Existing First Lien Credit Documents or the Pre-Petition First Lien Obligations, including all interest, fees, expenses and other amounts payable thereon.

**"Pre-Petition First Lien Security Documents"** means the Pre-Petition First Lien Security Agreement and all other documents granting security for any or all of the Pre-Petition First Lien Obligations, and all ancillary documents, in each case, as the same may be amended, supplemented or otherwise modified.

**"Pre-Petition Second Lien Agent"** means Ares, in its capacity as administrative agent under the Pre-Petition Second Lien Credit Agreement.

**"Pre-Petition Second Lien Claims"** means any and all Claims of the Pre-Petition Second Lien Lenders and the Pre-Petition Second Lien Agent in respect of, in connection with or related to the Existing Second Lien Credit Documents or the Pre-Petition Second Lien Obligations, including all interest, fees, expenses and other amounts payable thereon.

**"Pre-Petition Second Lien Credit Agreement"** means that certain Amended and Restated Second Lien Credit Agreement, dated as of July 6, 2007, by and among Summit-Intermediate, the Pre-Petition Second Lien Lenders and the Pre-Petition Second Lien Agent, as amended, supplemented or otherwise modified.

**"Pre-Petition Second Lien Lenders"** means the "Lenders" as defined in the Pre-Petition Second Lien Credit Agreement, and their respective successors and assigns, in each case in their respective capacities as such.

**"Pre-Petition Second Lien Obligations"** means the "Obligations" as defined in the Pre-Petition Second Lien Credit Agreement.

**"Priority Tax Claim"** means any Claim of a governmental unit of the kind entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code, including a Secured Tax Claim.

**"Professional Fee Claims"** means any Claim of a professional person retained or otherwise entitled to be paid pursuant to Sections 327, 503(b) or 1103 of the Bankruptcy Code, for compensation, indemnification or reimbursement of costs and expenses relating to services performed on and after the Petition Date through and including the Effective Date.

**"Proof of Claim"** means any proof of claim that is filed by a holder of a Claim.

**"Pro Rata Share"** means (a) with respect to an Allowed Claim in any Class, the ratio of (i) the amount of such Allowed Claim to (ii) the aggregate amount of all Allowed Claims in such Class and (b) with respect to an Allowed Equity Interest in any Class, the ratio of (i) the shares or units of such Equity Interest to (ii) the aggregate number of shares or units of all Equity Interests in such Class.

**"Reinstate"** means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; and (iii) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the holder of such Claim.

**"Related Persons"** means, with respect to any Person, such Person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and each of their respective present and former members, partners, equity-holders, officers, directors, managers, employees, representatives, advisors (whether engaged prior to or subsequent to the Petition Date), attorneys (whether engaged prior to, on or subsequent to the Petition Date), agents and professionals, acting in such capacity at any time on or prior to the Effective Date, and any Person claiming by or through any of them; provided, however, that no Insurers shall constitute a Related Person.

**"Released Parties"** means (i) the Debtors, (ii) the Pre-Petition First Lien Agent, the Pre-Petition First Lien Secured Parties, the Pre-Petition Second Lien Agent, the Pre-Petition Second Lien Lenders, the DIP Agent, and the DIP Lenders, in each case, solely in their respective capacities as such, and (iii) the respective Related Persons of each of the foregoing persons and entities referenced in clauses (i)-(iii) above.

**"Registration Rights Agreement"** means the registration rights agreement, to be dated as of the Effective Date, in the form attached as Exhibit ~~12~~11 to the Plan.

**"Reorganized Summit"** means Summit from and after the Effective Date or a newly created corporation to which all of the assets or the equity of Summit shall be transferred on the Effective Date.

**"Reorganized Debtors"** means the Debtors from and after the Effective Date, or the newly created corporations to which all the assets or equity of the Debtors shall be transferred on the Effective Date.

**"Reorganized Affiliates"** means the Reorganized Debtors, other than Reorganized Summit.

**"Requisite Supporting First Lien Parties"** means "Requisite Supporting First Lien Parties" as defined in the Restructuring Support Agreement.

**"Requisite Supporting Second Lien Parties"** means "Requisite Supporting Second Lien Parties" as defined in the Restructuring Support Agreement.

US_ACTIVE-~~105458165.9~~105458165.12

**"Restructuring Support Agreement"** means the Restructuring Support Agreement, dated as of January 24, 2011, a copy of which is attached as Exhibit 6 to the Plan.

**"Revolving Commitment Amount"** means "Revolving Commitment Amount" as defined in the Exit Credit Agreement.

**"Revolving Lenders"** means "Revolving Lenders" as defined in the Exit Credit Agreement.

**"Schedules"** means the schedules of assets and liabilities, the list of holders of Equity Interests and the statement of financial affairs, as amended, to be filed by the Debtors, on the first day of the Debtors' Reorganization Cases or as soon thereafter as practicable under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements have been or may be supplemented or amended through the Confirmation Date.

**"Second Lien Plan Distributions"** shall have the meaning set forth in Section 4.8 of the Plan.

**"Secured Claim"** means any Claim secured by a Lien on Collateral, which is not void or voidable under the Bankruptcy Code or any other applicable law, to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under Section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

**"Secured Tax Claim"** means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under Section 507(a)(8) of the Bankruptcy Code.

**"Summit"** means Summit Business Media Holding Company, a Delaware corporation.

**"Summit-Intermediate"** means Summit Business Media Intermediate Holding Company, LLC, a Delaware limited liability company.

**"Term Loan"** shall have the meaning set forth in Section 3.4 of the Plan.

      C.    <u>Rules of Interpretation.</u>

In the event of an inconsistency, the provisions of the Plan shall control over the contents of the Disclosure Statement. In the event of any conflict between the terms and provisions of this Plan and the terms and provisions in the Exit Credit Documents, the NewCo Operating Agreement, or the OpCo Operating Agreement, the terms and provisions of the Exit Credit Documents, the NewCo Operating Agreement, or the OpCo Operating Agreement, as applicable, and in each case as and to the extent in effect on the Effective Date, shall control and govern. The provisions of the Confirmation Order shall control over the contents of the Plan and all Plan Documents.

For the purposes of the Disclosure Statement:

      (a)    any reference in the Disclosure Statement to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be in such form or on such terms and

US_ACTIVE-105458165.9105458165.12

conditions or in form or on terms and conditions satisfactory to the (i) the Debtors, (ii) the Requisite Supporting First Lien Parties, and, (iii) to the extent required by the Restructuring Support Agreement, the Requisite Supporting Second Lien Parties.

(b)     any reference in the Disclosure Statement to an existing document, exhibit or schedule filed or to be filed means such document, exhibit or schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)     unless otherwise specified, all references in the Disclosure Statement to "Sections," "Articles," "Exhibits" and "Schedules" are references to Sections, Articles, Exhibits and Schedules of or to the Disclosure Statement, as the same they be amended, waived, supplemented or modified from time to time;

(d)     the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Disclosure Statement in its entirety rather than to only a particular portion of the Disclosure Statement;

(e)     captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Disclosure Statement;

(f)     the rules of construction set forth in Bankruptcy Code Section 102 shall apply, except to the extent inconsistent with the provisions of this Article of the Disclosure Statement; and

(g)     the word "including" means "including without limitation."

Except with respect to claims required to be paid pursuant to Section 3.1, 10.2(c) or 10.2(g) of the Plan (which shall be paid when due), whenever a distribution of property is required to be made on a particular date, the distribution shall be made on such date or as soon as promptly as practicable thereafter.

All Exhibits to the Disclosure Statement are incorporated into the Disclosure Statement and shall be deemed to be included in the Disclosure Statement, regardless of when they are filed.

Subject to the provisions of any contract, certificate, bylaws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Pre-Petition First Lien Agent for the Pre-Petition First Lien Secured Lenders, the Pre-Petition Second Lien Agent for the Pre-Petition Second Lien Lenders, and certain other creditors and constituencies.  Each of the foregoing was represented by counsel who either (a) participated in the formulation and documentation of or (b) was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto.  Accordingly, unless explicitly indicated otherwise, the general rule

of contract construction known as "contra proferentem" shall not apply as between and/or among any of the foregoing enumerated parties in question to the construction or interpretation of any provision of this Plan, the Disclosure Statement, any of the Plan Documents, or any contract, instrument, release, indenture or other agreement or document generated in connection herewith.

## XXVII.      CONCLUSION

The Debtors believe that the Plan maximizes recoveries to all creditors and, thus, is in their best interests.  The Plan as structured, among other things, allows creditors to participate in distributions in excess of those that would be available if the Debtors were liquidated under chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to all creditors.

**THE DEBTORS THEREFORE URGE CREDITORS TO <u>ACCEPT</u> THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR PROPERLY COMPLETED BALLOT(S) SO THAT THEY WILL BE ACTUALLY RECEIVED, AS INSTRUCTED ABOVE, BY THE SOLICITATION AGENT PRIOR TO THE VOTING DEADLINE.**

March 28, 2011

/s/        Thomas Flynn
COO and CFO
Summit Business Medial Holding Company

US_ACTIVE 105458165.9105458165.12

Document comparison by Workshare Professional on Wednesday, March 23, 2011 5:12:27 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DIGITALFILE/US_ACTIVE/105458165/9 |
| Description | #105458165v9<US_ACTIVE> - Summit - DS |
| Document 2 ID | interwovenSite://DIGITALFILE/US_ACTIVE/105458165/12 |
| Description | #105458165v12<US_ACTIVE> - Summit - DS |
| Rendering set | ReedSmith Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |

| Inserted cell | |
|---|---|
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 198 |
| Deletions | 201 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 399 |